121kWcitC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  CITY OF PONTIAC GENERAL
   EMPLOYEES' RETIREMENT SYSTEM,
4  Individually, and on behalf of
   all others similarly
5  situated,,

6           Plaintiff,

7        v.             11 CV 5026 (JSR)

8  LOCKHEED MARTIN CORPORATION,
   ROBERT STEVENS, BRUCE TANNER,
9  and LINDA GOODEN,

10         Defendants.

11  ------------------------------x
                   New York, N.Y.
12                 January 20, 2012
                 9:35 a.m.
13

14  Before:

15           HON. JED S. RAKOFF,

16                     District Judge

17            APPEARANCES

18  ROBBINS GELLER RUDMAN & DOWD LLP
      Attorneys for Plaintiffs
19  BY:  SAMUEL H. RUDMAN
      EVAN J. KAUFMAN
20      MARK MILLKEY

21  DLA PIPER LLP
      Attorneys for Defendants
22  BY:  JAMES D. WAREHAM
      JOHN M. HILLEBRECHT
23      JOHN VUKELJ

24

25

121kWcitC

```
1              (Case called)
2              MR. RUDMAN:  Good morning, your Honor.  Samuel Rudman,
3    for the plaintiff, from Robbins Geller Rudman & Dowd.
4              MR. KAUFMAN:  Good morning, your Honor.  Evan
5    Kaufman,Robbins Geller Rudman & Dowd, for plaintiff as well.
6              MR. MILLKEY:  Mark Millkey, from the same firm,
7    representing the same plaintiff.
8              MR. WAREHAM:  Good morning, your Honor.  James D.
9    Wareham, from DLA Piper, in Washington, for all defendants.
10             MR. HILLEBRECHT:  Good morning, Judge.  John
11   Hillebrecht, DLA Piper New York, for all defendants.
12             MR. VUKELJ:  John Vukelj, DLA Piper, for the
13   defendants.
14             THE COURT:  Good morning.  Before we get into the
15   argument on the many interesting arguments on count one, let me
16   ask plaintiff's counsel with respect to counts two and three,
17   I'm unclear what your theory is under either 20(a) or 20(b).
18             MR. RUDMAN:  Your Honor, 20(a) is a simple control
19   person count, and that is that the statute says that any person
20   who controls another that commits a violation --
21             THE COURT:  I understand what the statute says.  What
22   are you saying the individual defendants controlled?
23             MR. RUDMAN:  The company.  That they're control
24   persons of the company.  That they fit within the definition of
25   control.
```

121kWcitC

1              THE COURT:  What's your theory on count three?

2              MR. RUDMAN:  Count three, I would admit, your Honor,

3    is a unique different statute that has never been used before.

4    It really derives out of the decision in the Janus case, which

5    was actually first mentioned, I think, in the Fourth Circuit

6    opinion that was then appealed to the Supreme Court, and the

7    theory is that it's unlawful for another person to basically

8    cause another to commit a securities law violation.

9              THE COURT:  Who?

10             MR. RUDMAN:  Here, the argument is that defendant

11   Gooden knowingly took false information and passed it up the

12   chain at Lockheed and then Lockheed then made false statements.

13   That's the 20(b).

14             THE COURT:  Who controlled?

15             MR. RUDMAN:  No, that defendant Gooden utilized

16   Lockheed to commit securities law violations.

17             THE COURT:  I would say your chances of surviving on

18   count three, I'm making no determinations today, are remote, to

19   say the least.

20             MR. RUDMAN:  I understand.  I understand that, Judge.

21             THE COURT:  All right.  Now let's turn to the other

22   issues, starting with defense counsel as the movant in the

23   case.

24             MR. HILLEBRECHT:  Thank you, your Honor.

25             May it please the Court, our motion, your Honor, rests

121kWcitC

1  on two fundamental points.  The first kind of overarching point

2  is that the scheme alleged is utterly illogical.  There's no

3  logical motive alleged whatever in the complaint and the facts

4  as alleged make no sense.  The claim is inherently implausible.

5        THE COURT:  Explain that to me.  I thought the gist of

6  this is that they overstated the backlog, they overstated some

7  of the performance, and that's because they were pushing the

8  fact that this new, relatively new unit in the company was the

9  greatest thing since sliced bread.

10        What's illogical about that?

11        MR. HILLEBRECHT:  It's illogical in part because of

12  the time frame and in part because of the silence of the

13  complaint, in what it does not allege.  The time frame makes no

14  sense because if you take the allegations at face value, you

15  have allegedly false statements and then within two months

16  after the last statement alleged, you have a candid admission

17  from supposedly the same individuals who were involved in

18  making the false statements that we didn't make those

19  projections and a cleansing statement that comes out saying the

20  purportedly true information now correcting the earlier

21  information, in the middle of the fiscal year, after a very

22  short period of time, basically a couple of weeks.  So you're

23  left with the question what would have been the purpose of

24  having made those misstatements and then very soon thereafter

25  basically erasing those misstatements.

121kWcitC

1          THE COURT:  So, are you talking about plausibility, or

2     are you talking about scienter?

3          MR. HILLEBRECHT:  Both, because the plausibility goes

4     to scienter.

5          THE COURT:  The point you're making now is that it's

6     implausible, in your view, that they would knowingly and

7     intentionally have made the false statements if they were going

8     to correct them two weeks later.

9          MR. HILLEBRECHT:  It goes even further than that,

10    Judge.  It goes to scienter in two separate ways.  It's

11    implausible not only because of the short time frame I've

12    alluded to but also because of the complete dearth of any

13    allegation of any motive.  Why would anybody have done this?

14    There is no allegation of suspicious stock sales.  There is no

15    allegation of stock sales at all.  There is no allegation of

16    any sort of concrete personal benefit to Ms. Gooden, Mr.

17    Tanner, or Mr. Stevens.  That obviously goes to the opportunity

18    and motive prong.

19         THE COURT:  All of this rests on what you take to be

20    the correction made on such short time frame because otherwise

21    the motive would be perfectly plausible, yes?  Just to jack up

22    the price of the company's stock?

23         MR. HILLEBRECHT:  That would be a motive, I'd say

24    small M, in a way, that might make some sense, but the cases

25    teach that to be motive in the way that counts for proving

121kWcitC

1    scienter on the opportunity and motive theory, it has to be a

2    different kind of motive than simply to do as your Honor

3    suggests.  It has to be a concrete personal motive specific to

4    the individual.  The classic example, of course, is, taking

5    your Honor's hypothetical, intentionally pumping up the price

6    of the stock so that I, the individual who did that, can sell

7    some of my own stock at an inflated profit.  There is no such

8    allegation here.  There is nothing close to that alleged here.

9         The second way in which it goes to scienter is the

10    case we cite to your Honor, Espeed and others, make it clear

11    that that kind of analysis, whether it makes plausible sense,

12    whether it's economically sensible to have operated in this

13    way, also goes to a recklessness analysis.  Here, of course,

14    when we're talking about recklessness, we're not talking about

15    just a heightened form of recklessness, or anything like that.

16    We're talking about what the cases call conscious recklessness,

17    a type of recklessness so egregious that it is tantamount to

18    intent.  There as well you can afford some weight to the

19    argument that the scheme alleged is implausible because it's in

20    no one's financial interest directly and it just doesn't make

21    sense given the time frame.

22         The second fundamental point that we stress is that

23    there is no adequate allegation that anybody whose named as an

24    individual defendant, that anybody who made any of the

25    statements at issue did so with scienter.  And I want to start

121kWcitC

with that and focus on Mr. Tanner and Mr. Stevens, who are the
individuals alleged to have actually made some of the
statements at issue.

