USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/22/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
CITY OF PONTIAC GENERAL EMPLOYEES'
RETIREMENT SYSTEM, Individually and
on Behalf of All Others Similarly
Situated,

              Plaintiff,

   -v-

LOCKHEED MARTIN CORPORATION, ROBERT
STEVENS, BRUCE TANNER, and LINDA
GOODEN,

             Defendants.
-------------------------------------x

11 Civ. 5026 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

     In this securities class action suit filed against Lockheed Martin Corporation and three Lockheed executives, the City of Pontiac General Employees' Retirement System ("the Retirement System") sought to be appointed "lead plaintiff," pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See 15 U.S.C. § 78u-4(a)(3)(B). After hearing testimony from Ellen Zimmerman, the designated representative of the Retirement System, and considering the parties' oral and written arguments, this Court issued a "bottom-line" Order on November 7, 2011, appointing the Retirement System as lead plaintiff, and appointing the Retirement System's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as lead counsel. This Memorandum Order sets forth the reasons for these rulings and reaffirms them.

Congress enacted the PSLRA to curtail the champertous vice of "lawyer-driven" securities litigation. See Iron Workers Local No. 25 v. Credit-Based Asset Servicing & Securitization, LLC, 616 F. Supp. 2d 461, 463 (S.D.N.Y. 2009) (noting PSLRA intended to curtail lawsuits initiated and controlled by lawyers seeking potential fees rather than for the benefit of shareholders); In re Doral Fin. Corp. Sec. Litig., 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006) ("One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation."). To combat this problem, the PSLRA's lead plaintiff provision directs the Court to appoint the member of a class who will be "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i).[1] By a rebuttable presumption, the most adequate plaintiff is, inter alia, the plaintiff who "has the largest financial interest in the relief sought by the class" and who either has filed the complaint or has moved to be appointed lead plaintiff. § 78u-4(a)(3)(B)(iii)(I)(aa)-(bb). Here, the Retirement System purchased 2651 shares of Lockheed Martin during the Class Period,[2] and claims it has lost approximately $17,000 as a result

---

[1] 15 U.S.C. § 78u-4 is the part of the PSLRA applicable to cases, like this, brought under the Securities Exchange Act of 1934. Parallel provisions of the PSLRA applicable to cases brought under the Securities Act of 1933 are found at 15 U.S.C. § 77z-1.

[2] The Class Period in this action is from April 21, 2009 to July 21, 2009, inclusive. Am. Compl. ¶ 1.

2

of alleged fraud. See Memorandum of Law in Support of City of Pontiac General Employees' Retirement System for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel dated Sept. 19, 2011 ("Pl. Br.") at 3; Declaration of Samuel H. Rudman in Support of Motion of City of Pontiac General Employees' Retirement Plan for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel dated Sept. 19, 2011 ("Rudman Decl.") Ex. B-C. Since the Retirement System is the only plaintiff in the class that has moved to be appointed lead plaintiff, it is de facto presumed the "most adequate" plaintiff.

But the statutory presumption is a rebuttable presumption, and the Court has an obligation to consider whether the Retirement System will fairly and adequately protect the interests of the class. See 15 U.S.C. § 78u-4(a)(3)(B)(i), (iii)(II)(aa). At the evidentiary hearing held on October 11, 2011, the Court was made aware of an arrangement between the Retirement System and its counsel, Robbins Geller, that cast doubt on the adequacy of the Retirement System to serve as lead plaintiff and/or the adequacy of Robbins Geller to serve as lead counsel. The Court learned that the Robbins Geller had agreed to monitor the investments made by the Retirement System "for free," but to recommend to the Retirement System potential securities class action lawsuits arising from those investments. See Transcript of 10/11/11 at 3-4. If the Retirement System chose to

3

go forward with the litigation, Robbins Geller would be its presumptive choice as counsel but would only be obligated to continue to serve if the litigation was certified as a class action. Id. at 4-10. Thus, the way Robbins Geller would be paid for its work pursuant to this "free" monitoring arrangement was by the Retirement System's bringing a class action securities action recommended by Robbins Geller in which Robbins Geller served as lead counsel.

