C6KHPONA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CITY OF PONTIAC,

4               Plaintiff,          New York, N.Y.

5          v.                       11 Civ. 5026 (JSR)

6   LOCKHEED MARTIN, *et al.*,

7               Defendants.

8   ------------------------------x

9                                   June 20, 2012
                                    4:15 p.m.
10
    Before:
11
                        HON. JED S. RAKOFF,
12
                                        District Judge
13
                            APPEARANCES
14
    ROBBINS GELLER RUDMAN & DOWD, LLP
15       Attorneys for Plaintiff
    BY:  SAMUEL RUDMAN
16       EVAN KAUFMAN
         JONAH H. GOLDSTEIN
17
    DLA PIPER US LLP
18       Attorneys for Defendants
    BY:  JAMES WAREHAM
19       JOHN HILLEBRECHT
         JOHN VUKELJ
20

21

22

23

24

25

C6KHPONA

1              (Case called)

2              THE COURT:  So I had the privilege of giving a speech

3    a couple of weeks ago down in Washington to a group of in-house

4    corporate counsel and I pointed out that they on occasion come

5    to my court.  They never come to speak, of course.  They come,

6    as near as I can tell, to glare at their adversary or if things

7    are going really bad to glare at the court.  So there are all

8    sorts of options available.  Glad to have them here.

9              So this is the motion for class certification.  There

10   are really only two issues on which class certification is

11   opposed.  One is the question of whether the claims or defenses

12   of the representative party are typical of the claims and

13   defenses of the class, so-called typicality, and the other is

14   whether the representative party will fairly and adequately

15   protect the interests of the class.

16             In this kind of situation I am not sure that it

17   necessarily makes sense to have one side or the other go first,

18   but since the ultimate burden is on the plaintiff, we will hear

19   from the plaintiff.

20             MR. RUDMAN:  Thank you, your Honor.  Do you care where

21   I stand?  Do you want me to speak from the podium?

22             THE COURT:  No.  So long as we can hear you.

23             MR. RUDMAN:  Just for the record, we are here on our

24   class certification motion seeking to certify a class of all

25   persons that purchased Lockheed Martin stock between April 21,

C6KHPONA

2009 and July 21, 2009.  Although the defendants haven't

contested any of the elements, I wanted to state for the record

that we have submitted, we respectfully submit that we have

submitted sufficient proof to satisfy all of the elements of

class certification.

THE COURT:  The court has to find all the elements.

MR. RUDMAN:  Right.

THE COURT:  But let's deal with what is contested.

MR. RUDMAN:  As I understand the argument on

typicality, the defendants are arguing that Pontiac is atypical

or subject to a unique defense because they continued to buy

stock after the statement, the end of the class period,

so-called post class period purchases.  Your Honor held on this

very same issue in the Monster Worldwide case that post class

repurchases of stock do nothing to strip away the plaintiff's

right to claim that they relied on the integrity of the market

price at the time they purchased stock during the class period.

We submit, your Honor, that what happened here is on

all fours with what happened in Monster.  In the case that is

cited in Monster, which I think is the Salomon Analyst case,

that the post class period purchase of stock do nothing to

render Pontiac atypical or subject to any other unique defense.

The second kind of twist on that argument that was

made was that, well, Pontiac -- Ms. Zimmerman, who is the

representative from Pontiac who testified, was asked

C6KHPONA

specifically if you knew a fraud was going on, would you

instruct the money manager not to buy the stock, and the

response was no.  The defendants have cited that and said, see,

it doesn't matter what is out there, they are going to buy

stock even if they know a fraud is being committed.

          THE COURT:  But you are saying what she said is

because that is not her decision, it is the investment

committee's decision.

          MR. RUDMAN:  Correct.  As your Honor is well aware,

funds like this rely exclusively on money managers to make

those purchases, and there was no testimony from any of the

money managers that were deposed in this case that they knew

about a fraud at Lockheed when they purchased the stock on

behalf of the fund.  So I think that argument carries no weight

either.

          The adequacy argument -- that is all I have on

typicality as I understand their arguments, your Honor.

          The adequacy argument is really twofold, as I

understand it.  The first one is, well, it is really one thing,

which is, and it is not surprising, this plaintiff is not the

kind of plaintiff that the defendants would like to see suing

them.  They claim that for some reason the plaintiff is being

controlled by the lawyers and not prosecuting the lawsuit.

          I think if you look at Ms. Zimmerman's testimony and

you see what has happened in this case, you will see

C6KHPONA

1   Ms. Zimmerman took your Honor's admonition to closely monitor

2   this case to heart, has been actively involved in the

3   prosecution of this lawsuit.  She e-mails or speaks with her

4   lawyers three or four times a week and was able to at her

5   deposition adequately describe this case.

6           Now the standard on adequacy is set really by the

7   Baffa case in the Second Circuit, where an 18-year-old man was

8   appointed or the denial of his class certification was reversed

9   by the Second Circuit.  Now, it is not a high standard and we

10  respectfully submit that if you look at how Ms. Zimmerman has

11  acted in this case and the fund has acted, that easily meet

12  that standard.

13          The next argument the defendants raise with respect to

14  adequacy is the monitoring argument, that for some reason

15  because Pontiac has a monitoring agreement that makes them less

16  likely to prosecute this case.  For the life of me, I don't

17  understand how you reach that conclusion from the fact that

18  they have a monitoring agreement.  I know your Honor has raised

19  concerns about the monitoring agreements.  I think it is

20  important to understand why these funds have monitoring

21  agreements to begin with.  So I am going to go back in time

22  just a little bit to explain how they came into existence.

23          There was a case many years ago called the Teledyne

24  case in Cleveland.  In that case an institutional investor was

25  challenged as being inadequate to serve as a lead plaintiff

C6KHPONA

1    under ERISA.  So the other lead plaintiff movant said you can't

2    be a lead plaintiff because under ERISA you can't spend any

3    money other than -- you can't utilize your resources for

4    anything other than to benefit the funds.  The institutional

5    investor was the Florida State Board of Admission.

6           In response to that attack by another lead plaintiff

7    movant, the Department of Labor filed a brief in the Teledyne

8    case -- all this is in the briefing on the lead plaintiff

9    motion -- and said, wait, you have a fiduciary obligation to

10   monitor your investments for fraud and if you believe a fraud

11   has been committed, do what is necessary to pursue that.

