1

C6KHPONA
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CITY OF PONTIAC,

                    Plaintiff,          New York, N.Y.

            v.                          11 Civ. 5026 (JSR)

LOCKHEED MARTIN, et al.,

                    Defendants.

------------------------------x

                                        June 20, 2012
                                        4:15 p.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge

                         APPEARANCES

ROBBINS GELLER RUDMAN & DOWD, LLP
        Attorneys for Plaintiff
BY:  SAMUEL RUDMAN
     EVAN KAUFMAN
     JONAH H. GOLDSTEIN

DLA PIPER US LLP
        Attorneys for Defendants
BY:  JAMES WAREHAM
     JOHN HILLEBRECHT
     JOHN VUKELJ

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

C6KHPONA

```
 1              (Case called)
 2              THE COURT:  So I had the privilege of giving a speech
 3    a couple of weeks ago down in Washington to a group of in-house
 4    corporate counsel and I pointed out that they on occasion come
 5    to my court.  They never come to speak, of course.  They come,
 6    as near as I can tell, to glare at their adversary or if things
 7    are going really bad to glare at the court.  So there are all
 8    sorts of options available.  Glad to have them here.
 9              So this is the motion for class certification.  There
10    are really only two issues on which class certification is
11    opposed.  One is the question of whether the claims or defenses
12    of the representative party are typical of the claims and
13    defenses of the class, so-called typicality, and the other is
14    whether the representative party will fairly and adequately
15    protect the interests of the class.
16              In this kind of situation I am not sure that it
17    necessarily makes sense to have one side or the other go first,
18    but since the ultimate burden is on the plaintiff, we will hear
19    from the plaintiff.
20              MR. RUDMAN:  Thank you, your Honor.  Do you care where
21    I stand?  Do you want me to speak from the podium?
22              THE COURT:  No.  So long as we can hear you.
23              MR. RUDMAN:  Just for the record, we are here on our
24    class certification motion seeking to certify a class of all
25    persons that purchased Lockheed Martin stock between April 21,
```

3

C6KHPONA
```
 1   2009 and July 21, 2009.  Although the defendants haven't
 2   contested any of the elements, I wanted to state for the record
 3   that we have submitted, we respectfully submit that we have
 4   submitted sufficient proof to satisfy all of the elements of
 5   class certification.
 6             THE COURT:  The court has to find all the elements.
 7             MR. RUDMAN:  Right.
 8             THE COURT:  But let's deal with what is contested.
 9             MR. RUDMAN:  As I understand the argument on
10   typicality, the defendants are arguing that Pontiac is atypical
11   or subject to a unique defense because they continued to buy
12   stock after the statement, the end of the class period,
13   so-called post class period purchases.  Your Honor held on this
14   very same issue in the Monster Worldwide case that post class
15   repurchases of stock do nothing to strip away the plaintiff's
16   right to claim that they relied on the integrity of the market
17   price at the time they purchased stock during the class period.
18             We submit, your Honor, that what happened here is on
19   all fours with what happened in Monster.  In the case that is
20   cited in Monster, which I think is the Salomon Analyst case,
21   that the post class period purchase of stock do nothing to
22   render Pontiac atypical or subject to any other unique defense.
23             The second kind of twist on that argument that was
24   made was that, well, Pontiac -- Ms. Zimmerman, who is the
25   representative from Pontiac who testified, was asked
```

4

C6KHPONA

 1   specifically if you knew a fraud was going on, would you
 2   instruct the money manager not to buy the stock, and the
 3   response was no.  The defendants have cited that and said, see,
 4   it doesn't matter what is out there, they are going to buy
 5   stock even if they know a fraud is being committed.
 6          THE COURT:  But you are saying what she said is
 7   because that is not her decision, it is the investment
 8   committee's decision.
 9          MR. RUDMAN:  Correct.  As your Honor is well aware,
10   funds like this rely exclusively on money managers to make
11   those purchases, and there was no testimony from any of the
12   money managers that were deposed in this case that they knew
13   about a fraud at Lockheed when they purchased the stock on
14   behalf of the fund.  So I think that argument carries no weight
15   either.
16          The adequacy argument -- that is all I have on
17   typicality as I understand their arguments, your Honor.
18          The adequacy argument is really twofold, as I
19   understand it.  The first one is, well, it is really one thing,
20   which is, and it is not surprising, this plaintiff is not the
21   kind of plaintiff that the defendants would like to see suing
22   them.  They claim that for some reason the plaintiff is being
23   controlled by the lawyers and not prosecuting the lawsuit.
24          I think if you look at Ms. Zimmerman's testimony and
25   you see what has happened in this case, you will see

5

C6KHPONA
1   Ms. Zimmerman took your Honor's admonition to closely monitor
2   this case to heart, has been actively involved in the
3   prosecution of this lawsuit.  She e-mails or speaks with her
4   lawyers three or four times a week and was able to at her
5   deposition adequately describe this case.
6          Now the standard on adequacy is set really by the
7   Baffa case in the Second Circuit, where an 18-year-old man was
8   appointed or the denial of his class certification was reversed
9   by the Second Circuit.  Now, it is not a high standard and we
10  respectfully submit that if you look at how Ms. Zimmerman has
11  acted in this case and the fund has acted, that easily meet
12  that standard.
13         The next argument the defendants raise with respect to
14  adequacy is the monitoring argument, that for some reason
15  because Pontiac has a monitoring agreement that makes them less
16  likely to prosecute this case.  For the life of me, I don't
17  understand how you reach that conclusion from the fact that
18  they have a monitoring agreement.  I know your Honor has raised
19  concerns about the monitoring agreements.  I think it is
20  important to understand why these funds have monitoring
21  agreements to begin with.  So I am going to go back in time
22  just a little bit to explain how they came into existence.
23         There was a case many years ago called the Teledyne
24  case in Cleveland.  In that case an institutional investor was
25  challenged as being inadequate to serve as a lead plaintiff

