# Exhibit A

| CW1 (Margaret Burns) | |
|---|---|
| "CW1 stated that Defendant Gooden reported the status of IS&GS projects to Lockheed Martin's other senior executives." (¶ 44) | "**THE COURT:** So what you're saying is you don't know whether she in effect made a formal report or something of that sort?<br>**A.** Correct.<br>**THE COURT:** Were you present ever when she reported about any of these projects to other senior executives?<br>**A.** No, sir.<br>**THE COURT:** So you only know this from forming an impression from other conversations?<br>**A.** Correct." (10/1 Hrg. at 115:17-116:1; see also Ex. B (Burns Dep.) at 47:15-19). |
| "CW1 stated that the Sentinel Program had problems because it had been priced at a very low rate." (¶ 48) | "**THE COURT:** Did you tell that to the investigator?<br>**A.** I did not.<br>**THE COURT:** Do you recall saying anything about problems with Sentinel?<br>**A.** I did tell the investigator that the challenges on Sentinel were due to the technical nature of what we were trying to accomplish and the lack of clarity in the requirements as provided by the FBI."<br>**THE COURT:** So that's what you told him?<br>**A.** Yes." (10/1 Hrg. at 116:4-117:2; see also Ex. B (Burns Dep.) at 48:5-49:4 ▬▬▬▬). |
| "According to CW1, the TSA was not satisfied with the work performed by Lockheed Martin." (¶ 49) | "**THE COURT:** Did you say that?<br>**A.** So I don't recall precisely, sir. I may have said something like that.<br>**THE COURT:** And what was the basis of your understanding of their dissatisfaction, if you had one?<br>**A.** So in 2010, I was part of a program review of that program and so at that point I had exposure to the program's performance and understood what the difficulties were in the program and which things had or had not satisfied the TSA at that point." (10/1 Hrg. at 116:4-117:2; see also Ex. B (Burns Dep.) at 49:11-21). |

Redacted Pursuant to Protective Order

| | CW-2 (Pamela Hawn) |
|---|---|
| "According to CW2, . . . it was clear by the end of 2008 and early 2009 that 2009 was going to be a very difficult year for IS&GS and that financial goals for IS&GS for 2009 could not be achieved." (¶ 35) | "THE COURT: Did you tell that to the investigator?<br>A. I wouldn't have said that.<br>THE COURT: Do you remember what you said, if anything, about goals?<br>A. I wasn't in a position to make a statement on goals in 2008, nine.<br>THE COURT: I'm not asking whether you were in a position. I'm asking did you make a statement about goals to the investigator?<br>A. No, I did not." (10/1 Hrg. at 126:17-127:1; see also Ex. C (Hawn Dep.) at 88:3-89:8; 96:11-97:2; 193:17-24). |
| "According to CW2, Lockheed Martin deliberately underbid on programs and knew that it could not perform the work on many programs without large cost overruns." (¶ 38) | "THE COURT: Did you say that?<br>A. No, I did not.<br>THE COURT: Do you have any information as to whether there was any deliberate underbidding?<br>A. No, I do not.<br>THE COURT: Did you discuss bidding at all with the investigator?<br>A. I don't believe I did." (10/1 Hrg. at 128:17-24; see also Ex. C (Hawn Dep.) at 97:17-98:18; 189:12-24). |
| "According to CW2, the Sentinel Program was placed into Red status by early 2009 and problems with the Sentinel Program were caused in part by the inexperience of IS&GS personnel assigned to the program." (¶ 48) | "THE COURT: Did you say that to the investigator?<br>A. No, I did not." (10/1 Hrg. at 129:16-17) (see also Ex. C (Hawn Dep.) at 80:22-25 ▓▓▓▓ and 92:24-93:5 ▓▓▓▓). |
| "According to CW2, the Mission Integration and Development ('MIND') program and GeoScout program initiated by the National Geospatial-Intelligence Agency, were two IS&GS Intelligence Segment programs that experienced problems in early 2009." (¶ 52) | "THE COURT: Do you remember discussing that with the investigator?<br>A. No.<br>THE COURT: Is it true or do you have any knowledge as to whether those programs experienced problems in early 2009?<br>A. I don't have that knowledge." (10/1 Hrg. at 130:10-14; see also Ex. C (Hawn Dep.) at 104:25-105:9; 202:10-19; 202:24-203:17). |

