# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
CITY OF PONTIAC GENERAL EMPLOYEES'     No. 11 Civ. 5026 (JSR)(RLE)
RETIREMENT SYSTEM, Individually and on Behalf of
All Others Similarly Situated,     ECF CASE

                       Plaintiff,     **AFFIDAVIT OF PAMELA HAWN**

- v -

LOCKHEED MARTIN CORPORATION, et al.,

                       Defendants.
---------------------------------------------------------------x

       Pamela Hawn, being duly sworn, says:

       1.     My name is Pamela Hawn.

       2.     I was an employee at Lockheed Martin from 1977 until August 2009.

       3.     Between 2008 and 2009, I primarily worked for Dave Valore as a Senior Business Manager on the Integrated Airframe Technology for Affordability (IATA) program.

       4.     During this time, IATA was never considered a "Yellow" or "Red" program. At that time, I believed IATA was appropriately staffed.

       5.     In 2008 I also worked briefly on the bid for a project entitled Integrated Hiring Operations and Personnel (IHOP) and involving the customer Transportation Security Administration (TSA).

       6.     By 2009, I no longer worked on the IHOP program.

       7.     Between 2008 and 2009, my position at Lockheed Martin in no way involved IS&GS's backlog or backlog at any Lockheed Martin division. I thus never had the opportunity to see or know information pertaining to backlog at Information Systems and Global Solutions (IS&GS) or anywhere else within Lockheed Martin.

       8.     Between 2008 and 2009, my position at Lockheed Martin did not involve the financial goals of IS&GS or Lockheed Martin. Accordingly, I never had the opportunity to see or learn information pertaining to the financial goals of IS&GS or Lockheed Martin.

       9.     During my tenure at Lockheed Martin, and specifically between 2008 and 2009, I never met Linda Gooden. If I had passed Ms. Gooden on the street in that timeframe, I would not likely have recognized her.

10. During my tenure at Lockheed Martin, and specifically between 2008 and 2009, I never had a conversation or in any way communicated with Linda Gooden.

11. Having never met or communicated with Linda Gooden, and given the fact I had no role in setting or even seeing backlog numbers, Ms. Gooden of course never pressured me to change or alter IS&GS's backlog numbers.

12. I was never pressured by anyone in 2008 or 2009 to misrepresent IS&GS's or Lockheed Martin's backlog. Additionally, I never heard anyone say that any Lockheed Martin employee pressured anyone to misrepresent backlog at IS&GS or anywhere else within Lockheed Martin, or that anyone within IS&GS or Lockheed Martin misrepresented backlog during that time.

13. During my tenure at Lockheed Martin, I knew only in passing of a program called "Sentinel."

14. During my tenure at Lockheed Martin, and specifically between 2008 and 2009, I never received progress reports or any other type of information in connection with Sentinel.

15. During my tenure at Lockheed Martin, and specifically between 2008 and 2009, I do not recall working on any project involving the State Department.

16. Between 2008 and 2009, I would not have known the status of any program involving the State Department because it was not within my customer area.

17. Over the past year, I have been contacted three times by telephone by a man who said he was hired by a law firm that is bringing a case against Lockheed Martin regarding numbers and finances.

18. Each of the three times the caller has contacted me, I refused to answer the caller's questions because I consider the information I learned at Lockheed Martin to be proprietary information.

19. The caller did ask one question during the second call he placed to me to which I provided a substantive response. He asked whether I ever "cooked the books" or was aware of someone else "cooking the books" at Lockheed Martin. I responded that I never "cooked the books" and that I am not aware of anyone else ever "cooking the books" at Lockheed Martin.

20. The caller never mentioned the term "confidential witness." During the last of our brief conversations, the caller said that my name was going to be provided to Lockheed Martin. At that time, the caller also told me that he would arrange for me to be provided with a lawyer free of charge to me. I rejected that offer.

21. Never during my three conversations with the caller did I say it was clear by the end of 2008 and early 2009 that 2009 was going to be a very difficult year for IS&GS, that the financial goals for IS&GS could not be achieved, or that I had access to performance

2

reports containing projections for IS&GS. Indeed, I did not even know such information in 2008 and 2009 and I still do not know that information today.