Plaintiff has not identified in their complaint a
single document, a single e-mail, a single face-to-face
conversation, a single anything in which either Mr. Tanner or
Mr. Stevens received information that contradicted any of the
statements that are set forth in the complaint.  Not a single
one.  And we submit that that is fatal to their claim, that the
law is clear that they need to have some specificity and
particularity about how it is that these individuals received
the contradictory information.  If you look at the complaint,
it's just not there.  If you look at their opposition brief, on
page 17 of that brief, they give what they call two good
reasons to impute scienter or attribute scienter to Mr. Stevens
and Mr. Tanner, and I'd like to, Judge, just quickly go through
those two reasons they set forth.

The first is that, Tanner and Stevens "received
information about IS and GS directly" from Ms. Gooden and from
her financial manager.  And the second good reason that they
state for scienter for those individuals is the claim, first of
all, the first one I just mentioned comes from a single
anonymous witness.  The second one also comes from a single
anonymous witness, without any supporting detail, and the
second one is that "Gooden reported the status --"

121kWcitC

1        THE COURT:  Let me ask you this.

2        MR. HILLEBRECHT:  Yes, sir.

3        THE COURT:  How do you deal with this seemingly

4   similar situation about which Judge Posner wrote in the case of

5   Makor Issues?

6        MR. HILLEBRECHT:  I think we deal with it this way,

7   Judge, and we deal with it in the way that the Second Circuit

8   dealt with it in Dynex, citing Judge Posner's decision, which

9   is that to make a sufficient allegation, you have to allege

10  with particularity how the individual received the

11  contradictory information and what that information was.  Both

12  Judge Posner's decision and the Second Circuit's decision, in

13  Dynex, recognized the possibility that there could be extreme

14  situations where something less than that might be appropriate,

15  and the example given in both of the cases adopted in Dynex

16  from the Second Circuit decision is what I call for shorthand

17  the million SUV example, where someone at General Motors makes

18  an announcement that we have sold one million SUVs, generating,

19  I don't know what that would be, a lot of money in revenue,

20  when, in fact, they haven't sold any SUVs, zero.

21        In that kind of very extreme circumstance, there is a

22  recognition, and I submit to you more or less it's a

23  theoretical recognition, certainly in Dynex, that there might

24  be a case, there might be a case where you could set forth an

25  allegation that would suffice in those extreme circumstances.

121kWcitC

1          In Dynex, they go on to analyze the allegations in

2     that case, and basically conclude they're not close.  On remand

3     in front of Judge Baer, it turns out there's an amended

4     complaint where they do have particular and specific

5     allegations against particular individuals who actually made

6     the statement.  So this is the way the case played out in

7     reality, and as to the more general proposition, I think that

8     Dynex makes clear that the general rule, the case says so, the

9     general rule is there must be allegations with sufficient

10    specificity so that you can identify what particular

11    information was actually given to the individual who made the

12    statement that contradicted that statement.

13          THE COURT:  So what about Ms. Gooden?

14          MR. HILLEBRECHT:  Ms. Gooden is, I submit, Judge,

15    really where they hang their hat because the allegations as to

16    Tanner and Stevens don't even come close.  There's no

17    allegation about any CW having any direct dealings with

18    Mr. Tanner and Mr. Stevens.  There's no direct allegation of

19    anybody directly saying to Mr. Tanner or Mr. Stevens any of the

20    facts that would have led them to the conclusion that their

21    statements were inaccurate.

22          As to Ms. Gooden, there's more flavor, but there's no

23    more substance.  They do have allegations about some of her

24    subordinates, the CW's referring to in the complaint, who did

25    have face-to-face meetings with her, and there are allegations

1    about what some of those witnesses believed to be the case and

2    some of those witnesses said about certain things.  But if you

3    look closely and you read carefully, as I'm sure your Honor's

4    done, what's actually alleged about the CWs and their

5    interaction with Ms. Gooden, there's a lot less there than

6    initially might appear.  And a close look at the paragraphs

7    dealing with the various allegations makes clear that the

8    allegations, even as to what Ms. Gooden allegedly is told by

9    these confidential witnesses, is plainly not sufficient.  And I

10   can take you through any paragraph you want, but I wanted to

11   start --

12            THE COURT:  Let me grab the complaint.  Hold on.

13            MR. HILLEBRECHT:  Sure.

14            THE COURT:  Go ahead.

15            MR. HILLEBRECHT:  I'll start more or less in order

16   with paragraphs 34 through 36, Judge.

17            THE COURT:  Yes.

18            MR. HILLEBRECHT:  Entitled "defendants knowingly

19   overstated the financial projections," and it goes on from

20   there.  The key allegations.

21            THE COURT:  I'm sorry.  Which paragraph?

22            MR. HILLEBRECHT:  Paragraphs 34 through 36 of the

23   complaint on page nine.

24            THE COURT:  Go ahead.

25            MR. HILLEBRECHT:  Again, this allegation, the

121kWcitC

1  heading --

2          THE COURT:  I'm sorry.  You were reading from the

3  heading.

4          MR. HILLEBRECHT:  I apologize, Judge.

5          THE COURT:  Go ahead.

6          MR. HILLEBRECHT:  The heading really goes to the crux

7  of the allegations in the complaint, really.

8          Paragraph 34, I think your Honor will agree, there are

9  no specifics at all.  It is a kind of conclusory and

10 introductory paragraph.

11         THE COURT:  Yes.

12         MR. HILLEBRECHT:  If we turn to paragraph 35, you have

13 the first two sentences that set forth CW5's opinion that the

14 process for setting the IS and GS projections was arbitrary,

15 but specifically there's nothing there that alleges that he

16 shared that opinion that this was arbitrary and was the right

17 way to set the projections with anybody.  Certainly there is no

18 allegation that he shared that opinion with any of the

19 individual defendants.

20         Paragraph 35 also has a reference to CW2, who is

21 alleged to be a fairly low-level manager, again opining that it

22 was clear presumably to him or her that financial goals for IS

23 and GS for 2009 could not be achieved.

24         THE COURT:  Of course, this is all with reference to

25 so-called forward-looking statements.

121kWcitC

```
 1            MR. HILLEBRECHT:  Absolutely, your Honor, which is as

 2    regarding pretty much certainly the overwhelming majority,

 3    almost the entirety, of what's alleged, properly read.

 4            THE COURT:  That's why I started my little discussion

 5    a few minutes ago.  The heart of this case, if it survives,

 6    seems to me to rest on the allegations about past performance

 7    and backlog, both of which are not future statements.  And so

 8    the question is whether those statements were false and whether

 9    the scienter and all the other things we're talking about, and

10    while certainly I want to hear anything plaintiff's counsel

11    wants to say about these forward-looking statements, I'm more

12    interested in the statements about past performance or present

13    backlog.

14            MR. HILLEBRECHT:  Sure, and I'll get to those very

15    quickly, your Honor, and I'll skip my kind of detailed review

16    of these paragraphs, other than to say, if you look at them,

17    they're all akin to the one we just talked about.  It tells you

18    more or less what's in the various CWs' minds.  There is no

19    particularity of detail about how that CW reached that opinion.

20            For example, to the extent someone would have an

21    opinion that the projections were overly aggressive, there's no

22    explanation as to what the basis for that opinion was.  There's

23    no explanation for how much that individual's opinion diverged

24    from the opinion of Ms. Gooden or anyone else, and many of the

25    allegations make no reference whatever to any of the defendants
```

1   by name and make no reference to any direct contact between the

2   CW and any of the defendants, and if there's any particular

3   allegation that troubles your Honor on those kind of

4   forward-looking things, we can talk about them.

5          The key thing on the projections, one last point on

6   that, your Honor, is even the allegations on their face, which

7   we have to accept as true for present purposes, are inherently

8   equivocal.  Paragraph 36 is one, where the last sentence says:

9   "There was a great deal of discussion during the months leading

10  up to July 2009 that IS and GS may underperform relative to its

11  projections."  And I emphasized the word "may" and suggest to

12  you, at best or at worst, depending on one's perspective, what

13  the complaint depicts here is a disagreement, differing

14  opinions between Ms. Gooden and her subordinates, not at the

15  corporate level, but down at the IS and GS business sector

16  level, about how to use the word "aggressive" to be in

17  projections and disputes of that kind simply aren't enough, as

18  we argue many cases show, the PXRE Group case which we cite

19  from Judge Sullivan, and others.