In response to this disclosure, defendants, with the Court's permission, filed on October 17, 2011 post-hearing papers opposing the appointment of the Retirement System as lead plaintiff and/or of Robbins Geller as lead counsel, to which plaintiff replied on October 24, 2011.[3]

---

[3] In its response, plaintiff argued that defendants lacked standing to challenge its motion to be appointed lead plaintiff and to have Robbins Geller appointed as lead counsel. See Pl. Br. at 2. There is a split of authority on this issue, and the Second Circuit has not opined one way or the other. See In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 266-67 (3d Cir. 2005) (collecting cases). This Court, however, concludes that defendants do have standing to challenge the motion. There is no textual provision in the PSLRA that precludes a defendant from filing its opposition to a motion to appoint lead plaintiff or lead counsel. See 15 U.S.C. § 78u-4(a)(3)(B). It is true that § 78u-4(a)(3)(B)(iv) limits discovery on appointment to plaintiffs, see King v. Livent, 36 F. Supp. 2d 187, 190 (S.D.N.Y. 1999), and § 78u-4(a)(3)(B)(iii)(II) states that the presumption favoring the most injured lead plaintiff "may be rebutted only upon proof by a member of the purported plaintiff class." However, nothing in that provision, nor any other provision of the PSLRA, forbids a defendant from arguing against appointment. In the instant case, moreover, the Court, taking account of the fact that there are no other plaintiffs challenging the Retirement System's motion for lead plaintiff, finds that the purpose of the PSLRA in

This is not the first time the Court has confronted such a "monitoring agreement." See Iron Workers, 616 F. Supp. 2d 461. As this Court has previously noted, such an arrangement goes "far beyond any traditional contingency arrangement . . . [and], on its face, creates a clear incentive for [the monitoring firm] to discover 'fraud' in the investments it monitors." Id. at 464. Such a "practice fosters the very tendencies toward lawyer-driven litigation that the PSLRA was designed to curtail." Id.[4]

In the Iron Workers class action, this Court had to choose between two competing plaintiffs, the Iron Workers Fund and MissPERS, both of whom employed "monitoring agreements" with plaintiff's firms. The Iron Workers representative "had only a rough idea of what [the] lawsuit was all about," and had employed no steps to obtain disinterested advice or counsel from anyone

---

preventing "lawyer-driven" litigation is best served by having more argument, not less, from any interested source. See King, 36 F. Supp. 2d at 190 ("[W]hen . . . there are no other potential lead plaintiffs to challenge a moving party, the Court must rely on the defendants to insure that the requirements of [the PSLRA] are satisfied." (quoting Howard Gunty Profit Sharing v. Quantam Corp., No. Civ. 96-20711 (SW), slip op. at 6-7 (N.D. Cal. Feb. 6, 1997))). Furthermore, the PSLRA contemplates that the Court itself will make an independent inquiry before selecting lead plaintiff and lead counsel, and, a fortiori, the Court is free to solicit the views of any interested party, including the defendants, in making this inquiry.

[4] While a New York authority has held that such an agreement is not per se unethical, see New York State Bar Association Committee on Professional Ethics, Opinion No. 824 (July 2, 2008), this, of course, does not speak to whether it fosters tendencies in opposition to the purposes of the PSLRA that may bear on appointment.

other than the firm that was recommending Iron Workers bring a class action suit. Id. at 466. MissPERS, however, relied on twelve different firms to monitor its investments, and the firm that identified a potential lawsuit was not guaranteed that it could bring the lawsuit on MissPERS's behalf. Id. A group of lawyers in the Attorney General's Office of the State of Mississippi independently evaluated any recommendations made by a monitoring firm; indeed, in the case of the Iron Workers suit itself, MissPERS learned of the basis for the suit from another law firm with which it did not have a monitoring agreement and which would not be serving as lead counsel. Id. Despite serious reservations about even MissPERS's more limited monitoring agreement, the Court ultimately concluded that MissPERS would better oversee the litigation and protect the interests of the class than the Iron Workers, and appointed MissPERS lead plaintiff. Id. at 467.