12          From that brief, from the Department of Labor brief,

13   came monitoring agreements.  That is why we have them.  Funds

14   went out and said, hey, the Department of Labor has said we

15   need to monitor our funds for fraud.

16          THE COURT:  I agree with your point, or at least I

17   want to hear from your adversary, I don't really see why the

18   existence of the monitoring agreement that led to the

19   identification of this lawsuit affects the adequacy of the

20   plaintiff.  But the problem I have with monitoring

21   agreements -- which I continue to have, but I didn't find it

22   sufficient in the facts of this case to not appoint Pontiac as

23   the lead plaintiff -- is that because they are free, because

24   there is no charge being made, they arguably create an added

25   incentive to the counsel that is monitoring -- which in some

C6KHPONA

 1   agreements, not yours, was required to be the counsel if there

 2   actually was fraud -- an incentive to identify marginal cases

 3   as fraudulent because it is the only way the law firm gets paid

 4   for its services.

 5          So that is the concern that I had, continue to have to

 6   some degree, but I don't think it affects any issue that is

 7   before me on class certification.  I will be glad to hear

 8   anything your adversary has to say on that.

 9          MR. RUDMAN:  Then, your Honor, I think I am almost

10   done on the adequacy point.  The only thing I wanted to address

11   was, there was some argument in the defendant's briefs that

12   somehow by filing the lawsuit several days before the statute

13   of limitations ostensibly ran -- I say ostensibly because even

14   if the price drop was two years ago, it is not clear that under

15   Merck, the Supreme Court's decision in Merck, when the statute

16   of limitations would ultimately run.  But assuming that is when

17   it would have run, the argument in the defendant's papers are

18   that there was some kind of, quote-unquote, scheme to get

19   control of the lawsuit by doing that.

20          What I wanted to point out for the court is the PSLRA

21   doesn't let you do that, your Honor.  Once we filed the

22   lawsuit, we had to publish a notice advising anyone that wanted

23   to that they could come before your Honor and make a motion.

24   So the fact of the matter is, the plaintiff here or our firm

25   had no ability to preclude anybody else who wanted to be

C6KHPONA

 1    involved in a lawsuit or take control of the lawsuit from doing

 2    so.  Because the notice went out advising them if they wanted

 3    to make a motion, they should.  The fact of the matter is no

 4    one else wanted to make a motion.  Pontiac was able to become

 5    the lead plaintiff.

 6           Unless the court has any other questions for me on

 7    those points.

 8           THE COURT:  No, that is fine.

 9           MR. RUDMAN:  Thank you.

10           MR. WAREHAM:  May it please the court, your Honor,

11    James Wareham on behalf of the defendant.

12           Failures are two in number under 23(a).  They are

13    inadequate, not just the retirement system but the Robbins

14    Geller firm as well, and Pontiac is subject to unique defenses

15    because of their atypicality.  I am going to go through those

16    very quickly.

17           Plaintiff in its papers complains fairly loudly that

18    if the instant motions are denied the case will end, and for

19    several reasons that really is of no moment.  First, they cite

20    to the case that we would cite to, Kline v. Wolf, in support of

21    its position.  In Kline v. Wolf, the Second Circuit affirmed

22    the district court's denial of the motion for class

23    certification when there was one and only one participant, one

24    and only one competing class representative.  The Second

25    Circuit did it again several years later in Gary Plastic v.

C6KHPONA

 1   Merrill Lynch, again, where a class certification motion was

 2   denied when there was only one putative class representative.

 3          Now, the idiosyncrasies of this unusual case also cut

 4   in favor of a decision which ignores plaintiff's central

 5   argument, and the idiosyncrasies really do flow from the

 6   monitoring agreement, from the filing of the last day, from the

 7   facts that I am going to go through, some of which are very new

 8   now.

 9          Now two years passed between the July 21, 2009

10   announcement plaintiffs complain about.  They filed a very bare

11   bones complaint.  They lost $17,000.  Not one of the 600

12   institutional investors did the plaintiffs identify in their

13   current papers.  600 institutional investors in their own

14   papers own about 86 percent of the company.  Not one complained

15   at any point in time.  As Mr. Rudman pointed out, not even

16   notice was found.  This is not a case really about Pontiac

17   retirement system.  It is about Robbins Geller.

18          Now Ms. Zimmerman has testified since you saw her in

19   your courtroom, your Honor, as a 30(b)(6) witness.  She wasn't

20   testifying about her own knowledge, by the way.  What she said

21   as to what happened with respect to the fund is what would

22   happen with respect to the fund.  She is a 30(b)(6).  It is not

23   her personal knowledge that is being exacted for this

24   deposition.

25          THE COURT:  Did you depose her for her personal

C6KHPONA

1    knowledge?

2              MR. WAREHAM:  No, we did not, your Honor.

3              THE COURT:  So I don't know how that cuts one way or

4    the other.  If you are saying that her answers don't

5    necessarily reflect her personal knowledge because she was

6    deposed as a 30(b)(6), that is fine, but you can't infer from

7    that that her personal knowledge is greater, lesser, or

8    anything else because you didn't depose her for her personal

9    knowledge.

10             MR. WAREHAM:  That is a fair point.  The point I make

11   is, it is an admission of the enterprise.

12             THE COURT:  OK.

13             MR. WAREHAM:  That in light of a fraud, knowledge of a

14   fraud inside a company, the enterprise, not Ms. Zimmerman,

15   would not instruct its investors -- excuse me, its investor

16   advisors to refrain from purchasing or sell that stock.

17             THE COURT:  OK.  Now I understand your point.  Go

18   ahead.

19             MR. WAREHAM:  Thank you, your Honor.

20             Now, she was alerted to the need to have immediate

21   approval of a complaint less than 48 hours before the filing of

22   the initial complaint.  She was not told that the statute of

23   limitations was expiring.  She was not told why the approval

24   had to be so hurriedly done.

25             Now, in your preliminary ruling, your Honor, you did

C6KHPONA

1    express skepticism about the tactics employed by Robbins

2    Geller -- it is not us; it comes from the court -- who really

3    is driving this litigation.  And you did express skepticism

4    about Ms. Zimmerman's oversight, and discovery has revealed

5    some things that are troubling and lead to justification for

6    the court's skepticism.  I am going to go through a few things

7    that demonstrate, not just in prose or conclusory words but in

8    actual testimony, why Ms. Zimmerman's role has been inactive,

9    why she stood back and let Robbins Geller run the lawsuit.