6

C6KHPONA

1     under ERISA.  So the other lead plaintiff movant said you can't
2     be a lead plaintiff because under ERISA you can't spend any
3     money other than -- you can't utilize your resources for
4     anything other than to benefit the funds.  The institutional
5     investor was the Florida State Board of Admission.
6              In response to that attack by another lead plaintiff
7     movant, the Department of Labor filed a brief in the Teledyne
8     case -- all this is in the briefing on the lead plaintiff
9     motion -- and said, wait, you have a fiduciary obligation to
10    monitor your investments for fraud and if you believe a fraud
11    has been committed, do what is necessary to pursue that.
12             From that brief, from the Department of Labor brief,
13    came monitoring agreements.  That is why we have them.  Funds
14    went out and said, hey, the Department of Labor has said we
15    need to monitor our funds for fraud.
16             THE COURT:  I agree with your point, or at least I
17    want to hear from your adversary, I don't really see why the
18    existence of the monitoring agreement that led to the
19    identification of this lawsuit affects the adequacy of the
20    plaintiff.  But the problem I have with monitoring
21    agreements -- which I continue to have, but I didn't find it
22    sufficient in the facts of this case to not appoint Pontiac as
23    the lead plaintiff -- is that because they are free, because
24    there is no charge being made, they arguably create an added
25    incentive to the counsel that is monitoring -- which in some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

C6KHPONA

1   agreements, not yours, was required to be the counsel if there
2   actually was fraud -- an incentive to identify marginal cases
3   as fraudulent because it is the only way the law firm gets paid
4   for its services.
5           So that is the concern that I had, continue to have to
6   some degree, but I don't think it affects any issue that is
7   before me on class certification.  I will be glad to hear
8   anything your adversary has to say on that.
9           MR. RUDMAN:  Then, your Honor, I think I am almost
10  done on the adequacy point.  The only thing I wanted to address
11  was, there was some argument in the defendant's briefs that
12  somehow by filing the lawsuit several days before the statute
13  of limitations ostensibly ran -- I say ostensibly because even
14  if the price drop was two years ago, it is not clear that under
15  Merck, the Supreme Court's decision in Merck, when the statute
16  of limitations would ultimately run.  But assuming that is when
17  it would have run, the argument in the defendant's papers are
18  that there was some kind of, quote-unquote, scheme to get
19  control of the lawsuit by doing that.
20          What I wanted to point out for the court is the PSLRA
21  doesn't let you do that, your Honor.  Once we filed the
22  lawsuit, we had to publish a notice advising anyone that wanted
23  to that they could come before your Honor and make a motion.
24  So the fact of the matter is, the plaintiff here or our firm
25  had no ability to preclude anybody else who wanted to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

C6KHPONA

1    involved in a lawsuit or take control of the lawsuit from doing
2    so.  Because the notice went out advising them if they wanted
3    to make a motion, they should.  The fact of the matter is no
4    one else wanted to make a motion.  Pontiac was able to become
5    the lead plaintiff.
6            Unless the court has any other questions for me on
7    those points.
8            THE COURT:  No, that is fine.
9            MR. RUDMAN:  Thank you.
10           MR. WAREHAM:  May it please the court, your Honor,
11   James Wareham on behalf of the defendant.
12           Failures are two in number under 23(a).  They are
13   inadequate, not just the retirement system but the Robbins
14   Geller firm as well, and Pontiac is subject to unique defenses
15   because of their atypicality.  I am going to go through those
16   very quickly.
17           Plaintiff in its papers complains fairly loudly that
18   if the instant motions are denied the case will end, and for
19   several reasons that really is of no moment.  First, they cite
20   to the case that we would cite to, Kline v. Wolf, in support of
21   its position.  In Kline v. Wolf, the Second Circuit affirmed
22   the district court's denial of the motion for class
23   certification when there was one and only one participant, one
24   and only one competing class representative.  The Second
25   Circuit did it again several years later in Gary Plastic v.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