2

| Allegation | Sworn Testimony |
|---|---|
| **CW-2 (Pamela Hawn)** ||
| "According to CW2, there were monthly corporate review meetings where the troubled status of programs like the Sentinel Program, GeoScout, MIND, and HR Access were discussed. CW2, who participated in these corporate review meetings, stated that among the issues discussed was the impact that troubled programs would have on quarterly and year end financial results." (¶ 53) | "**THE COURT:** Now, did you participate in those meetings? <br> A. No, I did not. <br> **THE COURT:** And did you say anything along the lines of what's in those two sentences? <br> A. No." (10/1 Hrg. at 130:23-31:2; see also Ex. C (Hawn Dep.) at 106:5-107:5). |
| "CW2 had regular interactions with Defendant Gooden and other Business Area Managers." (¶ 24) | "Q. During 2008 or 2009, did you in fact have regular interactions with Linda Gooden? <br> A. No. <br> Q. Did you have any interactions at all with Linda Gooden in 2008 and 2009? <br> A. No. <br> Q. Would you have known Linda Gooden if you saw her walking down the hall? <br> A. No." (10/1 Hrg. at 149:23-50:6; see also Ex. C (Hawn Dep.) at 27:18-25; 34:20-35:7). |
| "[D]uring March 2009 . . . Defendant Gooden approached CW2 and pressured CW2 to represent that his/her area in IS&GS had $2.5 billion in backlog for 2009." (¶ 65) | "Q. Did you say that? <br> A. No. <br> Q. Is it true? <br> A. No." (10/1 Hrg. at 132:19-22; see also Ex. C (Hawn Dep.) at 197:10-19). <br> Q. Did Ms. Gooden in some other fashion instruct you to change backlog numbers? <br> A. No." (10/1 Hrg. at 150:7-9; see also Ex. C (Hawn Dep.) at 91:3-13). |
| "CW2 told Defendant Gooden and others that worked with Gooden that $2.5 billion in backlog was not reasonable." (¶ 65) | "**THE COURT:** Did you say that to the investigator? <br> A. No. <br> **THE COURT:** Did you have a discussion with Ms. Gooden about any of this that's talked about in this paragraph? <br> A. No." (10/1 Hrg. at 132:25-33:4; see also Ex. C (Hawn Dep.) at 198:3-199:17). |