22. Never during my conversations with the caller did I say Linda Gooden was told at the beginning of 2009 that the 2009 projections for IS&GS were overstated, or, that while Lockheed Martin knew that the IS&GS's 2009 goals could not be achieved, the shareholders did not know that IS&GS's 2009 goals could not be achieved. I knew of no such information in 2008 and 2009 and know of no such information today.

23. Never during my conversations with the caller did I say Bob Stevens and Bruce Tanner received information about IS&GS directly from Linda Gooden or Jeff MacLauchlan. I did not know in 2008 or 2009 what, if any, information Mr. Stevens or Mr. Tanner was provided by Ms. Gooden or Mr. McLaughlan. I do not know that information as of today.

24. Never during my conversations with the caller did I say Lockheed Martin deliberately underbid on programs, or that Lockheed Martin knew that it could not perform the work on many programs without large cost overruns. I had no such information in 2008 and 2009 and I still do not know that information today. Indeed, I do not believe this to be true.

25. Never during my conversations with the caller did I say, due to cost-cutting in 2008, IS&GS primarily had "low" paid personnel assigned to programs, which negatively impacted execution, performance and customer satisfaction. I had no such information in 2008 and 2009 and possess no such information today.

26. Never during my conversations with the caller did I say the Sentinel program was placed into "Red" status by early 2009, or problems with the Sentinel program were caused in part by the inexperience of IS&GS personnel assigned to the program. I did not in 2008 or 2009 have access to any information pertaining to the Sentinel program. I have no such access today.

27. Never during my conversations with the caller did I say that delays in funding were due in part to inexperienced personnel at Lockheed Martin or at the Department of State. Further, I never said during my conversations with the caller that the inexperienced personnel at the Department of State were unfamiliar with the funding submittal process or did not know how to submit a funding request. In 2008 and 2009, I had no way of knowing anything about any Lockheed Martin program with the Department of State. To this day I have no such information.

28. Never during my conversations with the caller did I say Lockheed Martin forecasted revenues associated with the Department of State projects for the second quarter of 2009, despite the fact that there was no way for revenues to be generated that quarter because funding requests had not been submitted in time, or that Lockheed Martin knew that these projects would not get funded during the second quarter of 2009. Again, I had no access in 2008 or 2009 to any information of any kind pertaining to the Department of State programs.

29. Never during my conversations with the caller did I say I was approached by Linda Gooden and pressured to represent that my area in IS&GS had $2.5 billion in backlog

3

for 2009, or that I told Ms. Gooden that $2.5 million in backlog was not reasonable. Indeed, I have never met or communicated in any way with Ms. Gooden and had no role in setting or even understanding backlog at IS&GS or anywhere else at Lockheed Martin.

30.     Never during my conversations with the caller did I say Linda Gooden grossly overstated the actual backlog for IS&GS. Having never met or communicated with Ms. Gooden, I could not have said this to the man who called on behalf of the plaintiff or to anyone else.

31.     Never during my conversations with the caller did I say that the Mission Integration and Development program and GeoScout program initiated by the National Geospatial-Intelligence Agency were two IS&GS Intelligence Segment programs that experienced problems in early 2009, that there were monthly corporate review meetings where the troubled status of programs was discussed, or that some of the issues addressed were the impact that the troubled programs would have on quarterly and year end financial results. In 2008 and 2009 I had no knowledge of these programs or supposed meetings and to this day have no information about these programs or supposed meetings.

32.     I discussed the information I swear to in this affidavit with lawyers from DLA Piper. They asked that I provide this affidavit, which I willingly agreed to do. Other than the man who called on behalf of the plaintiff in the case against Lockheed Martin and lawyers from DLA Piper, I have not discussed the Pontiac case with anyone.

Dated: May 15, 2012

*Pamela Hawn*

Pamela Hawn

Sworn to before me this 15th

Day of May, 2012.

*[signature]*
Notary Public

D. C. SANCHEZ
Commission # 1899688
Notary Public - California
Riverside County
My Comm. Expires Aug 14, 2014

4