20         THE COURT:  In any event, that sentence by itself, of

21  course, it has to be read in the context of what preceded it,

22  but it's more or less meaningless:  "There was a great deal of

23  discussion."  By whom?  Among whom?  What was the nature of the

24  discussion?  Who said what?  This is coming from a confidential

25  witness.  If the confidential witness has meaningful

121kWcitC

 1   information, they could have put a lot more specifics into that

 2   sentence.

 3        Now, in fairness though that's the last sentence of

 4   the paragraph that does have more specifics than I've just

 5   indicated.

 6        MR. HILLEBRECHT:  And we don't dispute that, your

 7   Honor, but we do agree that context is all here and that that

 8   sentence certainly gives flavor to the preceding sentences, and

 9   even taken on a stand-alone sentence, those sentences fall far

10   short, it seems to us.  Among other things, there's no

11   allegation even that when they're talking about how a certain

12   CW had a certain view about the projections that we're even

13   talking about corporate-level projections as opposed to the

14   IS's and GS's initial projections.  And some of the paragraphs

15   make it pretty clear we are talking about IS and GS internal

16   discussions.  But I'll pass on that and get to the things your

17   Honor indicated you were most interested in, past performance,

18   performance problems, and particularly the backlog issue.

19        A lot of that discussion about past performance and

20   whether certain projects were troubled talks about the red

21   status of various programs, and I think that it certainly is

22   the case that plaintiffs make a lot of those allegations that

23   certain of the IS and GS projects were allegedly in so-called

24   red status.  But, again, if you look closely at what's actually

25   alleged to come out of the mouth of any of these CWs as opposed

121kWcitC

1    to some of the conclusory sentences in the complaint and some

2    of the argument in the opposition memo, I think your Honor will

3    find that the complaint is artfully and to some extent somewhat

4    deceptive in drafting.  I'd like to take you through some of

5    those.

6            It's certainly true that there's a lot of talk about

7    this.  The CWs talk about a lot of programs in their view, in

8    their understanding being the red programs, being troubled in

9    some way, but there's nowhere -- nowhere, Judge -- a specific

10   allegation that the red status of any given project was

11   conveyed to anyone at the corporate level, like Mr. Tanner or

12   Mr. Stevens, was ever told, Hey, this project here,

13   Mr. Stevens, we're in red status on this program, we got a lot

14   of projects in trouble.  There's nothing like that.

15           The closest we have is CW1 in paragraph 44, your

16   Honor.

17           THE COURT:  I'm there.

18           MR. HILLEBRECHT:  CW1 supposedly states, somewhat

19   vaguely, I would say, that Ms. Gooden "reported the status of

20   IS and GS projects to Lockheed Martin's other senior

21   executives."  I'll adopt some of the questions your Honor asked

22   a few minutes ago:  What executives?  What information?  What

23   status?  What projects?  There's no detail at all.  There's no

24   mention of Mr. Tanner.  There's no mention of Mr. Stevens.

25   There's no mention of reporting any project as red at any time

121kWcitC

```
1   whatever.  It says simply that Ms. Gooden, an executive in the
2   IS and GS business sector, reported on the status of projects
3   to somebody.
4            THE COURT:  Except that if you go back to paragraph
5   36, the next-to-last sentence, "According to CW2, defendants
6   Stevens and Tanner received information about IS and GS
7   directly from defendant Gooden and Gooden's finance manager,
8   Jeff MacLauchlan."  So that gives a little bit of color to the
9   sentence that you're now talking about.
10           MR. HILLEBRECHT:  I'd say, if anything, Judge, it's
11  kind of beige.  All that says is they gave information to them.
12  The cases speak quite clearly, the allegations that certain
13  executives received information or that there was a channel of
14  communication, or even, Judge, the case we cite, allegations in
15  the complaint that say, the CEO received "detailed reports"
16  about X, whatever the problem status is, doesn't suffice
17  without -- what are the details?  What did you tell him?  These
18  allegations that they were told about the status of projects
19  are woefully insufficient, and then the allegation particularly
20  about the red programs that other senior executives received
21  information about the status without even saying it had
22  anything to do with red programs, you would be forced to find
23  inference upon inference, kind of gleaning from context what
24  other people thought, other CWs thought, to read an inference,
25  a conclusion that Ms. Gooden must have --
```

121kWcitC

                THE COURT:  This is on a side issue, it seems to me.
Is Ms. Gooden, hypothetically, knowingly and intentionally
conveyed false information to Mr. Stevens and Mr. Tanner who
then made public statements of that false information, that may
not suffice for liability of Mr. Stevens and Mr. Tanner, but
why wouldn't it suffice as liability for Lockheed?

                MR. HILLEBRECHT:  For the reason we lay out under the
section that talks about collective scienter theory and various
other things.

                The rule, Judge, for long has been not merely in the
securities law context, but also in the securities law context,
has been that for a certain intent to be imputed to a corporate
entity, you must have both that intent to scienter and the act
at issue residing in the same agent.  And we cited cases on
that.  It's black letter law, just general corporate law, if
you look at A.M. George II, if you look at the Encyclopedia of
Corporations.

                THE COURT:  I don't know that the Encyclopedia of
Corporations is the strongest authority.

                MR. HILLEBRECHT:  How about we'll go with the Fifth
Circuit and other circuit cases that we've cited?  How about we
go with Judge Sweet from Kinsey v. Cendant?

                THE COURT:  That's certainly more in the ballpark.

                MR. HILLEBRECHT:  I'm warming up, Judge.

                Let me just read.  This is a quote citing to another

121kWcitC

case.  I'll just read you a portion of the quote we cite in our
papers, your Honor:  "A defendant corporation is deemed to have
the requisite scienter for fraud only if the individual
corporate officer making the statement has the requisite level
of scienter, i.e., knows that the statement is false," and it
goes on from there.

          Obviously we don't rely entirely on Judge Sweet,
Judge.  We rely in large part on the other circuit cases we
cite, but Dynex is from the Second Circuit, which I think
plaintiffs in their papers kind of read part of it.  If you
read that decision and if you read the earlier Second Circuit
decision from Fluor that's cited and discussed in Dynex, there
seems to be no question that the Second Circuit is of the view
that that's the correct law of liability.  And Dynex, when
talking about what's required at the pleading stage, makes
quite clear, they say three different times, there must be
someone, someone, an agent of the corporation that has both
scienter and does the act at issue, in this case, making the
misstatement.  So we think that the law is pretty clear on
that.

          It is not, frankly, an issue that comes up often.  It
is much more generally the case that there are allegations in
cases like this that the person, as there are here, though we
say insufficiently, that the person responsible for making the
statement actually did so knowingly and with scienter.

121kWcitC

1          So there aren't a lot of cases, I concede that, Judge.

2     But we've got Second Circuit cases, a Fifth Circuit case, we've

3     Judge Sweet and other cases we cite as well in our papers about

4     that general proposition.  So when I look at Dynex, and it

5     says, to quote Dynex as opposed to Judge Sweet, to impute

6     scienter in this kind of case, PSLRA case, strong inference of

7     scienter.

8          THE COURT:  You're assuming, of course, that I should

9     pay more attention to the Second Circuit than to my extremely

10    distinguished and brilliant colleague Judge Sweet that I would

11    draw the opposite inference.

12         MR. HILLEBRECHT:  On the public record, I make no

13    response.