Here, the Retirement System falls somewhere in-between Iron Workers and MissPERS. The Retirement System retains three plaintiff's firms to monitor its investments, Tr. 10/11/11 at 3, and although the law firm that brings a matter to its attention "generally" represents it in any subsequently filed action, nonetheless, if there is a "reason" otherwise, the Retirement System is not obligated to select the referring firm but "can interview other firms." Id. at 4. On the other hand, Robbins

6

Gellers's retainer agreement with the Retirement System does not include serving as the Retirement System's <u>individual</u> counsel in the event the Retirement System is not appointed lead plaintiff or the class is not certified. <u>See</u> Tr. 10/11/11 at 10.

As for oversight, although Ms. Zimmerman is the sole representative of the Retirement System who will oversee this proposed class action (or any other class actions where the Retirement System is involved), <u>see</u> Tr. 10/11/11 at 3, 8, Ms. Zimmerman, though not an attorney, has demonstrated a far greater understanding of this action than the corresponding representative of Iron Workers in the <u>Iron Workers</u> case, <u>see</u> Tr. 10/11/11 at 15-18. Additionally, unlike the Iron Workers representative, she receives reports from the Retirement System's local counsel in connection with assessing the litigation. <u>Id.</u>

That being said, the Retirement System still appears to exert less meaningful oversight over Robbins Geller and the conduct of this litigation than the PSLRA ideally contemplates. At the evidentiary hearing, Ms. Zimmerman noted that once litigation begins, she merely "monitors" monthly reports from counsel and presents them to the Board of Trustees. <u>Id.</u> at 20. Moreover, she was unable to recall a single instance since at least 2005 where she had asked counsel to change a pleading or alter its position. <u>Id.</u> at 21-22.

7

Additionally, the procedural tactics Robbins Geller employed in bringing this suit give this Court further pause. Robbins Geller did not file this lawsuit until July 20, 2011, the very last day to file before the two-year statute of limitations period expired. See 28 U.S.C. § 1658(b). The firm then filed its motion to appoint the Retirement System as lead plaintiff and itself as lead counsel on September 19, 2011, the very last day any plaintiff could move to be appointed lead plaintiff after Robbins Geller had published notice in accordance with the PSLRA. See 15 U.S.C. § 78u-4(a)(3)(i)(II); Rudman Decl. Ex. A (notice of pendency of class action published in Business Wire on July 20, 2011). Further, on October 6, 2011, Robbins Geller filed its Amended Complaint, almost three months after it initiated this action, and only after any other potential plaintiffs or plaintiffs' firms were time-barred from moving to be appointed lead plaintiff and lead counsel.

On the one hand, the actions taken by Robbins Geller could be described as self-protective tactics, designed to ensure that no other plaintiff's firm could swoop in and profit from Robbins Geller's work merely because that firm had a client with a larger financial stake in Lockheed Martin than the stake of Robbins Geller's client, the Retirement System, which asserts a loss of only $17,000. Pl. Br. at 3. On the other hand, these tactics also suggest it is Robbins Geller, not the Retirement

8

System, driving this litigation. This is expressly contrary to Congress's aim in enacting the "lead plaintiff" provisions to avoid lawyer-driven litigation.

The Court acknowledges that plaintiffs' firms must take an active role if private securities fraud lawsuits are to serve not only to compensate victims but to perform a "private attorney general" function that helps detect and prevent fraud – a function repeatedly endorsed by the Securities and Exchange Commission, see Transcript of Oral Argument at 10, SEC v. Citigroup Global Markets Inc., No. 11 Civ. 7387 (JSR) (S.D.N.Y. Nov. 9, 2011), as well as the courts, see, e.g., In re Giant Interactive Group, Inc. Sec. Litig., No. 07 Civ. 10588(PAE), 2011 WL 5244707, at *10 (S.D.N.Y. Nov. 2, 2011). But such activities become potentially champertous, or even extortionate, when the plaintiff's law firm is, for all practical purposes, the real party in interest. See In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 158 (S.D.N.Y. 1997) ("Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff."). As this Court noted in the Iron Workers action, lawyer-driven litigation creates the potential for abusive lawsuits that allege "fraud" every time a corporation's stock price drops, see 616 F. Supp. 2d at 464-65, and the kind of "monitoring" arrangement used here may further foster such tendencies.