10           THE COURT:  I want to go back just for one second.  I

11   am still thinking through your 30(b)(6) point.

12           So your point is that Pontiac having become aware of

13   what they believed was a fraud continued to purchase the

14   Lockheed stock and that that may subject them to unique

15   defenses.  What they are saying, though, is institutionally

16   they relied on their money managers, their outside money

17   managers to make these determinations.  So while your point is

18   well-taken, that it is not a question of her personal

19   knowledge, it is a question of what the institution knew, what

20   do you say to their response that the institution delegates

21   these determinations to the money manager?

22           MR. WAREHAM:  The institution is the plaintiff.  The

23   institution is subject to attack for being both a program

24   trader, delegating all judgment out to some third party.  That

25   is not typical of a trader in today's market.  And they are

C6KHPONA

1    subject to unique defenses because they did indeed either

2    conclude that there was no fraud in the senior management at

3    Lockheed, because they kept buying, or that they were just so

4    irresponsible that they were atypical.  So they are subject to

5    unique defenses and they will be, if this case proceeds, which

6    we have grave questions about, they will be subject to attack

7    that their inactivity is different than the rest of the class

8    they purport to represent.

9            So I wanted to go back to just a few minutes on the

10   inactivity of Ms. Zimmerman, what she actually says.

11           THE COURT:  I am just thinking aloud.  If, for

12   example, an otherwise valuable company engages in some fraud

13   that if revealed would diminish the value of their stock but it

14   is still a good buy, why wouldn't it be perfectly reasonable

15   for a company to say, well, we want to sue them for what we

16   lost and we are an adequate representative of what everyone

17   lost, but that doesn't mean we don't think the company is so

18   lacking in value that it is still not a good investment.

19           MR. WAREHAM:  The best tutelage I can come up with is

20   that from the Supreme Court in Basic v. Levinson.  The court

21   asked a very interesting hypothetical.  Who would participate

22   in a rigged game after they know the game was rigged.  I

23   misquoted it, but that is basically what it said.

24           The answer really is no responsible, no typical

25   investor would.  So around the edges they may have concluded,

C6KHPONA

but there is no evidence, and we have deposed the advisors,
there is no evidence that anybody did that kind of analysis.
There is no evidence that anybody inside the fund paid
attention enough to have that kind of discussion.

They have delegated responsibility entirely and
completely and they have said they don't care if there is
fraud.  Ms. Zimmerman didn't testify on behalf of the
enterprise, we would study the circumstances, we would do a
calculus and we would say, is it the CFO, is it the CEO.  They
just said blanketly we would not instruct this enterprise, we
would not instruct our investment advisors to change their
course.

That hypothetical question the court asked in Basic v.
Levinson is indicative of what the court really thought should
be the case, which is people who believe there is fraud should
not continue to buy the stock.  There are courts that have held
that.

Your Honor did discuss this in Monster, and what the
court really said was it is not in and of itself a
disqualifying factor, and we are not arguing that that is the
only factor that leads and mandates to the denial of these
motions.  In gestalt, as I go through the lack of adequacy and
I go through new facts, I think in gestalt that conclusion that
the court raised -- which is not our position.  We are not
saying the mere fact of the decision to go forward, as some

C6KHPONA

 1    courts would prohibit as a class representative having bought

 2    the stock after the fraud, that is not the one thing.  It is a

 3    gestalt analysis.

 4             So she was asked, Ms. Zimmerman, because she reviewed

 5    pleadings and she said to the court before she does review

 6    near-final pleadings.  She asked general questions.  Was she

 7    ever able to identify to this court when she was here or in

 8    deposition months later any single question that Robbins Geller

 9    ever asked her or she ever asked Robbins Geller, one question

10    she ever asked.  The answer is no, can't think of one.  Just as

11    before, she still has not suggested a single change to any

12    draft paper, not a single change.  She cannot recall the very

13    few motions that have been filed, including the motion that

14    lead to the dismissal of two or three counts and lots and lots

15    of discovery because of the outstanding motion to dismiss on

16    the one count.  Didn't know about the motion to dismiss.

17    Didn't remember the motion to dismiss.  She knew little to

18    nothing of the so-called confidential witnesses, which I am

19    going to turn to in some detail.  She didn't know who they

20    were.  She didn't know who had interviewed them.  She had not

21    seen a witness statement.  She had not met them.  She didn't

22    know their names.  She didn't see notes of those interviews.

23    She left that to Robbins Geller.

24             She knew nothing of the private investigation firm

25    that is at the core of this case, a firm called L.R. Hodges,

C6KHPONA

which generated evidence by making phone calls to so-called
confidential witnesses.  She was shown a case that came out in
2012 called the Livonia case.  It is a case involving, a
Robbins Geller case brought against Boeing and its executives.

        In that case the complaint filed by Robbins Geller was
dismissed with prejudice because, and I quote the court:
Material facts concerning the confidential source's position
and personal knowledge were misrepresented by the plaintiff.
She had never heard of that case.  Her lawyers had not brought
that case to her attention.

        Moreover, in Livonia, the very same private
investigation firm that is involved in this case was involved
in that case.  The court, the Northern District of Illinois in
that case, concluded that it is likely or possible, excuse me,
that an investigator from L.R. Hodges had offered false and
perjured testimony to the court.  She didn't know about that
investigator.  She never heard of who was involved in that
case.  She didn't know about that case.

        The central point is she has taken no steps at any
time to monitor this case, to check on counsel.  She has taken
no steps at any time to understand who was doing what and
whether they are accused of improprieties in other important
forums.

        Now the retirement system has, to quote from this
court in Monster, simply lent its name to a suit controlled

C6KHPONA

1    entirely by the class attorneys.  That is what the record

2    establishes.

3         Now, her lack of oversight is established conclusively

4    in other respects at deposition.  Robbins Geller argues in its

5    paper that she has, quote, heeded the court's directive to

6    monitor expenses.  She has heeded the court's directive to

7    monitor expenses.  She has never questioned an invoice, your

8    Honor.  Why is that?  She has never seen an invoice.  She has

9    never asked for an invoice.  She went so far as to testify

10   under oath that she is not going to ask for an invoice, that

11   she is not going to review invoices.  That is not heeding; that

12   is ignoring.  It is the opposite of heeding.