C6KHPONA

1    Merrill Lynch, again, where a class certification motion was
2    denied when there was only one putative class representative.
3              Now, the idiosyncrasies of this unusual case also cut
4    in favor of a decision which ignores plaintiff's central
5    argument, and the idiosyncrasies really do flow from the
6    monitoring agreement, from the filing of the last day, from the
7    facts that I am going to go through, some of which are very new
8    now.
9              Now two years passed between the July 21, 2009
10   announcement plaintiffs complain about.  They filed a very bare
11   bones complaint.  They lost $17,000.  Not one of the 600
12   institutional investors did the plaintiffs identify in their
13   current papers.  600 institutional investors in their own
14   papers own about 86 percent of the company.  Not one complained
15   at any point in time.  As Mr. Rudman pointed out, not even
16   notice was found.  This is not a case really about Pontiac
17   retirement system.  It is about Robbins Geller.
18             Now Ms. Zimmerman has testified since you saw her in
19   your courtroom, your Honor, as a 30(b)(6) witness.  She wasn't
20   testifying about her own knowledge, by the way.  What she said
21   as to what happened with respect to the fund is what would
22   happen with respect to the fund.  She is a 30(b)(6).  It is not
23   her personal knowledge that is being exacted for this
24   deposition.
25             THE COURT:  Did you depose her for her personal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
       C6KHPONA
 1     knowledge?
 2              MR. WAREHAM:  No, we did not, your Honor.
 3              THE COURT:  So I don't know how that cuts one way or
 4     the other.  If you are saying that her answers don't
 5     necessarily reflect her personal knowledge because she was
 6     deposed as a 30(b)(6), that is fine, but you can't infer from
 7     that that her personal knowledge is greater, lesser, or
 8     anything else because you didn't depose her for her personal
 9     knowledge.
10              MR. WAREHAM:  That is a fair point.  The point I make
11     is, it is an admission of the enterprise.
12              THE COURT:  OK.
13              MR. WAREHAM:  That in light of a fraud, knowledge of a
14     fraud inside a company, the enterprise, not Ms. Zimmerman,
15     would not instruct its investors -- excuse me, its investor
16     advisors to refrain from purchasing or sell that stock.
17              THE COURT:  OK.  Now I understand your point.  Go
18     ahead.
19              MR. WAREHAM:  Thank you, your Honor.
20              Now, she was alerted to the need to have immediate
21     approval of a complaint less than 48 hours before the filing of
22     the initial complaint.  She was not told that the statute of
23     limitations was expiring.  She was not told why the approval
24     had to be so hurriedly done.
25              Now, in your preliminary ruling, your Honor, you did
```

11

C6KHPONA

1    express skepticism about the tactics employed by Robbins
2    Geller -- it is not us; it comes from the court -- who really
3    is driving this litigation.  And you did express skepticism
4    about Ms. Zimmerman's oversight, and discovery has revealed
5    some things that are troubling and lead to justification for
6    the court's skepticism.  I am going to go through a few things
7    that demonstrate, not just in prose or conclusory words but in
8    actual testimony, why Ms. Zimmerman's role has been inactive,
9    why she stood back and let Robbins Geller run the lawsuit.
10            THE COURT:  I want to go back just for one second.  I
11    am still thinking through your 30(b)(6) point.
12            So your point is that Pontiac having become aware of
13    what they believed was a fraud continued to purchase the
14    Lockheed stock and that that may subject them to unique
15    defenses.  What they are saying, though, is institutionally
16    they relied on their money managers, their outside money
17    managers to make these determinations.  So while your point is
18    well-taken, that it is not a question of her personal
19    knowledge, it is a question of what the institution knew, what
20    do you say to their response that the institution delegates
21    these determinations to the money manager?
22            MR. WAREHAM:  The institution is the plaintiff.  The
23    institution is subject to attack for being both a program
24    trader, delegating all judgment out to some third party.  That
25    is not typical of a trader in today's market.  And they are

C6KHPONA

1   subject to unique defenses because they did indeed either
2   conclude that there was no fraud in the senior management at
3   Lockheed, because they kept buying, or that they were just so
4   irresponsible that they were atypical.  So they are subject to
5   unique defenses and they will be, if this case proceeds, which
6   we have grave questions about, they will be subject to attack
7   that their inactivity is different than the rest of the class
8   they purport to represent.
9           So I wanted to go back to just a few minutes on the
10  inactivity of Ms. Zimmerman, what she actually says.
11          THE COURT:  I am just thinking aloud.  If, for
12  example, an otherwise valuable company engages in some fraud
13  that if revealed would diminish the value of their stock but it
14  is still a good buy, why wouldn't it be perfectly reasonable
15  for a company to say, well, we want to sue them for what we
16  lost and we are an adequate representative of what everyone
17  lost, but that doesn't mean we don't think the company is so
18  lacking in value that it is still not a good investment.
19          MR. WAREHAM:  The best tutelage I can come up with is
20  that from the Supreme Court in Basic v. Levinson.  The court
21  asked a very interesting hypothetical.  Who would participate
22  in a rigged game after they know the game was rigged.  I
23  misquoted it, but that is basically what it said.
24          The answer really is no responsible, no typical
25  investor would.  So around the edges they may have concluded,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

C6KHPONA

1   but there is no evidence, and we have deposed the advisors,
2   there is no evidence that anybody did that kind of analysis.
3   There is no evidence that anybody inside the fund paid
4   attention enough to have that kind of discussion.
5           They have delegated responsibility entirely and
6   completely and they have said they don't care if there is
7   fraud.  Ms. Zimmerman didn't testify on behalf of the
8   enterprise, we would study the circumstances, we would do a
9   calculus and we would say, is it the CFO, is it the CEO.  They
10  just said blanketly we would not instruct this enterprise, we
11  would not instruct our investment advisors to change their
12  course.
13          That hypothetical question the court asked in Basic v.
14  Levinson is indicative of what the court really thought should
15  be the case, which is people who believe there is fraud should
16  not continue to buy the stock.  There are courts that have held
17  that.
18          Your Honor did discuss this in Monster, and what the
19  court really said was it is not in and of itself a
20  disqualifying factor, and we are not arguing that that is the
21  only factor that leads and mandates to the denial of these
22  motions.  In gestalt, as I go through the lack of adequacy and
23  I go through new facts, I think in gestalt that conclusion that
24  the court raised -- which is not our position.  We are not
25  saying the mere fact of the decision to go forward, as some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6KHPONA

1   courts would prohibit as a class representative having bought
2   the stock after the fraud, that is not the one thing.  It is a
3   gestalt analysis.
4         So she was asked, Ms. Zimmerman, because she reviewed
5   pleadings and she said to the court before she does review
6   near-final pleadings.  She asked general questions.  Was she
7   ever able to identify to this court when she was here or in
8   deposition months later any single question that Robbins Geller
9   ever asked her or she ever asked Robbins Geller, one question
10   she ever asked.  The answer is no, can't think of one.  Just as
11   before, she still has not suggested a single change to any
12   draft paper, not a single change.  She cannot recall the very
13   few motions that have been filed, including the motion that
14   lead to the dismissal of two or three counts and lots and lots
15   of discovery because of the outstanding motion to dismiss on
16   the one count.  Didn't know about the motion to dismiss.
17   Didn't remember the motion to dismiss.  She knew little to
18   nothing of the so-called confidential witnesses, which I am
19   going to turn to in some detail.  She didn't know who they
20   were.  She didn't know who had interviewed them.  She had not
21   seen a witness statement.  She had not met them.  She didn't