3

| Allegation | Sworn Testimony |
|---|---|
| **CW-2 (Pamela Hawn)** | |
| "Defendant Gooden with the assistance of others ignored CW's backlog report and changed the backlog figure to reflect a figure much higher than the backlog computed by CW2. According to CW2, Defendant Gooden grossly overstated the actual backlog for IS&GS." (¶ 65) | "**THE COURT**: Did you ever say that to the investigator? <br> A. No. <br> **THE COURT**: Was any of that true to your knowledge? <br> A. No." (10/1 Hrg. at 133:9-13; see also Ex. C (Hawn Dep.) at 199:8-20). |
| "CW2 . . . stated that Defendant Gooden was told at the beginning of 2009 that the projections for 2009 for IS&GS were overstated." (¶ 36) | "**THE COURT**: Did you say that? <br> A. No. <br> **THE COURT**: Was that true? <br> A. I don't know." (10/1 Hrg. at 127:18-21; see also Ex. C (Hawn Dep.) at 193:17-24; 194:8-194:12). |
| "According to CW2, while Lockheed Martin knew that the goals for IS&GS couldn't be achieved, shareholders did not know this information. According to CW2, Defendant Stevens and Tanner received information about IS&GS directly from Defendant Gooden and Defendant Gooden's finance manager, Jeff McLuachlin [sic]." (¶ 36) | "**THE COURT**: Did you say any of those things that are in those two sentences? <br> A. No, I did not. <br> **THE COURT**: Do you know anything from personal knowledge as to how defendant Stevens and Tanner received information about IS&GS? <br> A. No, I do not." (10/1 Hrg. at 128:4-10; see also Ex. C (Hawn Dep.) at 97:3-16; 193:17-24; 194:8-12). |
| "According to CW2, due to cost cutting in 2008, IS&GS primarily had low paid personnel assigned to programs which negatively impacted execution, performance and customer satisfaction." (¶ 43) | "**THE COURT**: Did you say that to the investigator? <br> A. No, I did not. <br> **THE COURT**: Did you say anything about the level of pay of personnel? <br> A. No." (10/1 Hrg. at 129:5-9; see also Ex. C (Hawn Dep.) at 107:6-20). |
| "According to CW2, delays in funding were due in part to inexperienced personnel at Lockheed Martin and the Department of State." (¶ 55) | "**THE COURT**: Do you remember saying any of that? <br> A. I don't remember stating that. <br> **THE COURT**: Was there anything like that you discussed with the investigator? <br> A. I don't remember discussing with the investigator. <br> **THE COURT**: Is what's alleged there true? <br> A. There was inexperienced people at the Department of State, not at Lockheed Martin. <br> **THE COURT**: Okay. How did you know that, by the way? <br> A. I worked on the special project for about a month." (10/1 Hrg. at 131:9-20; see also Ex. C (Hawn Dep.) at 84:20-22; 101:7-102:3). |

4

| Allegation | Sworn Testimony |
|---|---|
| **CW-2 (Pamela Hawn)** ||
| "CW2 stated it was clear that the inexperienced personnel at the Department of State were unfamiliar with the department submittal process and did not know how to submit a funding request." (¶ 56) | "**THE COURT:** Do you understand that you did not say that to the investigator but that is nonetheless true allegations to the best of your knowledge? **A.** Yes." (10/1 Hrg. at 131:25-132:3; see also Ex. C (Hawn Dep.) at 101:22-102:3; 204:25-206:2 ). |
| "According to CW2, Lockheed Martin had forecasted revenues associated with Department of State projects for 2Q09 even though there was no way for revenues to be generated that quarter because funding requests had not been submitted in time." (¶ 56) | "**THE COURT:** Was that true? **A.** I don't have knowledge to that effect. **THE COURT:** You don't know one way or the other. **A.** No. **THE COURT:** Did you ever say it to the investigator? **A.** No." (10/1 Hrg. at 132:9-14; see also Ex. C (Hawn Dep.) at 103:12-21; 205:8-14; 207:4-11 ). |

| | CW-3 (William Parsons) |
|---|---|
| "CW3 ... stated that Defendant Gooden was told at the beginning of 2009 that the projections for 2009 for IS&GS were overstated." (¶ 36) | "**THE COURT**: Did you say that?<br>**A**: No, sir. That wouldn't be terms that I would use. I wouldn't know whether it was overstated or not. . . .<br>**THE COURT**: So did you tell the investigator that the projections were overstated?<br>**A**: No, sir. It's just not a term I would have used. I'm not a financial person. I'm more a manager." (10/1 Hrg. at 59-60; accord Ex. D (Parsons Dep.) at 39:24-40:20 ▇▇▇). |
| Per CW3, there was "discussion during the months leading up to July 2009 that IS&GS may underperform relative to its projections." (¶ 36) | "**Q**: Were you aware at any time in the months leading up to July, 2009, that IS&GS would underperform relative to its projections?<br>**A**: No." (Ex. D (Parsons Dep.) at 45:7-46:1) |
| "CW3 stated that many of the problems with IS&GS's financial performance in 2Q09 (including margins and earnings) were due to Defendant Gooden's practice of submitting lowball bids to win contracts." (¶ 39) | "**THE COURT**: Did you say that?<br>**A**: That's just not something that would be in my terminology, so I don't believe I've said anything like that.<br>**THE COURT**: All right. And forgetting about whether you said it or not, was it true?<br>**A**: Not – I just don't, again, I don't have the expertise to say that that would be true or not true." (10/1 Hrg. at 65:10-17; accord Ex. D (Parsons Dep.) at 50:1-51:24) |