14         I think Dynex is instructive.  I would belabor the

15    point, just to finish.  Dynex, you need that strong inference,

16    for the corporate entity, you need "someone whose intent could

17    be imputed to the corporation who acted with scienter."  They

18    go on a page later to say, "someone whose scienter is imputable

19    to the corporate defendants and who was responsible for the

20    statement made."  Obviously, that's a pre-Janus case.  I think

21    Janus has changed the landscape a bit as to that last prong,

22    who was responsible for the statement made; the analysis there

23    is slightly different.  But I think the general point that you

24    must have an intersection of scienter and act, bracket, in this

25    kind of case the act being the statement, closed bracket,

121kWcitC

residing in one agent or employee of the corporation is, as I

say, consistent with the common law and consistent with the

language of Dynex, Judge Sweet's holding, the Fifth Circuit

case of Southland, and other cases we cited.

        What they're trying to do, it seems like what they're

trying to suggest, is take what we say is insufficient, but

let's accept it for the moment, take allegations of scienter as

to Ms. Gooden, on the one hand, and take the actions of

Mr. Tanner and Mr. Stevens, on the other hand, and put them

together in one place to impute scienter to the corporation,

and they can't do that.

        THE COURT:  I'm just trying to think that through not

in terms of this case so much, just as a general proposition.

        In any large company, you can't expect the top

officers to have detailed personal knowledge of every aspect of

the company, so they will, as a matter of practice, rely on

certain key subordinates to give them the accurate information.

So let us assume, hypothetically, that a corporation acts and

the practice is that when the CEO makes a statement about

subsidiary-wise performance, he is really acting in effect as

the mouth piece or the agent of the chief financial officer of

the subsidiary in my hypothetical, and the chief financial

officer of the subsidiary in my hypothetical knowingly and

intentionally says to the CEO, We're doing fantastic, we've got

orders like we've never had before, we've got incredible

121kWcitC

prospects, etc., etc., etc., all of which, in my hypothetical,

are blatantly false, and I'll take your example of scienter,

and in my hypothetical this is being done because the

individual chief financial officer's subsidary thinks that

he's about to lose his job if he doesn't show that his

subsidiary is performing terrifically.

So now you have the investor being given, in my

hypothetical, blatantly false material and information that

comes from a totally unsuspecting CEO because the practice of

this company is he just, in my hypothetical, is a mouth piece

for the information provided, he can't keep track of

everything.  In my hypothetical, he's got 50 subsidiaries.  So

this is a long way from this case.  I'm doing this just because

I want to understand what your theory is.

You're saying there's no liability?

MR. HILLEBRECHT:  I'm not saying quite that there's no

liability.  I'm saying that under the logic of Janus, there's

no private right of action against the corporation.  The SEC

may have the ability to go after the corporation on the theory

of aiding and abetting or otherwise, but what the Supreme Court

has made clear is that the --

THE COURT:  I'll make it even tougher.  Instead of the

CEO making the statement, it is an incredibly low-level

employee who says, Pardon me, I'm an automaton and I'm just

reporting what I've been told, but here's what I've been told.

121kWcitC

1          MR. HILLEBRECHT:  Then you come up against some of the

2     language, which seems to be independent, of course, on all the

3     facts and circumstances, you might come up against some of the

4     language in Janus which talks about how in certain instances

5     there might be circumstances that suggest that that statement

6     is implicitly attributable to someone else as well as the

7     speaker, such that the head of the subsidiary --

8          THE COURT:  I'm not sure, at least the case law in

9     this district so far, takes quite as strong a view of Janus as

10    you're suggesting.  That's what I'm really getting at.  But,

11    anyway...

12         MR. HILLEBRECHT:  And I take your Honor's point.  And

13    it is far away from the case we have here, I suggest.  And I

14    think that Janus is obviously relatively new, pretty new, and

15    raises some interesting questions that are going to have to

16    play themselves out.  But the one question that I submit to you

17    is played out and is clear from Dynex and the other cases is

18    the general proposition.  Pre-Janus, your Honor's hypothetical,

19    very likely could be liability in some circumstances.  I think

20    post-Janus is a much different and much more difficult

21    question.

22         THE COURT:  You're saying, in effect, also that on the

23    facts of this case, even pre-Janus, you would say there's no

24    liability.

25         MR. HILLEBRECHT:  Absolutely, for any number of

121kWcitC

1    reasons, Judge, which, some we can talk about and others we can

2    talk about more.

3            One last point on Dynex, going back to a question your

4    Honor asked a few minutes ago and my million SUVs, talking

5    about what this case is not, this case is not remotely like

6    that hypothetical.  There's nothing so extreme at all.  I

7    think, fairly read, plaintiff's argument making that argument,

8    they're focusing in their opposition brief on the scienter of

9    Ms. Gooden and arguing in footnote 13 that her scienter should

10   be imputed to the corporation here.

11           THE COURT:  I find your hypothetical very hard to

12   accept because, since I live in the suburbs, everyone owns an

13   SUV.

14           MR. HILLEBRECHT:  Understood.

15           The last point I want to make about that, Judge, even

16   that hypothetical, in Dynex, assumes that the statement was

17   made by official or officials who "know that the announcement

18   was false" because of the extremity of the situation.  So even

19   there it presupposes at some point there will be a finding that

20   one actor made the statement with scienter, which we don't have

21   here.

22           Your Honor also mentioned the backlog, which is, I

23   think, of a piece on the allegations of past performance.  The

24   backlog information, in particular, is an interesting one for a

25   couple of reasons, the first being that there is no specific

121kWcitC

1    allegation that the backlog number at issue, that one CW talks

2    about, is a number that ends up as a number that actually gets

3    its way up the chain and publicly reported.  In connection with

4    the statement that they focus on that is allegedly relating to

5    backlog, it's the same, I believe, as set out in paragraph 71.

6    Let me just make sure I'm not misciting, Judge.

7         Paragraph 71 talks about a conference call with

8    Mr. Tanner in which he talks about IS's and GS's solid backlog,

9    but he doesn't go into any great detail.  He doesn't go into

10   any real metrics about it.  He says they have a solid backlog.

11        As to allegations that Ms. Gooden, supervisor of the

12   CW at issue, changed the backlog, there's no allegation of any

13   facts, certainly no citation of any statements or documents

14   that support the kind of inference that they want you to draw,

15   and I submit it can't be a strong inference.  The inference

16   they want you to draw is that she knowingly and intentionally

17   took a number that she thought to be accurate and real and

18   boosted it, bogus.  The allegation doesn't really say that.

19   What it says is that she and others changed the number.  It

20   does say the CW disagreed and made its disagreement known.  It

21   clearly says that, and I submit that's all it says.  It says a

22   subordinate disagreed with its supervisor and unknown others in

23   the company to find it prudent to change the number.  That

24   happens every day in corporate America, and unless something

25   more than what's here, can't necessarily support a strong

121kWcitC

1    inference that that was done with an improper intent.  It

2    certainly can't be used to impute any improper intent to

3    Mr. Tanner, Mr. Stevens, or anybody else, who go completely

4    unmentioned in those allegations, which allegations, I repeat,

5    don't even make it clear that that number ends up in any

6    meaningful way in any of the statements that are alleged to

7    have been made.

8            THE COURT:  I know you have a lot of other things you

9    want to cover, but I think at this point we need to hear from

10   plaintiff's counsel and then we'll come back to you.

11           MR. HILLEBRECHT:  Sure.

12           MR. RUDMAN:  Good morning, your Honor.  Sam Rudman,

13   for the City of Pontiac.

14           I think the logical place for me to start is, since we

15   just went through an extensive discussion with Dynex, would be

16   to start with the Dynex hypothetical, while it's fresh in the

17   Court's mind.

18           First, as I understand the defendants' position on

19   Dynex, in order to get a properly alleged corporate scienter,

20   you have to have a corporate defendant who makes a statement

21   and has scienter.  That, to me, would seem to make the concept

22   of corporate scienter meaningless.  In fact, when you read the

23   Dynex opinion, the Second Circuit says, "although there are

24   circumstances in which a plaintiff may plead the requisite

25   scienter against a corporate defendant without successfully

121kWcitC

1    pleading scienter against a specifically named individual

2    defendant, the plaintiff here has failed to do so," and when

3    you read Dynex, the test is, Was there information known by

4    people at the company that rendered, that the people at the

5    company who had either motive or opportunity or acted with

6    conscious disregard such that that information could be imputed

7    to the corporation and statements made on the corporation's

8    behalf could be found to be actionable under 10b or 10b-5?