9

Robbins Geller argues that it is unlikely that any law firm will undertake the expense of bringing a class action securities litigation where there is no reasonable chance of surviving even a motion to dismiss; but Congress, in enacting the PSLRA, effectively determined that that was not a sufficient disincentive to abusive lawsuits. Through the PSLRA, Congress intended to curb such litigation by placing control of the lawsuit in the hands of the largest shareholders with both the financial interest to protect the interests of shareholders and the experience necessary to exercise meaningful oversight of their counsel. Congress further reaffirmed this position when it passed the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which foreclosed plaintiff's firms' ability to bypass the PSLRA by filing securities actions in state courts. See 15 U.S.C. § 78bb(f); Romano v. Kazacos, 609 F.3d 512, 517-518 (2d Cir. 2010) (describing purpose of SLUSA as curbing circumvention of PSLRA by plaintiffs). The Court must be mindful of other attempts to circumvent the PSLRA that fall within its purview, by scrutinizing potential lead plaintiffs and their counsel. See also 15 U.S.C. § 78u-4(c)(1)-(2) (directing that at the end of any securities class action, a court should make specific findings of whether litigation abuse had been present at any stage, and, if so, impose mandatory sanctions).

That being said, after its examination of Ms. Zimmerman at the evidentiary hearing, the Court is satisfied, at least at this preliminary stage of the litigation, that Ms. Zimmerman and the Trustees of the Fund have the ability to properly exercise their role as lead plaintiff and protect the interests of all shareholders in the class and that they now recognize the Court's instruction that they do so. See Tr. 10/11/11 at 24-25 ("Court: . . . [I]f I do wind up appointing the City of Pontiac General Employees' Retirement System as lead plaintiff, I'm going to expect you to play [a very active] role. Okay? The Witness: Absolutely."). Further, the highly specific and detailed allegations asserted by plaintiff in its Amended Complaint suggest that this case is not the kind of abusive "strike suit" Congress intended the PSLRA to curb, where plaintiff's lawyers bring a lawsuit expecting settlement merely because the cost of settling is cheaper than actually disputing the allegations and proceeding with discovery. See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 171 (2d Cir. 2005) (describing one purpose of PSLRA as deterring strike suits). (Indeed, by "bottom-line" order issued last week, the Court partially denied defendants' motions to dismiss the complaint. See Order dated February 14, 2012.) Additionally, the Retirement System's claim as a common shareholder of Lockheed Martin is not subject to any unique defenses that would make it an atypical or inadequate lead

11

plaintiff or not otherwise satisfy the requirements of Rule 23. See § 78u-4(a)(3)(B)(iii)(I)(cc), (II)(bb); Sgalambo v. McKenzie, 286 F.R.D. 170, 173 (S.D.N.Y. 2010) (holding plaintiff seeking lead plaintiff status need only make "preliminary showing" that it will satisfy the typicality and adequacy requirements of Rule 23); Pl. Br. at 3-4 (asserting Retirement System held common stock and is not subject to any unique defenses); see generally Def. Opp. Br. (not disputing plaintiff's assertion).

Accordingly, despite the reservations here expressed, the Court reaffirms its November 7, 2011 Order appointing the City of Pontiac General Employees' Retirement System lead plaintiff in this action. Likewise, the Court reaffirms its approval of the Retirement System's selection of Robbins Geller, a firm experienced in securities class actions, as lead counsel. § 78u-4(a)(3)(B)(v).

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         February 21, 2012