13        Now, again, we talked a little bit about the

14   monitoring agreement, and it's problematic.  She has testified

15   that every single time --

16        THE COURT:  On the subject of expenses, it is curious

17   to me that on the one hand there are three attorneys here today

18   on the plaintiff's side, which presumably will, if this case

19   goes forward, be part of a lodestar application, where as near

20   as I can tell there is only one attorney who is arguing and he

21   is fully versed in all the issues here and fully capable of

22   arguing it.

23        On the other hand, that may be overly harsh on my part

24   when I see that there are three, indeed four people sitting at

25   defense counsel table, where as near as I can tell there is

C6KHPONA

1    only one arguing and he is perfectly capable and perfectly

2    familiar with all the facts.

3          So it is always, of course, a pleasure to have all you

4    fine folks here, but I wonder why we need all these lawyers.

5          MR. WAREHAM:  From my perspective I can tell you I

6    know two of them aren't billing their time for this.  I also

7    know Ms. Zimmerman has not the foggiest notion who is billing

8    time to the class.  Not the foggiest notion.  Hasn't looked at

9    an invoice, hasn't asked for one, doesn't know who is billing

10   to the class, doesn't know.  I think the court pretty clearly

11   admonished her at the front end of this case to know that type

12   of stuff.

13         THE COURT:  Well, I am glad to know that the other two

14   are not billing their time.  So now I guess the question is, is

15   your law firm in such good shape that it can afford to have two

16   folks sitting here not billing their time.  But that is not a

17   question for this court.

18         MR. WAREHAM:  It is funny.  Each time I have been in

19   this particular courtroom in a securities case interesting

20   things have happened.  This is a very educational experience

21   for those here and it has been that way -- I don't know why --

22   each time.  And this case, as I am going to get to in a little

23   bit, is taking another turn, an unpredictable turn.

24         THE COURT:  OK.

25         MR. WAREHAM:  Now, this monitoring agreement, she has

C6KHPONA

1    testified that every single time Robbins Geller came to them,

2    the retirement system, and suggested there was fraud, they have

3    authorized the filing of a lawsuit.  Their own papers

4    demonstrate that nine times in the past three years the

5    retirement system of Pontiac has sought to be appointed as lead

6    counsel.  They are one unlucky investor.

7         Now, I went through a little bit atypicality.  I think

8    that the In Re Salomon decision and the discussion and logic in

9    that case given the gestalt is more persuasive than the court's

10   rule stated.  Not a hard-and-fast rule but one that says it is

11   not disqualifying to be subject to unique defenses because of

12   trades in the market.

13        I will go right now, I actually have the quote in my

14   notes from Basic v. Levinson:  Who would knowingly roll the

15   dice in a crooked crap game.  Either the game wasn't crooked

16   and there are such unique defenses --

17        THE COURT:  I applaud the Supreme Court for its

18   knowledge of crap games, but what I was suggesting is that

19   while of course if someone thought that a company was involved

20   in a fraud from top to bottom one wouldn't invest in that

21   company.  There are many, many, many situations where an

22   otherwise well run and valuable company is accused -- sometimes

23   rightly, sometimes wrongly -- of engaging in some overstatement

24   or some misaccounting or misapplication, etc., that might state

25   a claim under the securities laws and yet doesn't affect the

C6KHPONA

total value of the company.  It affects one aspect of it.  So

an investor may have lost money because of that.  The stock may

have run up 10 percent above what it otherwise should be.  It

doesn't mean necessarily that the company is not still a good

investment.  That is why I am not sure that dictum from Basic

is really dispositive of this issue.

MR. WAREHAM:  I think it is instructive and in the

main it is because this is not the controller and some regional

manager that are defendants in this case.  This is the chairman

and chief executive officer.  This is the chief financial

officer.  This is the head of one of the four major businesses

in the company.  That is the whole crap game.

THE COURT:  Yes, but what they are claiming is that

they knowingly hyped one part of their business above what it

should have represented, and I have no opinion as to whether

that is right or wrong, but they are not saying that it was an

across-the-board fraud involving the entire company.  It is one

aspect that they are focusing on.

MR. WAREHAM:  My point is if the crap dealer, the guy

throwing the dice is in your mind a fraudster, you should be

out of that game.  I don't want to belabor that point.  This is

very senior people.  This is not divisional stuff.

I wanted to close, your Honor, with a brief summary of

some critical new facts.

Now remember the bare bones complaint was filed on

C6KHPONA

```
 1    July 20, 2011.  There is no evidence that any of the six

 2    confidential witnesses that are in the amended complaint filed

 3    in October were ever contacted by anyone on behalf of the

 4    plaintiff before the first complaint was filed.  No evidence

 5    that any witness -- never mind those six -- was ever contacted

 6    by the plaintiff or its representative at any time before the

 7    first case was filed.

 8            All presently known contacts of the six confidential

 9    witnesses involved a single private investigator, a gentleman

10    in California.  He made calls by himself.  He is with that firm

11    that is at the center of the Livonia controversy.  No Robbins

12    Geller lawyer ever met with or spoke to any of the so-called

13    confidential witnesses before the second amended complaint was

14    filed.  And of course, Ms. Zimmerman knew nothing of the

15    confidential witnesses, saw no statements, saw no memoranda,

16    knew no names.

17            Your Honor, no affidavits or statements were obtained

18    before the amended complaint was filed.  None of the four

19    so-called witnesses deposed to date, because we are in the

20    course of generating a record for summary judgment, authorized

21    anyone at L.R. Hodges or Robbins Geller to include information

22    about them in the amended complaint or saw the amended

23    complaint.  All six --

24            THE COURT:  What is it that you believe the

25    confidential witnesses are adding to the complaint?  What do
```

C6KHPONA

1    you think is there based on them that wouldn't be there

2    otherwise?

3          MR. WAREHAM:  We would posit that virtually the whole

4    case, from the bare bones case to the amended complaint, the

5    whole change really is these confidential witnesses.  Now

6    admittedly one, confidential witness No. 6, says so little that

7    we are unlikely to pursue her in discovery in pursuit of

8    dismissal of the case.