22   know their names.  She didn't see notes of those interviews.
23   She left that to Robbins Geller.
24         She knew nothing of the private investigation firm
25   that is at the core of this case, a firm called L.R. Hodges,

C6KHPONA

1  which generated evidence by making phone calls to so-called
2  confidential witnesses.  She was shown a case that came out in
3  2012 called the Livonia case.  It is a case involving, a
4  Robbins Geller case brought against Boeing and its executives.
5           In that case the complaint filed by Robbins Geller was
6  dismissed with prejudice because, and I quote the court:
7  Material facts concerning the confidential source's position
8  and personal knowledge were misrepresented by the plaintiff.
9  She had never heard of that case.  Her lawyers had not brought
10 that case to her attention.
11          Moreover, in Livonia, the very same private
12 investigation firm that is involved in this case was involved
13 in that case.  The court, the Northern District of Illinois in
14 that case, concluded that it is likely or possible, excuse me,
15 that an investigator from L.R. Hodges had offered false and
16 perjured testimony to the court.  She didn't know about that
17 investigator.  She never heard of who was involved in that
18 case.  She didn't know about that case.
19          The central point is she has taken no steps at any
20 time to monitor this case, to check on counsel.  She has taken
21 no steps at any time to understand who was doing what and
22 whether they are accused of improprieties in other important
23 forums.
24          Now the retirement system has, to quote from this
25 court in Monster, simply lent its name to a suit controlled

16

C6KHPONA

1   entirely by the class attorneys.  That is what the record
2   establishes.
3           Now, her lack of oversight is established conclusively
4   in other respects at deposition.  Robbins Geller argues in its
5   paper that she has, quote, heeded the court's directive to
6   monitor expenses.  She has heeded the court's directive to
7   monitor expenses.  She has never questioned an invoice, your
8   Honor.  Why is that?  She has never seen an invoice.  She has
9   never asked for an invoice.  She went so far as to testify
10  under oath that she is not going to ask for an invoice, that
11  she is not going to review invoices.  That is not heeding; that
12  is ignoring.  It is the opposite of heeding.
13          Now, again, we talked a little bit about the
14  monitoring agreement, and it's problematic.  She has testified
15  that every single time --
16          THE COURT:  On the subject of expenses, it is curious
17  to me that on the one hand there are three attorneys here today
18  on the plaintiff's side, which presumably will, if this case
19  goes forward, be part of a lodestar application, where as near
20  as I can tell there is only one attorney who is arguing and he
21  is fully versed in all the issues here and fully capable of
22  arguing it.
23          On the other hand, that may be overly harsh on my part
24  when I see that there are three, indeed four people sitting at
25  defense counsel table, where as near as I can tell there is

17

C6KHPONA

1  only one arguing and he is perfectly capable and perfectly
2  familiar with all the facts.
3          So it is always, of course, a pleasure to have all you
4  fine folks here, but I wonder why we need all these lawyers.
5          MR. WAREHAM:  From my perspective I can tell you I
6  know two of them aren't billing their time for this.  I also
7  know Ms. Zimmerman has not the foggiest notion who is billing
8  time to the class.  Not the foggiest notion.  Hasn't looked at
9  an invoice, hasn't asked for one, doesn't know who is billing
10  to the class, doesn't know.  I think the court pretty clearly
11  admonished her at the front end of this case to know that type
12  of stuff.
13          THE COURT:  Well, I am glad to know that the other two
14  are not billing their time.  So now I guess the question is, is
15  your law firm in such good shape that it can afford to have two
16  folks sitting here not billing their time.  But that is not a
17  question for this court.
18          MR. WAREHAM:  It is funny.  Each time I have been in
19  this particular courtroom in a securities case interesting
20  things have happened.  This is a very educational experience
21  for those here and it has been that way -- I don't know why --
22  each time.  And this case, as I am going to get to in a little
23  bit, is taking another turn, an unpredictable turn.
24          THE COURT:  OK.
25          MR. WAREHAM:  Now, this monitoring agreement, she has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

C6KHPONA

1   testified that every single time Robbins Geller came to them,
2   the retirement system, and suggested there was fraud, they have
3   authorized the filing of a lawsuit.  Their own papers
4   demonstrate that nine times in the past three years the
5   retirement system of Pontiac has sought to be appointed as lead
6   counsel.  They are one unlucky investor.
7           Now, I went through a little bit atypicality.  I think
8   that the In Re Salomon decision and the discussion and logic in
9   that case given the gestalt is more persuasive than the court's
10  rule stated.  Not a hard-and-fast rule but one that says it is
11  not disqualifying to be subject to unique defenses because of
12  trades in the market.
13          I will go right now, I actually have the quote in my
14  notes from Basic v. Levinson:  Who would knowingly roll the
15  dice in a crooked crap game.  Either the game wasn't crooked
16  and there are such unique defenses --
17          THE COURT:  I applaud the Supreme Court for its
18  knowledge of crap games, but what I was suggesting is that
19  while of course if someone thought that a company was involved
20  in a fraud from top to bottom one wouldn't invest in that
21  company.  There are many, many, many situations where an
22  otherwise well run and valuable company is accused -- sometimes
23  rightly, sometimes wrongly -- of engaging in some overstatement
24  or some misaccounting or misapplication, etc., that might state
25  a claim under the securities laws and yet doesn't affect the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6KHPONA

1  total value of the company.  It affects one aspect of it.  So
2  an investor may have lost money because of that.  The stock may
3  have run up 10 percent above what it otherwise should be.  It
4  doesn't mean necessarily that the company is not still a good
5  investment.  That is why I am not sure that dictum from Basic
6  is really dispositive of this issue.
7           MR. WAREHAM:  I think it is instructive and in the
8  main it is because this is not the controller and some regional
9  manager that are defendants in this case.  This is the chairman
10  and chief executive officer.  This is the chief financial
11  officer.  This is the head of one of the four major businesses
12  in the company.  That is the whole crap game.
13          THE COURT:  Yes, but what they are claiming is that
14  they knowingly hyped one part of their business above what it
15  should have represented, and I have no opinion as to whether
16  that is right or wrong, but they are not saying that it was an
17  across-the-board fraud involving the entire company.  It is one
18  aspect that they are focusing on.
19          MR. WAREHAM:  My point is if the crap dealer, the guy
20  throwing the dice is in your mind a fraudster, you should be
21  out of that game.  I don't want to belabor that point.  This is
22  very senior people.  This is not divisional stuff.
23          I wanted to close, your Honor, with a brief summary of
24  some critical new facts.
25          Now remember the bare bones complaint was filed on

20

C6KHPONA

1   July 20, 2011.  There is no evidence that any of the six
2   confidential witnesses that are in the amended complaint filed
3   in October were ever contacted by anyone on behalf of the
4   plaintiff before the first complaint was filed.  No evidence
5   that any witness -- never mind those six -- was ever contacted
6   by the plaintiff or its representative at any time before the
7   first case was filed.
8           All presently known contacts of the six confidential
9   witnesses involved a single private investigator, a gentleman
10  in California.  He made calls by himself.  He is with that firm
11  that is at the center of the Livonia controversy.  No Robbins
12  Geller lawyer ever met with or spoke to any of the so-called
13  confidential witnesses before the second amended complaint was
14  filed.  And of course, Ms. Zimmerman knew nothing of the
15  confidential witnesses, saw no statements, saw no memoranda,
16  knew no names.
17          Your Honor, no affidavits or statements were obtained
18  before the amended complaint was filed.  None of the four
19  so-called witnesses deposed to date, because we are in the
20  course of generating a record for summary judgment, authorized