6

| CW4 (Victor Morrison) | |
|---|---|
| "…CW4 stated that Defendant Gooden, along with VP of Business Development, Tom Oles, were directly responsible for the strategy of underbidding on programs." (¶ 39) | |
| "CW4 added that IS&GS often fired employees in order to reduce labor costs. This . . . resulted in inexperienced workers being assigned to projects, which caused various execution problems." (¶ 39) | "THE COURT: Well, while you were there, did you see instances in which you thought the people who were being assigned to projects were not sufficiently experienced?<br><br>A. I can't make that opinion because once again, I was focused in on my program, which was the Federal Trade Commission's Do Not Call program, and my staff were able to perform with very high excellence.<br><br>THE COURT: So, it certainly wasn't a problem in your area?<br><br>A. We won excellence awards, we were a premiere [sic] program, my program was considered one of the most successful government programs in history. So --<br><br>THE COURT: I'm pleased to know all that, but my only question was: Inexperience of employees was not a problem on your program?<br><br>A. Not on my program." (10/1 Hrg. at 87:7-22; see also Ex. E (Morrison Dep.) at 72:11-73:9). |

7

| CW4 (Victor Morrison) | |
|---|---|
| "CW4 learned in the first and second quarters of 2009 about significant problems with four large IS&GS programs, including a contract with the Veterans Affairs and Federal Reserve in Cleveland, OH, the Sentinel Program, HR Access for the TSA, and a help desk program for the National Aeronautics and Space Administration." (¶ 51) | "**THE COURT:** And did you tell him that you first learned about these problems in the first or second quarters of 2009?<br>**A.** I don't recall stating the time frame. I just mentioned the program names.<br>**THE COURT:** Do you now know what time frame you learned about those problems?<br>**A.** I do not know, and I do not remember stating the time frames." (10/1 Hrg. at 90:19-91:2). |

8

| Allegation | Sworn Testimony |
|---|---|
| | **CW-4 (Victor Morrison)** |
| "Defendant Gooden was kept apprised of developments about the Sentinel Program and participated irregular conference calls with CW4 and others to discuss this program." (¶ 48) | "**A.** This sentence is false. I was never in any conference call with Ms. Gooden. I have only had one call back in 2004, with Ms. Gooden. What was stated was Ms. Gooden was kept appraised of developments about the Sentinel program and participated in regular conference calls with others to discuss the program. I never stated in any sort of way that I was involved in any sort of Sentinel discussion. **THE COURT:** So, do I understand you to say that you did say, in words or substance, to the investigator that Defendant Gooden was kept apprised of developments about the Sentinel program and participated in regular conference calls with others to discuss the program? **A.** That's correct." (10/1 Hrg. at 88:5-17; see also Ex. E (Morrison Dep.) at 95:2-97:2). |