9           THE COURT:  I'm not sure I follow you totally.

10          MR. RUDMAN:  I'm basically picking up --

11          THE COURT:  This has, I think, been the law of the

12   United States for over a hundred years.  There has to be a

13   human being who both made the false statement or caused it to

14   be made and who had the requisite scienter at the time he or

15   she took that act before you can impute liability to the

16   corporation.  You're not disagreeing with that?

17          MR. RUDMAN:  No, I'm not.

18          THE COURT:  I just wanted to make sure.

19          MR. RUDMAN:  I'm not, Judge.  What I'm disagreeing

20   with is that that person has to be the same person who made the

21   statement, which is what I understood the defendants' argument

22   to be.

23          THE COURT:  You think that --

24          MR. RUDMAN:  I want to pick up on your hypothetical.

25          THE COURT:  I understand.  But I just want to make

121kWcitC

1    sure I understand where you're going.  You're saying Mr. X can

2    have tons of scienter, but if he or she neither made nor caused

3    to be made the statement, the fact that someone else innocently

4    made the statement is enough to make --

5            MR. RUDMAN:  No.

6            THE COURT:  That can't be right.

7            MR. RUDMAN:  I'm not saying that at all.

8            THE COURT:  I'm still having trouble following you.

9            MR. RUDMAN:  I'm not saying that.  Maybe it's because

10   I'm not explaining myself clearly.

11           THE COURT:  Okay.

12           MR. RUDMAN:  As I understood the defendants' argument,

13   the person had to be the same person.

14           THE COURT:  Right.

15           MR. RUDMAN:  And they disagreed with your explanation

16   of the allegations in this complaint where you said let's

17   suppose Ms. Gooden acted with scienter and knowingly passed up

18   false information, why isn't that good enough, and the answer

19   was she didn't make any statements, okay, because under Dynex,

20   the answer as I understood it, it was a long answer, but what

21   eventually came out was it's not good enough, under Dynex, she

22   needed to make statements, she didn't make any statements, so,

23   therefore, you can't have corporate scienter.  And my response

24   to that is under your hypothetical, it was good enough.  She

25   acted with scienter and was responsible for the making of the

121kWcitC

1    false statements by passing along the false information to

2    defendants Tanner and Stevens, and then they then repeated

3    those statements to the public.  I don't think anything in

4    Dynex says that you need to have the person who had scienter

5    and whose scienter is being imputed to the cooperation be the

6    one that makes the statement.

7              THE COURT:  What about Janus?

8              MR. RUDMAN:  Janus deals with aider and abettor

9    situation, your Honor.  It's a continuation of three cases of

10   the Supreme Court, Central Bank, Stone Ridge, and Janus, which

11   deal with when someone who isn't the issuer makes a statement,

12   can other people other than the issuer be responsible for the

13   making of the statement.  And I really view those issues as

14   attribution.  In other words, how did the market interpret who

15   was making the statement or who is making the statement?

16             In this case, we don't have any Janus issues because

17   the statements are all being made by Lockheed.  They're either

18   being made by employees of Lockheed, whose statements can be

19   imputed to the corporation, or they're being made by Lockheed,

20   and Lockheed is being controlled, the ultimate maker of the

21   false statements.  So in the corporate issuer context, I don't

22   see how you even get to Janus.  Janus was a situation where the

23   situation was made by one entity and they were trying to sue a

24   separate, distinct legal entity, and the question was in that

25   circumstance did that separate, distinct legal entity make the

121kWcitC

1    statement.

2         The references in the opinion of Stone Ridge relate

3    directly, I think, your Honor, I would respectfully submit, to

4    attribution, how did the market view that statement.  When that

5    statement's put out into the market, what prudent investors

6    understand in making the statement.  In Janus, it was to mutual

7    funds making the statement, and because there was no way the

8    market could ever know that someone else was making the

9    statement, that was the maker of the statement.

10        In Stone Ridge, false financial figures were put out,

11   but no one ever knew about the improper dealings between

12   Motorola and the cable company, so, therefore, you couldn't

13   attribute the statements.  The Refco case, which your Honor

14   took from Judge Lynch when he went up to the Second Circuit,

15   same exact situation with the lawyer in Refco.  Even though he

16   drafted the actual statements, because the Second Circuit

17   found, because the market didn't know he was the maker of the

18   statement, it wasn't attributed to him, he couldn't be held

19   responsible.  And here, we don't have that issue.

20        We have one entity, Lockheed.  The statements are

21   being made, all the statements are made by Lockheed.  There

22   were statements made by Mr. Tanner, Mr. Stevens, but they're

23   all Lockheed statements.  They have ultimate control, ultimate

24   authority over the making of those statements, and we

25   respectfully submit there's no Janus issue in the case.  Janus

121kWcitC

1    deals with a different situation.

2         THE COURT:  I understand what you're saying about

3    Janus.  Let's go back to Dynex.  Again, I want to be absolutely

4    sure I understand your theory.  Is it your theory that if

5    Ms. -- I keep forgetting her name because I notice in your

6    caption you didn't list her as a defendant.

7         MR. RUDMAN:  Gooden.  Your Honor, we kept the caption

8    the same as the caption that was initially filed with the case

9    or the clerk will bounce.

10        THE COURT:  You didn't name her as a defendant.

11        MR. RUDMAN:  In the opening complaint.  She was named

12   in the amended complaint, and I can't change the caption.

13        THE COURT:  Actually, you can, if you --

14        MR. RUDMAN:  Seek permission from your Honor?

15        THE COURT:  Exactly.  But I think it's somewhat

16   telling that you didn't name her as a defendant originally.

17   But it's neither here or there to my question.

18        If Ms. Gooden intentionally makes a false statement,

19   an actionable false statement, to Mr. Stevens and Mr. Tanner,

20   who, in my hypothetical, contrary to the allegations in the

21   complaint, unknowingly and not recklessly then make it public,

22   you're saying that's still sufficient to make Lockheed liable

23   because you have the individual who, in my hypothetical,

24   Ms. Gooden, had both scienter and who, in effect, caused the

25   statement to be made, or was part of the group process that led

121kWcitC

1    to the statement being generated?

2            MR. RUDMAN:  Correct.

3            THE COURT:  Okay.

4            MR. RUDMAN:  That's our theory on Ms. Gooden, yes.

5    I'm not conceding that we haven't sufficiently alleged scienter

6    as to Mr. Tanner and Mr. Stevens.

7            THE COURT:  I know.  That's what I want to ask.  But I

8    understand your theory.

9            MR. RUDMAN:  Under your hypothetical --

10           THE COURT:  Now changing from the hypothetical to your

11   actual allegations.

12           MR. RUDMAN:  Right.

13           THE COURT:  What reason is there to believe that

14   Tanner or Stevens had the --

15           MR. RUDMAN:  Two things, your Honor.

16           The first is there are allegations about the chain of

17   information, how information flowed from the IS/GS division to

18   these individuals through defendant Gooden and Tanner and

19   Stevens, and we would argue that supports a reasonable

20   inference, plausible inference that things were going on at IS

21   and GS and they were reported up the chain.  More importantly,

22   we're not talking about something defendants never spoke about.

23           THE COURT:  Wait, wait.  Let me just go back.  So even

24   as your adversary's pointing out, many of your allegations

25   suggest that there was some controversy in the division that

121kWcitC

1    eventually Ms. Gooden asserted her authority and, in effect,

2    said this is what we're going to say.  Now, if you're in the

3    position of Stevens and Tanner, why shouldn't you rely on what

4    she tells you?