9          If one of the witnesses says in the amended complaint,

10   as drummed up by L.R. Hodges in California, that Linda Gooden

11   instructed her to change backlog, and this case is ostensibly

12   to some degree about backlog -- while we don't have the benefit

13   of the court's opinion, we think that helped get across the

14   line.  That individual, your Honor, in affidavit and now on

15   cross-examination, says the following:  I had nothing to do

16   with backlog while at IS and GS.  I never had any communication

17   with Ms. Gooden of any kind, not written, not e-mail, not

18   verbal, not telephonic.  She says under oath:  If I saw

19   Ms. Gooden in the hallways at IS and GS while I was there, I

20   wouldn't have recognized her.

21         You take confidential witness No. 5, your Honor -- he

22   is identified in the amended complaint as the president of one

23   of the largest divisions of the company.  The complaint says he

24   would say:  I didn't think in the beginning of '09 we could

25   make our projections.  I thought our projections were arbitrary

C6KHPONA

1    and I told Linda Gooden, one of the defendants, that we would

2    not make our projections.

3           He has testified under oath, with independent counsel,

4    that he never talked at any length, at any substance with this

5    private investigator.  He has denied flatly ever saying that to

6    the private investigator.  More important, he has said that the

7    financials for IS and GS for 2009 were not arbitrary.  He just

8    said that he believed that they were makeable numbers, and he

9    said that he never said anything attributed to him in the

10   amended complaint to Ms. Gooden.

11          This is important stuff, and there are more examples.

12   I don't want to belabor this because we have videotaped

13   deposition, we have written record, and it is coming in next

14   week in the form of a summary judgment motion pursuant to the

15   court's instruction.

16          So the point really is, who is running this?  When we

17   were trying to get the identity of the confidential witnesses,

18   we actually got to the very call, to call the court to ask for

19   permission to file a motion to compel.  In that call, the

20   plaintiffs finally gave the names or agreed to give the names.

21   What did they do?  Robbins Geller after that, or right before

22   that, contacted, through the private investigation guy in

23   California, all six of these witnesses and offered to pay their

24   legal fees for a sole practitioner, one reference, one guy, a

25   sole practitioner in New York, who happens to be two things.

C6KHPONA

1   One, a former partner at the predecessor law firm of Robbins

2   Geller, and, two, a man that has used the private investigator

3   in question in the past.

4        So we have studied New York ethics rules and it might

5   be possible to do what Robbins Geller has done as long as there

6   is independence.  I don't think it is for today to argue the

7   question of whether this person who has been referred to the

8   six people is independent.

9        Now, three of the six agreed to use that individual,

10  one of whom, this confidential witness No. 2, I have already

11  taken you through her testimony.  Even with this lawyer in

12  place, she has steadfastly, in response to unbelievably

13  boisterous, loud, aggressive testimony -- questioning, excuse

14  me, she steadfastly said that she did not say any of those

15  things to the private investigator and, more importantly, she

16  doesn't believe them.

17       Who is running the lawsuit?  It is Robbins Geller who

18  is running the lawsuit.  Whose interests are at stake here?

19  Robbins Geller's interests are at stake here.

20       THE COURT:  Who is that lawyer?

21       MR. WAREHAM:  It is Frank Karron, and I am not casting

22  aspersions on Mr. Karron.  He is a sole practitioner and he is

23  trying to make a living.

24       As I said, of the three people that agreed to the

25  suggestion for free counsel, paid for by Robbins Geller, one is

C6KHPONA

 1    being deposed on Friday, one does not want to be deposed and,

 2    as I said, she is confidential witness No. 6.  We are probably

 3    OK with that.  One has already gone forward.  The record will

 4    come before the court and the video will come before the court

 5    reflecting that she stuck to her view of the facts.  She stuck

 6    to her beliefs.

 7            So I am not suggesting that in and of himself he has

 8    done anything improper.  Why a law firm would pay for

 9    third-party witness counsel itself is perplexing to me.  I have

10    been doing this 25 years.  I have never seen it.  It disturbs

11    me.  That will come before the court as well.

12            THE COURT:  I agree it is probably not ripe for

13    today's discussion.  I wonder whether those witnesses, those

14    three witnesses don't have potentially mutually antagonistic

15    interests such that one lawyer could not represent all three.

16            MR. WAREHAM:  Well, I think so.  And, second, your

17    Honor, do these people know that the man at the core of this,

18    that we believe fabricated information, this private

19    investigator out in California, do these people know that this

20    individual lawyer has used that same investigator in other

21    cases.  That presents a whole other avenue for exploration on

22    conflict.

23            Again, that is not before the court today, but to try

24    to, from the monitoring agreement, to the tactics to block

25    other people, to the inclusion of confidential witness

C6KHPONA

 1    statements, with no one inside the firm forming any view on

 2    validity, on credibility, to the attacking, viciously attacking

 3    their own witnesses, I wonder what is behind the concept that

 4    you rest your complaint on six confidential witnesses and you

 5    have now spent hours trying to determine if they are absolutely

 6    credible.

 7              So I assume, your Honor, that that is what they will

 8    continue to do, that they won't analyze the veracity of this

 9    one guy making phone calls out in California from the suspect

10    firm, that they will call all the people liars.  I assume they

11    will attack my motivations and the way we contacted these

12    people.

13              What I wanted to do in closing, your Honor, is say

14    these facts go right toward the question of adequacy, not just

15    of the class representative who has delegated its entire case

16    from start to finish but of the firm itself.  All I ask is

17    until that record is developed and the court sees both sides of

18    the aisle and understands their views of the facts that it hold

19    abeyance the ruling on these two motions.

20              THE COURT:  Thank you very much.

21              Let me hear from plaintiff's counsel.

22              MR. RUDMAN:  Your Honor, I think I can be brief.

23    First of all, look, we have a summary judgment motion coming

24    up.  Discovery is not closed on this confidential witness

25    issue.  I mean, Mr. Goldstein is here because he specifically

C6KHPONA

1  was dealing with this issue.  He took the depositions.  If your

2  Honor would like to hear our counterpoints to the points that

3  Mr. Wareham made, I am happy to have him speak about what

4  happened with the witnesses.  There is still discovery ongoing

5  and there is going to be more discovery from us in terms of the

6  confidential witnesses.