21  anyone at L.R. Hodges or Robbins Geller to include information
22  about them in the amended complaint or saw the amended
23  complaint.  All six --
24          THE COURT:  What is it that you believe the
25  confidential witnesses are adding to the complaint?  What do

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6KHPONA
1   you think is there based on them that wouldn't be there
2   otherwise?
3           MR. WAREHAM:  We would posit that virtually the whole
4   case, from the bare bones case to the amended complaint, the
5   whole change really is these confidential witnesses.  Now
6   admittedly one, confidential witness No. 6, says so little that
7   we are unlikely to pursue her in discovery in pursuit of
8   dismissal of the case.
9           If one of the witnesses says in the amended complaint,
10  as drummed up by L.R. Hodges in California, that Linda Gooden
11  instructed her to change backlog, and this case is ostensibly
12  to some degree about backlog -- while we don't have the benefit
13  of the court's opinion, we think that helped get across the
14  line.  That individual, your Honor, in affidavit and now on
15  cross-examination, says the following:  I had nothing to do
16  with backlog while at IS and GS.  I never had any communication
17  with Ms. Gooden of any kind, not written, not e-mail, not
18  verbal, not telephonic.  She says under oath:  If I saw
19  Ms. Gooden in the hallways at IS and GS while I was there, I
20  wouldn't have recognized her.
21          You take confidential witness No. 5, your Honor -- he
22  is identified in the amended complaint as the president of one
23  of the largest divisions of the company.  The complaint says he
24  would say:  I didn't think in the beginning of '09 we could
25  make our projections.  I thought our projections were arbitrary

22

C6KHPONA

1  and I told Linda Gooden, one of the defendants, that we would
2  not make our projections.
3         He has testified under oath, with independent counsel,
4  that he never talked at any length, at any substance with this
5  private investigator.  He has denied flatly ever saying that to
6  the private investigator.  More important, he has said that the
7  financials for IS and GS for 2009 were not arbitrary.  He just
8  said that he believed that they were makeable numbers, and he
9  said that he never said anything attributed to him in the
10  amended complaint to Ms. Gooden.
11         This is important stuff, and there are more examples.
12  I don't want to belabor this because we have videotaped
13  deposition, we have written record, and it is coming in next
14  week in the form of a summary judgment motion pursuant to the
15  court's instruction.
16         So the point really is, who is running this?  When we
17  were trying to get the identity of the confidential witnesses,
18  we actually got to the very call, to call the court to ask for
19  permission to file a motion to compel.  In that call, the
20  plaintiffs finally gave the names or agreed to give the names.
21  What did they do?  Robbins Geller after that, or right before
22  that, contacted, through the private investigation guy in
23  California, all six of these witnesses and offered to pay their
24  legal fees for a sole practitioner, one reference, one guy, a
25  sole practitioner in New York, who happens to be two things.

23

C6KHPONA

1   One, a former partner at the predecessor law firm of Robbins
2   Geller, and, two, a man that has used the private investigator
3   in question in the past.
4        So we have studied New York ethics rules and it might
5   be possible to do what Robbins Geller has done as long as there
6   is independence.  I don't think it is for today to argue the
7   question of whether this person who has been referred to the
8   six people is independent.
9        Now, three of the six agreed to use that individual,
10   one of whom, this confidential witness No. 2, I have already
11   taken you through her testimony.  Even with this lawyer in
12   place, she has steadfastly, in response to unbelievably
13   boisterous, loud, aggressive testimony -- questioning, excuse
14   me, she steadfastly said that she did not say any of those
15   things to the private investigator and, more importantly, she
16   doesn't believe them.
17        Who is running the lawsuit?  It is Robbins Geller who
18   is running the lawsuit.  Whose interests are at stake here?
19   Robbins Geller's interests are at stake here.
20        THE COURT:  Who is that lawyer?
21        MR. WAREHAM:  It is Frank Karron, and I am not casting
22   aspersions on Mr. Karron.  He is a sole practitioner and he is
23   trying to make a living.
24        As I said, of the three people that agreed to the
25   suggestion for free counsel, paid for by Robbins Geller, one is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6KHPONA

1  being deposed on Friday, one does not want to be deposed and,
2  as I said, she is confidential witness No. 6.  We are probably
3  OK with that.  One has already gone forward.  The record will
4  come before the court and the video will come before the court
5  reflecting that she stuck to her view of the facts.  She stuck
6  to her beliefs.
7          So I am not suggesting that in and of himself he has
8  done anything improper.  Why a law firm would pay for
9  third-party witness counsel itself is perplexing to me.  I have
10 been doing this 25 years.  I have never seen it.  It disturbs
11 me.  That will come before the court as well.
12         THE COURT:  I agree it is probably not ripe for
13 today's discussion.  I wonder whether those witnesses, those
14 three witnesses don't have potentially mutually antagonistic
15 interests such that one lawyer could not represent all three.
16         MR. WAREHAM:  Well, I think so.  And, second, your
17 Honor, do these people know that the man at the core of this,
18 that we believe fabricated information, this private
19 investigator out in California, do these people know that this
20 individual lawyer has used that same investigator in other
21 cases.  That presents a whole other avenue for exploration on
22 conflict.
23         Again, that is not before the court today, but to try
24 to, from the monitoring agreement, to the tactics to block
25 other people, to the inclusion of confidential witness

25

C6KHPONA

 1  statements, with no one inside the firm forming any view on
 2  validity, on credibility, to the attacking, viciously attacking
 3  their own witnesses, I wonder what is behind the concept that
 4  you rest your complaint on six confidential witnesses and you
 5  have now spent hours trying to determine if they are absolutely
 6  credible.
 7          So I assume, your Honor, that that is what they will
 8  continue to do, that they won't analyze the veracity of this
 9  one guy making phone calls out in California from the suspect
10  firm, that they will call all the people liars.  I assume they
11  will attack my motivations and the way we contacted these
12  people.
13          What I wanted to do in closing, your Honor, is say
14  these facts go right toward the question of adequacy, not just
15  of the class representative who has delegated its entire case
16  from start to finish but of the firm itself.  All I ask is
17  until that record is developed and the court sees both sides of
18  the aisle and understands their views of the facts that it hold
19  abeyance the ruling on these two motions.
20              THE COURT:  Thank you very much.
21              Let me hear from plaintiff's counsel.
22              MR. RUDMAN:  Your Honor, I think I can be brief.
23  First of all, look, we have a summary judgment motion coming
24  up.  Discovery is not closed on this confidential witness
25  issue.  I mean, Mr. Goldstein is here because he specifically

C6KHPONA
```
 1  was dealing with this issue.  He took the depositions.  If your
 2  Honor would like to hear our counterpoints to the points that
 3  Mr. Wareham made, I am happy to have him speak about what
 4  happened with the witnesses.  There is still discovery ongoing
 5  and there is going to be more discovery from us in terms of the
 6  confidential witnesses.
 7           THE COURT:  Let me ask you this.  What is the name of
 8  this investigator again?
 9           MR. RUDMAN:  L.R. Hodges, and the investigator's name
10  is Ken Keatley.
11           THE COURT:  Before filing your either original or
12  amended complaint, what information had you received from him?
13           MR. RUDMAN:  We conducted an investigation, your
14  Honor.
15           THE COURT:  No, no.  Answer my question.
16           MR. RUDMAN:  I'm not sure I understand the question.
17           THE COURT:  The question is, what information did you
18  receive from this investigator?  Did you get affidavits?  Did
19  you get a report?
20           MR. RUDMAN:  OK.
21           THE COURT:  Did you get an oral presentation?
22           MR. RUDMAN:  Now I understand it.  We got memos from
23  the investigator.
24           THE COURT:  So maybe I should hear from your
25  colleague.
```

27

C6KHPONA