9

| Allegation | Sworn Testimony |
| --- | --- |
| | CW-5 (Ken Asbury) |
| "According to CW5, the financial projections for IS&GS's 2009 performance, which were formulated during 2008, were arbitrary." (¶ 35) | "**THE COURT:** Is that something you said? **A.** No, your Honor. **THE COURT:** Did you say anything like that? **A.** I don't recall having, or saying anything remotely like this." (10/1 Hrg. at 5:19-23; see also Ex. F (Asbury Dep.) at 39:7-17).<br><br>"**THE COURT:** Now, do you have a recollection of discussing that topic at all? **A.** No, your Honor, I do not. **THE COURT:** Are you saying that you are confident it was not discussed? **A.** I can't say I'm confident it is not discussed. What I can say, your Honor, is that I'm confident that the information contained in this line about how this is done, I am very confident that I would not have said anything like this. **THE COURT:** That they were arbitrary. **A.** That is correct, your Honor." (10/1 Hrg. at 35:1-12; see also Ex. F (Asbury Dep.) at 39:7-17). |
| "CW5 stated that projections for IS&GS for 2009 were set from the top down as opposed to being based on reasonable estimates from IS&GS's division leaders." (¶ 35) | "**THE COURT:** Did you say that? **A.** No, your Honor, I did not. **THE COURT:** Did you say anything like that? **A.** I recall to one of the questions that the investigator asked me around how estimates were set generally describing that goals were established at the ISGS level for the year and then estimates were created from each of the businesses in order to meet those goals." (10/1 Hrg. at 6:3-10; see also Ex. F (Asbury Dep.) at 39:18-40:12).<br><br>"**THE COURT:** So you're saying that the problem that you were referring to before had nothing to do with projections for IS&GS for 2009? **A.** That is correct, your Honor." (10/1 Hrg. at 36:2-5; see also Ex. F (Asbury Dep.) at 39:18-40:12). |

10

| Allegation | CW-5 (Ken Asbury) Sworn Testimony |
|---|---|
| "In February 2009, it was clear to CW5 and other IS&GS division leaders that the full year 2009 projections for IS&GS could not be achieved and CW5 and other division leaders told this to Defendant Gooden at that time." (¶ 36) | "**THE COURT:** Did you tell that to the investigator? **A.** No, sir, I did not. **THE COURT:** Is it true? **A.** It is not true." (10/1 Hrg. at 7:6-9; see also Ex. F (Asbury Dep.) at 40:13-41:20; 130:20-131:20). |
| Stated that "Lockheeed Martin held weekly Tuesday telephone conference calls referred to as Red Program Review Meetings during which each IS&GS program classified as Red was discussed." (¶ 45) | "**THE COURT:** Did you tell that to the investigator? **A.** Your Honor, as I recall, there's two parts to this answer. The first is no, I did not describe the program review meetings. The meetings that I'm familiar with did not have that name. However, again, towards the – after I went through the conversation and agreed that I would answer some questions for him, I did describe the general review process for conducting reviews and that did describe a meeting that was held on Tuesday afternoon, but it was not called a red program review meeting. **THE COURT:** These were regular Tuesday meetings? **A.** They became, I would say regular, your Honor, in the sense that I think at the beginning of the year they weren't as regular and became more regular as we developed our internal business rhythms **THE COURT:** We're talking year 2009? **A.** Yes sir. **THE COURT:** And is it correct that in these meetings or at least as they developed later in the year into regular meetings each IS&GS program classified as red was discussed? **A.** As I recall, we would have a variety of meetings. There could be as annny as eight to ten per Tuesday afternoon, and red programs, should they be in existence at the time, they would always be on the docket. But – **THE COURT:** Go ahead. **A.** But we would also review programs that were new starts or programs that may have some particular technical difficulty. Those would also be in there, but they wouldn't of necessity be coded as red." (10/1 Hrg. at 7:14-8:17; see also Ex. F (Asbury Dep.) at 41:24-42:11; 229:4-6; 231:2-24).

"**A.** If I recall, there was some prior knowledge on the part of the investigator on this topic about reviews. But generally what you just described with the exception of the |

| Allegation | CW-5 (Ken Asbury) Sworn Testimony |
|---|---|
|  | time period at which they occurred would have been the information that I would have discussed with the investigator." (10/1 Hrg. at 39:10-15; see also Ex. F (Asbury Dep.) at 41:24-42:11; 229:4-6; 231:2-24). |