5            MR. RUDMAN:  Maybe you should.

6            THE COURT:  If you hear there was some controversy

7    down there and some lesser subordinates had a different view,

8    but after hearing this all out, she decided that this is the

9    right answer, why should Stevens and Tanner then be on notice

10   that there's anything wrong?

11           MR. RUDMAN:  My first response to that would be if

12   that's how your Honor goes, we're back to the person A we're

13   spoke about knowingly passing on false information and all the

14   statements you find actionable are alive anyway because she had

15   scienter.

16           THE COURT:  No, no.  Now I'm talking about their

17   liability.

18           MR. RUDMAN:  Even putting that aside, here's why,

19   Judge.  It's the core.  It's what's been referred to as the

20   core operations inferences here.  This was not a division of

21   the company that the defendants Tanner and Stevens weren't

22   keenly aware of.  If you look at the complaint, it alleges, and

23   I think defendants would agree, that this division was a

24   substantial, significant division of the company and it was one

25   that was actually showing significant growth, and it was

121kWcitC

1    important to the company, important enough that, as you can see

2    from the conference call transcripts and the investor

3    presentations in the complaint, defendant Tanner and defendant

4    Stevens answered many questions on the conference calls about

5    this division.  So this was something they knew about.  They

6    would have to have looked into, and they had access to the

7    information in their positions as CEO and CFO.

8         If we look at Novak, the Second Circuit's first

9    decision on scienter, it discusses conscious recklessness.  It

10   says that you make a statement if you either know is false or

11   you have acted or you've seen reports or have access, having

12   access to the correct information and disregarding it, you can

13   act recklessly.

14        THE COURT:  You have to consciously disregard it.

15        MR. RUDMAN:  Right.

16        Here our allegations are that when they went out and

17   made detailed statements, detailed statements about performance

18   issues at this division, detailed statements about the earnings

19   of this division, how it was performing, the services it was

20   providing, they had access, if they wanted to, to true

21   information and that they were acting with conscious disregard

22   to the truth of the statements.  Do I know or do we allege that

23   they actually had a report in their hands?  They had not.  The

24   complaint speaks for itself.  But it does allege that this was

25   an important, significant division that was spoken about.  And

121kWcitC

1    that's important, Judge, because if you're going to out to the

2    investing public and make detailed statements about a segment

3    of your business, you better know what you're talking about.

4              THE COURT:  No.  I think that would be a fine

5    statement if there were liability for negligence, but that's

6    not the law.  And it's not the law that if you fail to know

7    what you're talking about, that gives you liability per se.

8              I think that to me one of the very interesting issues

9    is, assuming there's no liability for Stevens and Tanner, but

10   there is for Gooden in terms of scienter, whether she could be

11   said to have caused a statement such as to then hold the

12   company liable.  But what do you say is her scienter?  What are

13   the allegations?

14             MR. RUDMAN:  The allegations against her are direct

15   knowledge, your Honor, that she had access to the true facts

16   and was told the true facts.  With respect to the projections

17   and performance issue, there's allegations from the

18   confidential witnesses.

19             THE COURT:  My point is there has to be an intent to

20   defraud.

21             MR. RUDMAN:  Right.

22             THE COURT:  You can make a blatantly false statement,

23   but if you don't have an intent to defraud --

24             MR. RUDMAN:  I'm not following, Judge.  Do you mean a

25   motive?

121kWcitC

```
 1                THE COURT:  There are two different ways.

 2                MR. RUDMAN:  Right.

 3                THE COURT:  This is like Second Circuit law 101.

 4                MR. RUDMAN:  Right.

 5                THE COURT:  Either you've alleged an actual intent to

 6     defraud, CW20 reports that she said, A-ha, I'm going to line my

 7     pockets by making this false statement, or, much more commonly,

 8     there's motive and opportunity.

 9                MR. RUDMAN:  Judge, we've alleged, she certainly had

10     the opportunity.  We've alleged she wanted her division to

11     perform well, to get business, and to advance in her position,

12     and we've alleged conscious disregard for the truth, that the

13     people that were working with her on these projects are in

14     meetings where it's discussed that there are significant

15     performance issues, where it's discussed that the projections

16     are overstated, where she's being told the true facts about the

17     company's performance.

18                THE COURT:  Just so you're clear, conscious disregard

19     of the truth is relevant to her knowledge of falsity.  It's a,

20     if you will, substitute for knowledge of actual falsity.  It is

21     not a substitute for intent to defraud.  If I purposely blind

22     myself to what my subordinates are telling me about my backlog,

23     or something like that, or the performance of my projects, and

24     then make a statement about how well they're performing, and so

25     forth, that can be a basis for showing knowledge even though
```

121kWcitC

1    she had no maybe actual knowledge, she purposely chose, I don't

2    want to hear what you have to say about that, that's not

3    sufficient to show scienter.

4         MR. RUDMAN:  Scienter is the whole picture of what

5    happened in the case, Judge.  It's the whole fraudulent, it's

6    the allegations of what took place.  We learned in the Tellabs

7    case, you have to look at it holistically, what's the theory of

8    fraud as alleged in the complaint.  And the theory of fraud

9    that's alleged in the complaint is that defendant Gooden took

10   over this division, wanted it to perform well, and in 2008

11   knowingly underbid on contracts to get business, did things to

12   make those contracts perform better which cost less, hired paid

13   personnel to increase the margins, and then that caused

14   performance issues.  When you come into the class period, the

15   company, the division, at least, is suffering from performance

16   issues on a number of big contracts.

17        THE COURT:  So your adversary says this is implausible

18   because with respect to these particular statements, at least

19   the backward-looking statements, the facts are going to come

20   out and did come out fairly quickly, so why would she have done

21   it if it was going to be contradicted on such a short-term

22   basis.

23        MR. RUDMAN:  That's an innocence, we always get

24   accused of fraud in hindsight, Judge, that's an innocence

25   argument.  When somebody makes a false statement or fraudulent

121kWcitC

1    act, they don't know when it's going to come out; they're

2    hoping that it never comes out.  The fact that somebody makes a

3    statement in April and it happens to be in July the company is

4    corrected and puts out the corrective information doesn't mean

5    that at the time the statements were made in April they weren't

6    false and misleading when made.  It means that the information

7    came out in July.

8            THE COURT:  The question is this.  If you make a false

9    statement and there is every good reason to believe that it

10   will never be caught, that's one thing.  If you hypothetically

11   make a false statement knowing, in my hypothetical, that two

12   weeks later the definitive information is going to come out,

13   it's hard to see that you were acting with an intent to

14   defraud.

15           MR. RUDMAN:  That hypothetical presupposes that you

16   know it's going to come out.

17           THE COURT:  I agree.

18           MR. RUDMAN:  That's the piece that's missing.  Those

19   are the competing inferences, Judge.  Tellabs says you have to

20   look at both their stories.  Their story is why would anybody

21   make a false statement if they knew it was going to come out in

22   July.  Our story is look at the totality of the allegations

23   alleged in the complaint with specificity by the problems at

24   the division, what caused those problems, what high-level

25   executives right below the defendant Gooden were saying about

121kWcitC

1    the true state of the division of that business.  Look at the

2    statements that were made, and then look what was announced at

3    what is now at the end of the class period, the admission by

4    defendants.  That is at least as compelling as their story that

5    they said things and a few months later they realized that

6    things weren't as good at the division as they thought.

7          Keep in mind, Judge, these projects they do at these

8    divisions are big, massive projects, that these problems don't

9    crop up in a week, two weeks, a month, they take time to

10   develop, and that it's not the kind of thing that would

11   surprise somebody if you're having big problems with one of

12   these big, major intelligence projects it's something that's

13   been going on for a while.  And you also can look at what the

14   defendants ultimately admitted to at the end of the class

15   period.