7          THE COURT:  Let me ask you this.  What is the name of

8  this investigator again?

9          MR. RUDMAN:  L.R. Hodges, and the investigator's name

10  is Ken Keatley.

11          THE COURT:  Before filing your either original or

12  amended complaint, what information had you received from him?

13          MR. RUDMAN:  We conducted an investigation, your

14  Honor.

15          THE COURT:  No, no.  Answer my question.

16          MR. RUDMAN:  I'm not sure I understand the question.

17          THE COURT:  The question is, what information did you

18  receive from this investigator?  Did you get affidavits?  Did

19  you get a report?

20          MR. RUDMAN:  OK.

21          THE COURT:  Did you get an oral presentation?

22          MR. RUDMAN:  Now I understand it.  We got memos from

23  the investigator.

24          THE COURT:  So maybe I should hear from your

25  colleague.

C6KHPONA

1          MR. RUDMAN:  Hold on a second.

2          THE COURT:  Excuse me.

3          MR. RUDMAN:  I'm sorry, Judge.

4          THE COURT:  Let me hear from your colleague.

5          MR. GOLDSTEIN:  Sure, your Honor.

6          THE COURT:  There must have been a miscommunication

7    there.  I said I needed to hear from your colleague and you

8    asked him to sit down.

9          MR. RUDMAN:  I'm sorry, Judge.

10         THE COURT:  If you ever do that again in my court, you

11   will be in contempt of court.

12         MR. GOLDSTEIN:  Your Honor, I am happy to answer any

13   specific questions.  The reason I am here today is even though

14   we believed it was going to be a class certification hearing

15   and that would be limited to issues that related to class

16   certification, we thought Mr. Wareham might take the

17   opportunity to raise the issues --

18         THE COURT:  That certainly answers one of my earlier

19   questions.

20         So the defenses alleged -- and this may go to this

21   motion, it may only go to the summary judgment motion.  I don't

22   know.  But since it has been raised and since that is why you

23   are here, let's hear from you on what he had to say.

24         MR. GOLDSTEIN:  Certainly, your Honor.  I would like

25   the court to understand that there were six witnesses that were

C6KHPONA

```
 1   in the complaint.  We have taken testimony now from four.  I
 2   would like the court to understand, first of all, what each of
 3   these witnesses is bound by and what their motive is to come in
 4   and say what is in the affidavit that DLA Piper wrote for them
 5   and to which there has been numerous corrections by those
 6   witnesses on the record as saying certain portions of them
 7   aren't accurate.  But those witnesses, your Honor, each of them
 8   have a confidentiality agreement, a nondisparagement agreement
 9   with as much as $200,000 at stake for the rest of their lives.
10   That is Mr. Asbury.  Your Honor, it is clear that these
11   witnesses are scared.  One of the witnesses --
12             THE COURT:  I'm --
13             MR. GOLDSTEIN:  No, no.
14             THE COURT:  Excuse me.
15             MR. GOLDSTEIN:  I wasn't --
16             THE COURT:  First I had one plaintiff's counsel in
17   effect trying to countervene the court's instruction that his
18   colleague speak and then I just saw, let the record reflect,
19   counsel -- I am speaking of the plaintiff -- putting up his
20   hand to direct the court not to interrupt him.
21             MR. GOLDSTEIN:  I apologize, your Honor.
22             THE COURT:  You --
23             MR. GOLDSTEIN:  I apologize greatly, your Honor.
24             THE COURT:  Now my question is you had used this
25   investigator before.
```

C6KHPONA

1          MR. GOLDSTEIN:  Our firm has used the investigator

2     before.

3          THE COURT:  I don't know anything about this other

4     case other than what I have seen in the papers, but I take it

5     that his credibility has been cast into doubt in some other

6     case.

7          MR. GOLDSTEIN:  Not this specific investigator, sir,

8     that was used, but the firm for which he works for, yes, sir.

9          THE COURT:  Was that before or after you retained that

10    investigator firm on this case?

11         MR. GOLDSTEIN:  Your Honor, I will speak to the best

12    of my ability, but I may need to refer to Mr. Rudman as I was

13    just added to the case.

14         I do believe that the issue was pending, that we hired

15    the investigator while the issue was pending.  I'm not certain

16    as to that and I would defer to Mr. Rudman.  I am just not

17    sure, your Honor.

18         THE COURT:  Now he supplied you with memoranda, is

19    that it?

20         MR. GOLDSTEIN:  Your Honor, what this investigator

21    did, and I will be full and complete -- we have provided it on

22    the privilege log because we believe it constitutes our work

23    product.  He took contemporaneous notes of the conversations,

24    which are substantial.  He then, in short time, as close as the

25    next day or the very same day, converted those notes into a

C6KHPONA

memorandum, single spaced, which go anywhere from five to 15

pages, single spaced, which detail to the best of his ability

what was said on those calls.  He did not record the calls as

they are not allowed to do so in California.  Then he provided

those memorandum to us, which we then used in formulating the

amended complaint, as I understand.  But again, I would defer,

your Honor -- I want to make sure I am not --

            THE COURT:  Did he have anyone with him when he did

this?

            MR. GOLDSTEIN:  I don't believe so, sir.  I believe he

was the sole person on the phone at the time and that that is

normally the practice of most investigative firms that are used

a lot in these cases, and in my experience even as a federal

prosecutor that typically a lot of times the agents would be

one on one, so to speak.

            THE COURT:  Well, the reason I raise that is your

adversary says that at least one witness has flatly denied ever

saying anything like what your investigator said she said.  To

the extent that becomes an issue for the court, I would

probably have to take the testimony here in this courtroom of

both the witness and the investigator.  I wanted to know if

there are any third persons involved, but apparently not.

            MR. GOLDSTEIN:  May I interject, your Honor?

            THE COURT:  Yes.

            MR. GOLDSTEIN:  Your Honor, with respect to some of

C6KHPONA

1   the things specifically that Mr. Wareham said, for example,

2   that Mr. Asbury, who, by the way, Lockheed paid for his

3   counsel, just as an aside, as we are being accused for paying

4   for counsel.  They got him counsel and he is a former

5   executive.  They paid for, he testified under oath --

6           THE COURT:  I just had an interesting case, United

7   States v. Gupta, in which defense counsel, having received,

8   according to the press, some $30 million from Goldman to pay

9   for the defense, spent most of his summation attacking Goldman.