```
 1                MR. RUDMAN:  Hold on a second.
 2                THE COURT:  Excuse me.
 3                MR. RUDMAN:  I'm sorry, Judge.
 4                THE COURT:  Let me hear from your colleague.
 5                MR. GOLDSTEIN:  Sure, your Honor.
 6                THE COURT:  There must have been a miscommunication
 7      there.  I said I needed to hear from your colleague and you
 8      asked him to sit down.
 9                MR. RUDMAN:  I'm sorry, Judge.
10                THE COURT:  If you ever do that again in my court, you
11      will be in contempt of court.
12                MR. GOLDSTEIN:  Your Honor, I am happy to answer any
13      specific questions.  The reason I am here today is even though
14      we believed it was going to be a class certification hearing
15      and that would be limited to issues that related to class
16      certification, we thought Mr. Wareham might take the
17      opportunity to raise the issues --
18                THE COURT:  That certainly answers one of my earlier
19      questions.
20                So the defenses alleged -- and this may go to this
21      motion, it may only go to the summary judgment motion.  I don't
22      know.  But since it has been raised and since that is why you
23      are here, let's hear from you on what he had to say.
24                MR. GOLDSTEIN:  Certainly, your Honor.  I would like
25      the court to understand that there were six witnesses that were
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

C6KHPONA

1  in the complaint.  We have taken testimony now from four.  I
2  would like the court to understand, first of all, what each of
3  these witnesses is bound by and what their motive is to come in
4  and say what is in the affidavit that DLA Piper wrote for them
5  and to which there has been numerous corrections by those
6  witnesses on the record as saying certain portions of them
7  aren't accurate.  But those witnesses, your Honor, each of them
8  have a confidentiality agreement, a nondisparagement agreement
9  with as much as $200,000 at stake for the rest of their lives.
10  That is Mr. Asbury.  Your Honor, it is clear that these
11  witnesses are scared.  One of the witnesses --
12           THE COURT:  I'm --
13           MR. GOLDSTEIN:  No, no.
14           THE COURT:  Excuse me.
15           MR. GOLDSTEIN:  I wasn't --
16           THE COURT:  First I had one plaintiff's counsel in
17  effect trying to countervene the court's instruction that his
18  colleague speak and then I just saw, let the record reflect,
19  counsel -- I am speaking of the plaintiff -- putting up his
20  hand to direct the court not to interrupt him.
21           MR. GOLDSTEIN:  I apologize, your Honor.
22           THE COURT:  You --
23           MR. GOLDSTEIN:  I apologize greatly, your Honor.
24           THE COURT:  Now my question is you had used this
25  investigator before.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C6KHPONA

1            MR. GOLDSTEIN:  Our firm has used the investigator
2     before.
3            THE COURT:  I don't know anything about this other
4     case other than what I have seen in the papers, but I take it
5     that his credibility has been cast into doubt in some other
6     case.
7            MR. GOLDSTEIN:  Not this specific investigator, sir,
8     that was used, but the firm for which he works for, yes, sir.
9            THE COURT:  Was that before or after you retained that
10    investigator firm on this case?
11           MR. GOLDSTEIN:  Your Honor, I will speak to the best
12    of my ability, but I may need to refer to Mr. Rudman as I was
13    just added to the case.
14           I do believe that the issue was pending, that we hired
15    the investigator while the issue was pending.  I'm not certain
16    as to that and I would defer to Mr. Rudman.  I am just not
17    sure, your Honor.
18           THE COURT:  Now he supplied you with memoranda, is
19    that it?
20           MR. GOLDSTEIN:  Your Honor, what this investigator
21    did, and I will be full and complete -- we have provided it on
22    the privilege log because we believe it constitutes our work
23    product.  He took contemporaneous notes of the conversations,
24    which are substantial.  He then, in short time, as close as the
25    next day or the very same day, converted those notes into a

C6KHPONA

1    memorandum, single spaced, which go anywhere from five to 15
2    pages, single spaced, which detail to the best of his ability
3    what was said on those calls.  He did not record the calls as
4    they are not allowed to do so in California.  Then he provided
5    those memorandum to us, which we then used in formulating the
6    amended complaint, as I understand.  But again, I would defer,
7    your Honor -- I want to make sure I am not --
8            THE COURT:  Did he have anyone with him when he did
9    this?
10           MR. GOLDSTEIN:  I don't believe so, sir.  I believe he
11   was the sole person on the phone at the time and that that is
12   normally the practice of most investigative firms that are used
13   a lot in these cases, and in my experience even as a federal
14   prosecutor that typically a lot of times the agents would be
15   one on one, so to speak.
16           THE COURT:  Well, the reason I raise that is your
17   adversary says that at least one witness has flatly denied ever
18   saying anything like what your investigator said she said.  To
19   the extent that becomes an issue for the court, I would
20   probably have to take the testimony here in this courtroom of
21   both the witness and the investigator.  I wanted to know if
22   there are any third persons involved, but apparently not.
23           MR. GOLDSTEIN:  May I interject, your Honor?
24           THE COURT:  Yes.
25           MR. GOLDSTEIN:  Your Honor, with respect to some of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