16         What comes out after the class period is probative to

17   what defendants knew during the class period.  You have

18   defendant Tanner and Stevens at the end of the class period

19   saying there were performance issues as to these contracts.  We

20   didn't get paid because there were performance issues.  We did

21   have programs that turned red.  They turned red late in the

22   period.  We do have to scale back our projections for this

23   division because of a variety of reasons, projects under

24   contract, things like that.

25         That's the whole story, your Honor.  You have to look

121kWcitC

1    at it from the beginning, the business is being built,

2    Ms. Gooden wants to develop this division and grow it and has

3    gone on underbidding contracts, slashing costs, that caused

4    performance problems.  When you come to the class period, we

5    have allegations of high-level witnesses.  One of the witnesses

6    is president of the civil division saying we were there telling

7    Ms. Gooden our projections are overstated and we have detailed

8    allegations about performance problems and then you have

9    information coming out.

10          When you look at that, that's at least as compelling

11   as the story of we made statements and a few months later we

12   told everybody that things weren't as good at the division as

13   we thought.  That's our theory of scienter on Ms. Gooden, our

14   theory of scienter on Lockheed, along with Mr. Tanner and

15   Mr. Stevens, that you have to look at the whole story, and I

16   submit we have sufficient detail at this stage for the purposes

17   of a pleading motion, not a matter of proof, to get discovery

18   and see what really happened.

19          Was there anything else that the Court was interested?

20          THE COURT:  There are a lot of issues here.  We're not

21   going to get into all of them today.  But I'm glad we had the

22   time we've had this morning to get at least into some of them

23   in some detail.  You've covered at least my immediate

24   questions.

25          Let me hear again in rebuttal from defense counsel.

121kWcitC

1          MR. RUDMAN:  Thank you, your Honor.

2          MR. HILLEBRECHT:  Your Honor, I'll start, if I might,

3    at the very last point that was made.  Your Honor asked in a

4    hypothetical why would people make certain statements if you

5    know the truth will come out, and counsel took issue with that.

6    I think that really goes to the crux of the allegations here

7    and why they're implausible and illogical and why that

8    implausibility undercuts scienter and everything else, because

9    the allegations are that there are two ways to look at it.  I

10   submit to you, your Honor, it was either aggressive management

11   by Ms. Gooden over her subordinates that turned out to be in

12   some respects wrong, or it was deliberate conduct by

13   Ms. Gooden, deliberately underbidding, deliberately concealing

14   the truth about performance issues, and deliberately

15   sugar-coating the reality, again bracket, which we argue is not

16   remotely adequately alleged as to Ms. Gooden but accept it for

17   the moment.  If that's what's going on, if she's deliberately

18   underbidding, if she's deliberately firing all the competent

19   employees, if she deliberately is concealing evidence that

20   we've got all these projects that are going badly, then she

21   does know that the truth will come out.  So if you accept the

22   implausible argument that that's what the allegations show, the

23   necessary conclusion from that, that it's deliberate, conscious

24   action by Ms. Gooden is that it doesn't make any sense because

25   if you're telling me I'm deliberately underbidding, I'm cutting

121kWcitC

1    prices on these things just to boost up my numbers temporarily,

2    it's necessarily temporarily.  It's necessarily something that

3    will see the light of day in short order.

4            THE COURT:  I wonder if your argument doesn't prove

5    too much.  There are many classic frauds in which the fraudster

6    thought, Well, by making these false statements now, I can get

7    over the immediate hurdle, I can promote my fraud, and I'll

8    worry about when an event, I'm not sure it will come out

9    tomorrow or ten years from now, but I'll worry about it then,

10   I'll come up with something then.  In some ways, this is a very

11   farfetched example, but Madoff is an example of that.  Any

12   Ponzi scheme, if the person thinks about it, they'll think,

13   well, eventually, some day, it's all going to fall apart.  That

14   hasn't apparently deterred everyone from engaging in Ponzi

15   schemes, or, more to the point, it doesn't mean that their

16   false statements about making trades that don't exist aren't

17   actionable as frauds.

18           MR. HILLEBRECHT:  I think, actually, your Honor, your

19   example shows precisely why what we have here doesn't exist

20   because Bernie Madoff was getting rich, because Bernie Madoff

21   had a motive, because he was deriving concrete --

22           THE COURT:  They're saying it was to promote her

23   position, in effect, by showing how well her division was

24   doing.

25           MR. HILLEBRECHT:  If that's their motive, I submit to

121kWcitC

1   you that on the facts as alleged, unlike your perhaps limitless

2   time horizon of the fraudster thinking I'll get caught ten

3   years from now, as alleged what she's doing is she's gutting

4   this division, this business sector, firing all the competent

5   employees, that's not something that's not going to see the

6   light of day for a long time.  It's going to see the light of

7   day fairly soon.

8           Perhaps more to the point, the cases speak with a

9   unity of voices that the kind of motive that's being suggested,

10  to further my career, to make my division look good, it doesn't

11  count, so that's not sufficient on the opportunity and motive

12  prong, and I suggest even on the recklessness prong, the

13  allegations are sufficiently illogical that they fall short

14  here.  I'll make the point here I was going to make.

15          THE COURT:  I know the cases you're referring to.  I'm

16  not quite sure they're quite as far out there.  Supposing an

17  executive makes a knowingly and intentionally false statement

18  about how his division is doing in order to get a bigger bonus

19  at the end of the year, and he figures, all right, eventually

20  it's going to come out and all like that, but they're not going

21  to be able to take back my bonus, I'll have it, I'll be able to

22  pay for my yacht and my country estate and so forth.  You're

23  saying that wouldn't be sufficient?

24          MR. HILLEBRECHT:  Just a moment, Judge.

25          Yes, and we argue that on page 11, citing the Novak

121kWcitC

case, Second Circuit, Judge Gleeson and Johnson and other

cases, and let me quote, if I might, quoting from Judge

Gleeson, "motives that are common to most corporate officers

such as the desire for the corporation to appear profitable and

the desire to keep stock prices high to increase officer

compensation do not constitute motive for purpose of this

inquiry."

THE COURT:  That's a little different.  At least in my

hypothetical, it's to advance the maker's own situation as

opposed to the company as a whole.  I would add as well while,

of course, I have the very, very greatest respect for Judge

Gleeson, even though he is a judge from the Eastern District of

New York, that his view of what the law is in this area is not

binding on me.

MR. HILLEBRECHT:  I take your point.  I just want to

emphasize, again, I recognize what you say about his Honor, but

he does specifically mention as things that don't count,

executive compensation in there, and I believe he is merely

stating the law as stated in the circuit in Novak and other

cases.

THE COURT:  You're going to have to show that to me

because at least in my hypothetical, which is not this case --

MR. HILLEBRECHT:  Right.

THE COURT:  -- so it's not the end of the discussion,

but if, hypothetically, an executive made an intentionally

121kWcitC

```
1    false, knowingly false statement for the purpose of boosting

2    his own compensation in a way that he knew could not be

3    realistically taken back, like a year-end bonus, you're going

4    to have to show me the case that says that doesn't count.  That

5    sounds to me exactly equivalent to common law fraud.  It is

6    making a false statement for the purpose of obtaining money or

7    property.  That's the common law definition of fraud.

8            MR. HILLEBRECHT:  And I don't mean to split hairs with

9    you at all, Judge.  The cases I just cited to you, Novak from

10   the Second Circuit and Judge Gleeson's case, go specifically to

11   the motive prong, the opportunity and motive prong, those

12   motives don't count.  I'm not suggesting under the recklessness

13   analysis or something else that might not be something that you

14   could analyze.

15           What we are arguing here is under both motive and

16   recklessness, motive, again small M, even taking your Honor's

17   hypothetical, is not sufficiently compelling on the facts of

18   this case.  I mean, taking the facts as alleged here, there's

19   nothing remotely akin to what your Honor's saying as personal

20   compensation.

21           THE COURT:  I agree there's nothing like that.  What I

22   just described would give liability to the executive, it still

23   doesn't necessarily follow it would give liability to the

24   company.

25           MR. HILLEBRECHT:  I certainly agree with that, and I
```