10  So these things happen.

11          I am a little more concerned, but I don't want to get

12  derailed on this now, whether one person can represent all the

13  confidential witnesses or some combination of them.  Anyway, go

14  ahead with what you were saying.

15          MR. GOLDSTEIN:  Your Honor, what he testified to, for

16  example, was that he spoke to Mr. Keatley, the gentleman's

17  name, for no longer than five minutes.  We have subpoenaed the

18  records.  Mr. Keatley's phone log shows that he spoke to him

19  for 50 minutes.  We believe that the records from Mr. Asbury's

20  corporation as well as his personal records will indeed show

21  that.

22          I think, your Honor, that just begs the point, in

23  these depositions there has been some harmful testimony that

24  shows the manner by which these declarations have been obtained

25  by the defendants and I would like to tell the court about some

C6KHPONA

1    of the conduct that DLA engaged in if they are casting

2    aspersions on us.

3              THE COURT:  All right.

4              MR. GOLDSTEIN:  Your Honor, for example, one of the

5    witnesses testified -- I am happy to read it to the court --

6    that Mr. Wareham promised him that if he signed the affidavit

7    he wouldn't have to testify.  He said here, your Honor:

8    Explain to me exactly what they said, that hopefully by signing

9    this declaration that it will be enough evidence that you

10   wouldn't have to come and testify?"

11   "A.  That this would -- I don't remember the specifics.  It was

12   pretty much that, yes, I wouldn't have to come and testify."

13             "As a lawyer representing Lockheed, you believed them,

14   didn't you?"

15             "Yes."

16             "Because you understand that Lockheed hires very smart

17   and powerful lawyers?"

18             "Yes."

19             "And if a lawyer from Lockheed says, hey, if you do

20   this and you won't have to come testify, you thought you should

21   do this, right, sir?"

22             "Objection.  You can answer, sir."

23             "I can get on with my life."

24             "You wanted to get on your with your life by signing

25   this, sir?"

C6KHPONA

1              "Yes, because I am not really -- I really don't feel

2      that I have no interest."

3              That is one witness, your Honor.

4              THE COURT:  Well, a lot of that was leading questions,

5      which of course was permitted, but I am not sure how much

6      weight I can give to what you just read to me.  It would be one

7      thing if the Lockheed lawyer said if you sign this, you won't

8      have to testify.  It is another thing if the lawyer said, look,

9      we are going to be bringing a motion, we are very hopeful this

10     motion will succeed.  If it does succeed, you won't have to

11     testify, and so forth.  That would cast a rather different spin

12     on it.  It is a little hard to know at this point.

13             MR. GOLDSTEIN:  Certainly, I understand.  Your Honor,

14     that begs the point that really these are issues that will be

15     fully litigated in that motion.  I do want to inform the court

16     what happened at these depositions because Mr. Wareham stood up

17     and made it seem like these witnesses came in and said this

18     gentleman made these things up and that that's the end of the

19     story.

20             That is not what occurred in these depositions, sir.

21     Witnesses testified that they spoke to him for brief five

22     minutes, ten minutes, and then were confronted with phone

23     records showing that they in fact spoke with him for 50

24     minutes.  The witnesses came in and they said wholesale, I

25     don't remember what I said to that investigator.  One of the

C6KHPONA

witnesses was presented with specific allegations of the

complaint attributed to him and he said, yeah, that could

happen.  In fact, I believe that did happen at Lockheed, that

they replaced experienced personnel with inexperienced

personnel in order to reduce costs.  Did I say that to the

investigator?  I don't remember.

Your Honor, there was clearly a lot of wholesale

memory loss by these witnesses.  I think in any case in most

trials there are cases where witnesses say something and then

they recant.  That is a credibility issue that we have all been

faced with.  It does not mean that we committed fraud or that

this investigator made these things up.

Your Honor, some of the testimony that was elicited,

for example, in Mr. Asbury's deposition was I asked Mr. Asbury

whether or not there were program review meetings.  He said

yes.  I said what day of the week.  He said Tuesday.  I said

afternoon or evening.  He said afternoon.  That's precisely

what Mr. Keatley wrote in his memoranda.

It begs the question, how is Mr. Keatley so prescient

that he can pull that out of thin air.

There are other things, specifics, your Honor.  For

example, in Ms. Burns' testimony, she was asked about certain

internal programs and she talked about a dashboard in which

certain things were placed to evaluate the program.  That was

volunteered.  That word was not even presented to her.  Again,

C6KHPONA

1    that specific description of the dashboard program is in

2    Mr. Keatley's memorandum.

3            What Mr. Wareham would say and what these declarations

4    apparently say is, I spoke to Mr. Keatley, I told him I

5    couldn't speak to him and then nothing more was said.  And

6    obviously that keeps them within the confines of their

7    confidentiality agreements, their nondisclosure agreements,

8    their nondisparagement agreements, and it keeps their pensions

9    intact.

10           I am not saying they were intimidated with respect to

11   that.  The testimony has not been that Mr. Wareham said here is

12   your confidentiality agreement, you are in violation.  I am not

13   representing that to the court.  But clearly these witnesses

14   spoke to the investigator.  There are specifics that will be

15   confirmed in the memoranda.  We intend to present evidence from

16   the investigator.

17           It is beyond logic to think that a man would make up

18   ten pages of handwritten notes, including information, your

19   Honor, that in some cases doesn't help us.  In some cases, with

20   respect to Mr. Asbury, he was asked did you discuss with

21   Mr. Keatley whether or not certain programs were the cause of

22   the miss in the Sackett court, and his response was no.  I

23   didn't speak with him at all.  Well, in fact, what it says in

24   Mr. Keatley's memo, which we are going to present, is that he

25   told Mr. Keatley, don't go down the programs road.

C6KHPONA

1          Now, why would the investigator put that in a memo.

2     Why would I ask that question.  Where would I even get that

3     information from, that quote, if it wasn't discussed by

4     Mr. Asbury.

5          What we believe, your Honor, independent records will

6     show is a 50-minute conversation.  It defies logic to think

7     that for 50 minutes educated people -- Mr. Asbury is the

8     president of the civil division -- would say nothing more than,

9     sir, let me ask you a question.  Mr. Keatley:  Let me ask you a

10    question about your division.  I'm sorry, sir, I am bound by a

11    confidentiality agreement.  That discussion would take two

12    minutes.