C6KHPONA
1   the things specifically that Mr. Wareham said, for example,
2   that Mr. Asbury, who, by the way, Lockheed paid for his
3   counsel, just as an aside, as we are being accused for paying
4   for counsel.  They got him counsel and he is a former
5   executive.  They paid for, he testified under oath --
6           THE COURT:  I just had an interesting case, United
7   States v. Gupta, in which defense counsel, having received,
8   according to the press, some $30 million from Goldman to pay
9   for the defense, spent most of his summation attacking Goldman.
10  So these things happen.
11          I am a little more concerned, but I don't want to get
12  derailed on this now, whether one person can represent all the
13  confidential witnesses or some combination of them.  Anyway, go
14  ahead with what you were saying.
15          MR. GOLDSTEIN:  Your Honor, what he testified to, for
16  example, was that he spoke to Mr. Keatley, the gentleman's
17  name, for no longer than five minutes.  We have subpoenaed the
18  records.  Mr. Keatley's phone log shows that he spoke to him
19  for 50 minutes.  We believe that the records from Mr. Asbury's
20  corporation as well as his personal records will indeed show
21  that.
22          I think, your Honor, that just begs the point, in
23  these depositions there has been some harmful testimony that
24  shows the manner by which these declarations have been obtained
25  by the defendants and I would like to tell the court about some
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

C6KHPONA

1    of the conduct that DLA engaged in if they are casting
2    aspersions on us.
3            THE COURT:  All right.
4            MR. GOLDSTEIN:  Your Honor, for example, one of the
5    witnesses testified -- I am happy to read it to the court --
6    that Mr. Wareham promised him that if he signed the affidavit
7    he wouldn't have to testify.  He said here, your Honor:
8    Explain to me exactly what they said, that hopefully by signing
9    this declaration that it will be enough evidence that you
10   wouldn't have to come and testify?"
11   "A.  That this would -- I don't remember the specifics.  It was
12   pretty much that, yes, I wouldn't have to come and testify."
13           "As a lawyer representing Lockheed, you believed them,
14   didn't you?"
15           "Yes."
16           "Because you understand that Lockheed hires very smart
17   and powerful lawyers?"
18           "Yes."
19           "And if a lawyer from Lockheed says, hey, if you do
20   this and you won't have to come testify, you thought you should
21   do this, right, sir?"
22           "Objection.  You can answer, sir."
23           "I can get on with my life."
24           "You wanted to get on your with your life by signing
25   this, sir?"

33

C6KHPONA

1          "Yes, because I am not really -- I really don't feel
2     that I have no interest."
3          That is one witness, your Honor.
4          THE COURT:  Well, a lot of that was leading questions,
5     which of course was permitted, but I am not sure how much
6     weight I can give to what you just read to me.  It would be one
7     thing if the Lockheed lawyer said if you sign this, you won't
8     have to testify.  It is another thing if the lawyer said, look,
9     we are going to be bringing a motion, we are very hopeful this
10    motion will succeed.  If it does succeed, you won't have to
11    testify, and so forth.  That would cast a rather different spin
12    on it.  It is a little hard to know at this point.
13         MR. GOLDSTEIN:  Certainly, I understand.  Your Honor,
14    that begs the point that really these are issues that will be
15    fully litigated in that motion.  I do want to inform the court
16    what happened at these depositions because Mr. Wareham stood up
17    and made it seem like these witnesses came in and said this
18    gentleman made these things up and that that's the end of the
19    story.
20         That is not what occurred in these depositions, sir.
21    Witnesses testified that they spoke to him for brief five
22    minutes, ten minutes, and then were confronted with phone
23    records showing that they in fact spoke with him for 50
24    minutes.  The witnesses came in and they said wholesale, I
25    don't remember what I said to that investigator.  One of the

C6KHPONA
1   witnesses was presented with specific allegations of the
2   complaint attributed to him and he said, yeah, that could
3   happen.  In fact, I believe that did happen at Lockheed, that
4   they replaced experienced personnel with inexperienced
5   personnel in order to reduce costs.  Did I say that to the
6   investigator?  I don't remember.
7           Your Honor, there was clearly a lot of wholesale
8   memory loss by these witnesses.  I think in any case in most
9   trials there are cases where witnesses say something and then
10  they recant.  That is a credibility issue that we have all been
11  faced with.  It does not mean that we committed fraud or that
12  this investigator made these things up.
13          Your Honor, some of the testimony that was elicited,
14  for example, in Mr. Asbury's deposition was I asked Mr. Asbury
15  whether or not there were program review meetings.  He said
16  yes.  I said what day of the week.  He said Tuesday.  I said
17  afternoon or evening.  He said afternoon.  That's precisely
18  what Mr. Keatley wrote in his memoranda.
19          It begs the question, how is Mr. Keatley so prescient
20  that he can pull that out of thin air.
21          There are other things, specifics, your Honor.  For
22  example, in Ms. Burns' testimony, she was asked about certain
23  internal programs and she talked about a dashboard in which
24  certain things were placed to evaluate the program.  That was
25  volunteered.  That word was not even presented to her.  Again,

C6KHPONA

1  that specific description of the dashboard program is in
2  Mr. Keatley's memorandum.
3          What Mr. Wareham would say and what these declarations
4  apparently say is, I spoke to Mr. Keatley, I told him I
5  couldn't speak to him and then nothing more was said.  And
6  obviously that keeps them within the confines of their
7  confidentiality agreements, their nondisclosure agreements,
8  their nondisparagement agreements, and it keeps their pensions
9  intact.
10          I am not saying they were intimidated with respect to
11  that.  The testimony has not been that Mr. Wareham said here is
12  your confidentiality agreement, you are in violation.  I am not
13  representing that to the court.  But clearly these witnesses
14  spoke to the investigator.  There are specifics that will be
15  confirmed in the memoranda.  We intend to present evidence from
16  the investigator.
17          It is beyond logic to think that a man would make up
18  ten pages of handwritten notes, including information, your
19  Honor, that in some cases doesn't help us.  In some cases, with
20  respect to Mr. Asbury, he was asked did you discuss with
21  Mr. Keatley whether or not certain programs were the cause of
22  the miss in the Sackett court, and his response was no.  I
23  didn't speak with him at all.  Well, in fact, what it says in
24  Mr. Keatley's memo, which we are going to present, is that he
25  told Mr. Keatley, don't go down the programs road.