121kWcitC

```
1    want to address one of the other arguments counsel made and

2    kind of link back to what we were just discussing.

3           One of the things, when your Honor asked what about

4    Mr. Tanner, what about Mr. Stevens, counsel emphasized that

5    there was a quote/unquote information flow to Mr. Tanner and

6    Mr. Stevens, but, as we argued earlier, that plainly ain't

7    enough, and we cited numerous cases on it, the Fadden case

8    which speaks almost in those words, about information flowing

9    from the channels of information isn't enough, and we also

10   cited Wachovia and American Express, Judge Koeltl's decision,

11   you need more than that.

12           THE COURT:  Again, I'm not making any determinations

13   today, but I do read the case law in that area similar to the

14   way you've just stated it, at least tentatively.

15           MR. HILLEBRECHT:  But at the conclusion, the real

16   reason I'm harping on that a second time, at the conclusion of

17   that, I don't want to put too much weight on it, it's oral

18   argument, but plaintiff's counsel said that based on that

19   information flow, it was a reasonable inference that Mr. Tanner

20   and Mr. Stevens received this information.  A, we dispute that.

21   B, assuming it, so what.  It may be arguably a reasonable

22   inference.  I don't think it is.  Even if it is, it certainly

23   is not a strong inference of the kind that's required here to

24   conclude that Mr. Tanner or Mr. Stevens had scienter, and I

25   think moving back to the other argument, the same point could
```

121kWcitC

1    be made as to the illogic implausibility of the scheme as

2    alleged.

3         THE COURT:  If Ms. Gooden is hypothetically

4    intentionally making a fraudulent statement to promote her own

5    position, she has a motive to actually conceal from Tanner and

6    Stevens what she's up to by not providing them with the

7    information that would expose her fraud.  So it doesn't seem to

8    me that just talking about the general flow of information will

9    satisfy their burden at least as to Tanner and Stevens.

10        MR. HILLEBRECHT:  Obviously, we agree.  There are

11   cases.

12        THE COURT:  I know.  That's why I gave you a softball

13   curve.  Don't expect another one.

14        MR. HILLEBRECHT:  There are, as your Honor knows,

15   cases that say precisely that, that if we're trying to draw

16   inferences here and when the allegations, which again we say

17   quite clearly they don't really make out, but the allegations

18   that a subordinate has some kind of direct motive, I'll say

19   small M, to engage in this, really the only reasonable

20   inference is why on earth would she tell these guys, she

21   wouldn't, and I think that's pretty clear from the cases.

22        On Ms. Gooden, the initial part of the argument from

23   counsel was that she was responsible for passing along the

24   information, and your Honor quite rightly said what about

25   Janus, and if Janus speaks clearly to anything, it's to that

121kWcitC

```
 1    point.  The argument that I repeat that they've made in their
 2    briefs --
 3             THE COURT:  You're saying Janus is really a case about
 4    two distinct corporate entities is their argument not about
 5    interactions within --
 6             MR. HILLEBRECHT:  Sure, I understand that.  But I
 7    don't think that's plausible reading.  Janus defines the word
 8    "make."  There's no definition for "make" that applies in one
 9    context and not in the other, in both contexts applying the
10    same rule, 10b-5.  Janus also speaks about, when they say,
11    footnote six of the opinion:  "We draw a clean line between the
12    two.  The maker is the person or entity with ultimate authority
13    over statement and others are not," and there are other points
14    in the opinion when they talk about a person.  So the attempt,
15    it seems to me, to limit it to a different entity context was
16    rightly rejected by the Court in Coinstar and Hawaii
17    Ironworkers, and other cases we cite, and, frankly, you just
18    have to read Janus to see it doesn't make any sense.
19             THE COURT:  All right.  I want to begin to bring
20    things to a conclusion, but go ahead, and then I'll give
21    plaintiff's counsel one last shot as well.
22             MR. HILLEBRECHT:  Sure.  I guess, given that hint,
23    I'll wrap it up, Judge.
24             I think we've set forth a number of reasons, some of
25    which we didn't get to, why this complaint is deficient.  The
```

121kWcitC

1    ones we've spoken about today, we think, we submit to your

2    Honor, respectfully, it's clear that there isn't any close to

3    sufficient allegations as to Mr. Tanner and Mr. Stevens.  When

4    you look closely and carefully at the allegations as to

5    Ms. Gooden, they also fall short.  The CWs, a lot of smoke, a

6    lot of *sturm und drang*, but if you say who said what to whom,

7    when, it's not there.

8          The other issue is Ms. Gooden didn't make any

9    statement.  We spent a lot of time on that.

10          So we obviously think this case should be dismissed.

11   We also said in our papers, Judge, just very briefly, it should

12   not only be dismissed, it should be dismissed with prejudice.

13   The case involved allegations and conduct from two years plus

14   ago.  They've had time to do whatever investigation that is

15   deemed appropriate, they didn't.  They've already had two bites

16   at the apple.  Your Honor amended the complaint already.

17          I want to just briefly mention we shouldn't lose sight

18   of the fact --

19          THE COURT:  I guess the question I always have on that

20   is I could say to plaintiff's counsel now is there anything you

21   would add if I gave you leave to amend, but the difficulty from

22   plaintiff's standpoint is they don't know in the hypothetical

23   what ground it would be that I was saying they were deficient,

24   and you've raised 20 grounds in which you think they're

25   deficient.  I might agree with all 20, I might agree with zero,

121kWcitC

1    or I might agree with somewhere in between.  This is a problem,

2    I think, I've wrestled with in other cases.  It may be,

3    assuming hypothetically, I were to dismiss the complaint on

4    three grounds, at that point, before I give them leave to

5    amend, they would have to make a showing as to those three

6    grounds as to what else they could allege, but I don't think it

7    would be fair to say to them now, in effect, what else could

8    you say on any of these issues.  There are just too many

9    issues.  It would be fine if we were dealing with a single

10   point.  But that's not the situation.

11        MR. HILLEBRECHT:  I take your Honor's point.  I know

12   your Honor has in other cases, top A cases and other securities

13   cases, and others, done that inquiry, that argument, based on

14   the papers if your Honor doesn't feel it's appropriate.  Given

15   the complexity of this case, we obviously understand that.

16        The one point I want to make is just a reminder point,

17   which I know your Honor doesn't need, we shouldn't lose sight

18   of the fact that there are obviously real costs here.  There

19   are costs to the company.  There's financial costs, obviously

20   enough, there's distraction of management since obviously it's

21   an allegation that we have to deal with.

22        THE COURT:  That's all true, and it's also true that

23   plaintiff's counsel needs to know where this is going because

24   they have costs too.  These are not easy cases to bring in

25   terms of commitment by plaintiff's side either.  So, I was

121kWcitC

1   going to say this right after we finished argument, but I'll

2   say it now.  I will give a bottom line ruling on this motion by

3   no later than February 14.  I thought you'd want a Valentine's

4   gift.  That will be just a bottom line.  I'm quite sure, given

5   what else is on my plate, I won't get to it, but that will then

6   give you a basis to know how things will go or not go forward

7   at that point.

8         But, anyway, anything else you wanted to say?

9         MR. HILLEBRECHT:  Unless your Honor has any additional

10   questions.

11         THE COURT:  No.  Thank you so much.  Let me hear from

12   plaintiff's counsel.

13         MR. RUDMAN:  Your Honor, I don't have anything

14   further.

15         THE COURT:  Very good.  This was the kind of argument

16   I wanted to have and I'm glad we were able to have it today

17   rather than get rushed last night, and I appreciate everyone's

18   indulgence in that regard.  I will take the matter sub judice.

19         MR. RUDMAN:  Thank you, your Honor.

20         (Proceedings adjourned)

21

22

23

24

25