13         I believe that the court will have the benefit of

14    those subpoenas.  It will have the benefit of his testimony in

15    full to see that in fact what happened here is what happens in

16    a lot of cases.  My experience in many criminal cases during my

17    time with the government is that witnesses recant.  They have

18    motivations for recanting and then they say things and then

19    ultimately they recant.

20         Your Honor, I will represent to you we are going to

21    take another gentleman high up and we believe, based on an

22    e-mail that we received and based on my conversation with his

23    counsel, that he wrote an e-mail essentially saying that

24    Lockheed Martin committed fraud.  This is Mr. Asbury's deputy.

25    The court will have that evidence before it.  That we simply

C6KHPONA

1    didn't come in here and make this up.

2              THE COURT:  All right.  That is very helpful.  I will

3    let you sit down.

4              MR. GOLDSTEIN:  Thank you, your Honor, and I apologize

5    again.  I appreciate your time.

6              THE COURT:  So was there anything else, Mr. Rudman,

7    you wanted to say?

8              MR. RUDMAN:  Your Honor, I want to apologize.  I meant

9    you absolutely no disrespect.

10             I want to talk about a couple of things.  The first

11   thing was we had a lot of discussion about this whole Basic v.

12   Levinson, it is a quote that plaintiff's lawyers love, which is

13   no one would play in a loaded craps game.

14             THE COURT:  You mean defendant's lawyer.

15             MR. RUDMAN:  Yes.

16             THE COURT:  I think you said plaintiff's lawyers.

17             MR. RUDMAN:  We like Basic v. Levinson, but aside from

18   that point, the game was over here.  By the time they make

19   their purchases, there was no game.  The game ended the end of

20   the class period.

21             Mr. Wareham's point is if they think they were bad

22   guys during the class period, then the truth comes out and they

23   continue buying, that renders them somehow atypical.  There is

24   680 some odd institutional investors Mr. Wareham mentioned, by

25   the way, probably all continued buying, all bought through the

C6KHPONA

1  class period and continued buying after.  So to that extent

2  Pontiac is just like everybody else who is a member of this

3  class.  The point really is the game is over.

4         There was a lot of argument about Ms. Zimmerman's

5  involvement here.  We cite the cases in our brief, your Honor,

6  that a class representative can rely on the expertise of their

7  lawyers.  Pontiac is not a securities lawyer.  They hire a

8  securities lawyer to do a securities case.  It is not

9  surprising that Ms. Zimmerman or anyone at Pontiac can't help

10  out with the scienter section in the brief.  That is not what

11  they do.

12         I think, your Honor, if you look --

13         THE COURT:  I think we are reaching the point of

14  diminishing returns and I think I understand the arguments from

15  both sides.

16         What do you say to defendant's suggestion that I

17  should reserve on this motion until the upcoming summary

18  judgment motion that they are filing because it, first of all,

19  may moot it and, second of all, even if it doesn't, it will

20  inform my evaluation of this motion.  Do you have a view on

21  that?

22         MR. RUDMAN:  Yes.  My view is you should rule on the

23  motion in the ordinary course that your Honor would rule on the

24  motion.  I don't see any reason to delay.

25         THE COURT:  OK.

C6KHPONA

1            MR. RUDMAN:  What I do want to mention, though,

2     because this brings me to my last point, I can send your Honor

3     the cite in the Medtronic Securities Litigation, which I think

4     I mentioned once on a call with the clerk.  The very same fact

5     pattern occurred.  Seven, eight, nine, ten confidential

6     witnesses all supposedly recanted.  The issue was brought up in

7     that circumstance saying counsel's inadequate because look at

8     the investigation they did and how all these witnesses

9     recanted.  The judge in Medtronic said that is an issue for

10    summary judgment, that is an issue for discovery, and certified

11    the class.

12            I am happy to provide the court with that opinion.  I

13    recognize it is from a district court in Minnesota, but it

14    still is informative in that it was the very same issue they

15    are suggesting here.

16            THE COURT:  Sure.  I would be happy to look at it.

17            MR. RUDMAN:  Thank you, your Honor.

18            THE COURT:  I don't know that one can draw any

19    hard-and-fast rule about recantation or not recantation.  What

20    your adversary is suggesting is that your investigator was

21    making things up.  Your colleague has suggested that there is

22    substantial evidence to the contrary.

23            We all understand that on the one hand there are

24    motives sometimes in talking to an investigator to say negative

25    things and there are motives when talking in a deposition to

C6KHPONA

say positive things, and the people in these situations are
under pressures of a variety of sort.  You can't make I think
generalizations.  You have to look at the individual and the
circumstances.  But if there were hypothetically in some case
clear undisputed evidence of fraud on the part of an
investigator, that is something the court would have to look
into regardless of any motion.  That would be a matter
potentially of obstruction of justice.

          I haven't heard anything yet that gives me a basis for
concluding anything about this one way or the other, but I am
looking forward to what I will be presented with in the
upcoming summary judgment motion.

          I should add, by the way, that even if an investigator
were to have obstructed justice in some case, that doesn't
necessarily go to any of these matters -- it may or may not --
because a reasonable plaintiff's counsel could rely on what
appeared to be a perfectly straightforward presentation by an
investigator without being aware that he or she had falsified
something.

          In giving that hypothetical I don't even mean to
suggest that the investigator did falsify anything.  I don't
have any opinion on any of this.  I am just saying that it is
not something one can evaluate without a lot more specifics
than I have now.

          Yes.

C6KHPONA

1          MR. RUDMAN:  Your Honor, you should know we are before

2     you on many matters, we are in this court all the time on these

3     cases, and we obviously take our responsibilities and our

4     obligations to the court extremely seriously.

5          THE COURT:  That is fine.  All right.

6          I will give your adversary one last shot if he wants

7     to say anything further and then we will call it a day.

8          MR. WAREHAM:  I want to say thank you for staying so

9     late, your Honor.  I have nothing to say.

10          THE COURT:  Very good.

11          The court will take the matter under advisement.

12          Thanks a lot.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25