36

C6KHPONA

1          Now, why would the investigator put that in a memo.
2     Why would I ask that question.  Where would I even get that
3     information from, that quote, if it wasn't discussed by
4     Mr. Asbury.
5          What we believe, your Honor, independent records will
6     show is a 50-minute conversation.  It defies logic to think
7     that for 50 minutes educated people -- Mr. Asbury is the
8     president of the civil division -- would say nothing more than,
9     sir, let me ask you a question.  Mr. Keatley:  Let me ask you a
10    question about your division.  I'm sorry, sir, I am bound by a
11    confidentiality agreement.  That discussion would take two
12    minutes.
13         I believe that the court will have the benefit of
14    those subpoenas.  It will have the benefit of his testimony in
15    full to see that in fact what happened here is what happens in
16    a lot of cases.  My experience in many criminal cases during my
17    time with the government is that witnesses recant.  They have
18    motivations for recanting and then they say things and then
19    ultimately they recant.
20         Your Honor, I will represent to you we are going to
21    take another gentleman high up and we believe, based on an
22    e-mail that we received and based on my conversation with his
23    counsel, that he wrote an e-mail essentially saying that
24    Lockheed Martin committed fraud.  This is Mr. Asbury's deputy.
25    The court will have that evidence before it.  That we simply

37

C6KHPONA

1   didn't come in here and make this up.
2           THE COURT:  All right.  That is very helpful.  I will
3   let you sit down.
4           MR. GOLDSTEIN:  Thank you, your Honor, and I apologize
5   again.  I appreciate your time.
6           THE COURT:  So was there anything else, Mr. Rudman,
7   you wanted to say?
8           MR. RUDMAN:  Your Honor, I want to apologize.  I meant
9   you absolutely no disrespect.
10           I want to talk about a couple of things.  The first
11   thing was we had a lot of discussion about this whole Basic v.
12   Levinson, it is a quote that plaintiff's lawyers love, which is
13   no one would play in a loaded craps game.
14           THE COURT:  You mean defendant's lawyer.
15           MR. RUDMAN:  Yes.
16           THE COURT:  I think you said plaintiff's lawyers.
17           MR. RUDMAN:  We like Basic v. Levinson, but aside from
18   that point, the game was over here.  By the time they make
19   their purchases, there was no game.  The game ended the end of
20   the class period.
21           Mr. Wareham's point is if they think they were bad
22   guys during the class period, then the truth comes out and they
23   continue buying, that renders them somehow atypical.  There is
24   680 some odd institutional investors Mr. Wareham mentioned, by
25   the way, probably all continued buying, all bought through the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

38

C6KHPONA

1   class period and continued buying after.  So to that extent
2   Pontiac is just like everybody else who is a member of this
3   class.  The point really is the game is over.
4           There was a lot of argument about Ms. Zimmerman's
5   involvement here.  We cite the cases in our brief, your Honor,
6   that a class representative can rely on the expertise of their
7   lawyers.  Pontiac is not a securities lawyer.  They hire a
8   securities lawyer to do a securities case.  It is not
9   surprising that Ms. Zimmerman or anyone at Pontiac can't help
10  out with the scienter section in the brief.  That is not what
11  they do.
12          I think, your Honor, if you look --
13          THE COURT:  I think we are reaching the point of
14  diminishing returns and I think I understand the arguments from
15  both sides.
16          What do you say to defendant's suggestion that I
17  should reserve on this motion until the upcoming summary
18  judgment motion that they are filing because it, first of all,
19  may moot it and, second of all, even if it doesn't, it will
20  inform my evaluation of this motion.  Do you have a view on
21  that?
22          MR. RUDMAN:  Yes.  My view is you should rule on the
23  motion in the ordinary course that your Honor would rule on the
24  motion.  I don't see any reason to delay.
25          THE COURT:  OK.

39

C6KHPONA

1              MR. RUDMAN:  What I do want to mention, though,
2    because this brings me to my last point, I can send your Honor
3    the cite in the Medtronic Securities Litigation, which I think
4    I mentioned once on a call with the clerk.  The very same fact
5    pattern occurred.  Seven, eight, nine, ten confidential
6    witnesses all supposedly recanted.  The issue was brought up in
7    that circumstance saying counsel's inadequate because look at
8    the investigation they did and how all these witnesses
9    recanted.  The judge in Medtronic said that is an issue for
10   summary judgment, that is an issue for discovery, and certified
11   the class.
12             I am happy to provide the court with that opinion.  I
13   recognize it is from a district court in Minnesota, but it
14   still is informative in that it was the very same issue they
15   are suggesting here.
16             THE COURT:  Sure.  I would be happy to look at it.
17             MR. RUDMAN:  Thank you, your Honor.
18             THE COURT:  I don't know that one can draw any
19   hard-and-fast rule about recantation or not recantation.  What
20   your adversary is suggesting is that your investigator was
21   making things up.  Your colleague has suggested that there is
22   substantial evidence to the contrary.
23             We all understand that on the one hand there are
24   motives sometimes in talking to an investigator to say negative
25   things and there are motives when talking in a deposition to

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C6KHPONA

1  say positive things, and the people in these situations are
2  under pressures of a variety of sort.  You can't make I think
3  generalizations.  You have to look at the individual and the
4  circumstances.  But if there were hypothetically in some case
5  clear undisputed evidence of fraud on the part of an
6  investigator, that is something the court would have to look
7  into regardless of any motion.  That would be a matter
8  potentially of obstruction of justice.
9           I haven't heard anything yet that gives me a basis for
10  concluding anything about this one way or the other, but I am
11  looking forward to what I will be presented with in the
12  upcoming summary judgment motion.
13           I should add, by the way, that even if an investigator
14  were to have obstructed justice in some case, that doesn't
15  necessarily go to any of these matters -- it may or may not --
16  because a reasonable plaintiff's counsel could rely on what
17  appeared to be a perfectly straightforward presentation by an
18  investigator without being aware that he or she had falsified
19  something.
20           In giving that hypothetical I don't even mean to
21  suggest that the investigator did falsify anything.  I don't
22  have any opinion on any of this.  I am just saying that it is
23  not something one can evaluate without a lot more specifics
24  than I have now.
25           Yes.

41

C6KHPONA

1              MR. RUDMAN:  Your Honor, you should know we are before
2    you on many matters, we are in this court all the time on these
3    cases, and we obviously take our responsibilities and our
4    obligations to the court extremely seriously.
5              THE COURT:  That is fine.  All right.
6              I will give your adversary one last shot if he wants
7    to say anything further and then we will call it a day.
8              MR. WAREHAM:  I want to say thank you for staying so
9    late, your Honor.  I have nothing to say.
10             THE COURT:  Very good.
11             The court will take the matter under advisement.
12             Thanks a lot.
13             (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300