# Exhibit S

1

CA1CIT1                    Hearing
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    CITY OF PONTIAC,
3
4                    Plaintiff,
4
5          v.                          11 CV 5026 (JSR)
5
6    LOCKHEED MARTIN,
6
7                    Defendant.
7
8    ------------------------------x
8                                     New York, N.Y.
9                                     October 1, 2012
9                                     9:45 a.m.
10
10   Before:
11
11                   HON. JED S. RAKOFF,
12
12                                     District Judge
13
13                        APPEARANCES
14
14   ROBBINS GELLER RUDMAN & DOWD LLP
15        Attorneys for Plaintiff
15   SAMUEL H. RUDMAN, ESQ.
16   EVAN J. KAUFMAN, ESQ.
16   JONAH H. GOLDSTEIN, ESQ.
17
18   DLA PIPER
18        Attorneys for Defendant
19   JAMES WAREHAM, ESQ.
19   JOHN M. HILLEBRECHT, ESQ.
20   JOHN BUKELL, ESQ.
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

CA1CIT1                    Hearing

1   projections for IS&GS for 2009 were set from the top down as
2   opposed to being based on reasonable estimates from IS&GS's
3   division leaders."  Did you say that?
4            THE WITNESS:  No, your Honor, I did not.
5            THE COURT:  Did you say anything like that?
6            THE WITNESS:  I recall to one of the questions that
7   the investigator asked me around how estimates were set
8   generally describing that goals were established at the ISGS
9   level for the year and then estimates were created from each of
10  the businesses in order to meet those goals.
11           THE COURT:  I don't understand that.  Do you want to
12  explain that to me?
13           THE WITNESS:  Yes, sir.  For example, to start any
14  year, we would set a growth goal or, excuse me, ISGS or
15  corporate would set a goal of we would like to have 8 percent
16  sales growth and 8 percent profit growth.  Those goals would be
17  given to each of the businesses.  Each of the businesses at
18  that point would build an estimate looking at the business that
19  we had in hand, business that we thought we could win in
20  competition and depending on the nature of the year, excuse me,
21  the kind of year it was, whether it was, I'm sorry, if it
22  looked like a year where we could grow current contracts there
23  were going to be additional requirements, all that would be put
24  together into an estimate to meet those goals that were
25  established at the ISGS level.

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

CA1CIT1                    Hearing

```
 1              THE COURT:  All right.  Look at the next paragraph,
 2    paragraph 36.  It says in the first sentence, quote:  "In
 3    February 2009 it was clear to CW5 and other IS&GS leaders that
 4    the full year 2009 projections for IS&GS could not be achieved
 5    and CW5 and other division leaders told this to defendant
 6    Gooden at the time."  Did you tell that to the investigator?
 7              THE WITNESS:  No, sir, I did not.
 8              THE COURT:  Is it true?
 9              THE WITNESS:  It is not true.
10              THE COURT:  Let's go to page 13, paragraph 45.  Quote:
11    "According to CW3 and CW5, Lockheed Martin held weekly Tuesday
12    telephone conferences referred to as red program review
13    meetings during which each IS&GS program classified as red was
14    discussed."  Did you tell that to the investigator?
15              THE WITNESS:  Your Honor, as I recall, there's two
16    parts to this answer.  The first is no, I did not describe the
17    program review meetings.  The meetings that I'm familiar with
18    did not have that name.  However, again, towards the -- after I
19    went through the conversation and agreed that I would answer
20    some questions for him, I did describe the general review
21    process for conducting reviews and that did describe a meeting
22    that was held on Tuesday afternoon, but it was not called a red
23    program review meeting.
24              THE COURT:  These were regular Tuesday meetings?
25              THE WITNESS:  They became, I would say regular, your
```

8

CA1CIT1                    Hearing
1   Honor, in the sense that I think at the beginning of the year
2   they weren't as regular and became more regular as we developed
3   our internal business rhythms.
4              THE COURT:  We're talking year 2009?
5              THE WITNESS:  Yes, sir.
6              THE COURT:  And is it correct that in these meetings
7   or at least as they developed later in the year into regular
8   meetings each IS&GS program classified as red was discussed?
9              THE WITNESS:  As I recall, we would have a variety of
10  meetings.  There could be as many as eight to ten per Tuesday
11  afternoon, and red programs, should they be in existence at the
12  time, they would always be on the docket.  But --
13             THE COURT:  Go ahead.
14             THE WITNESS:  But we would also review programs that
15  were new starts or programs that may have some particular
16  technical difficulty.  Those would also be in there, but they
17  wouldn't of necessity be coded as red.
18             THE COURT:  All right.  Go ahead, counsel.
19             MR. GOLDSTEIN:  Very well.
20  DIRECT EXAMINATION
21  BY MR. GOLDSTEIN:
22  Q.  Mr. Asbury, I'm just going to hand you what has been
23  previously marked as Exhibit 19, your severance agreement, I'm
24  referring to the declaration of Samuel Rudman in support of
25  summary judgment, so I'm handing you your severance agreement,
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
       CA1CITH                      Asbury - direct
  1    him for 50 minutes and had called him back after your call had
  2    dropped, right?
  3            THE COURT:  Well, I think he's already testified he
  4    doesn't have a recollection of calling him back, but he's not
  5    contesting what the record shows, is that correct?
  6            THE WITNESS:  That's correct, your Honor.
  7            MR. GOLDSTEIN:  Just give me one moment.
  8            THE COURT:  Yes.
  9            (Pause)
 10    Q.  Mr. Asbury, I'm trying to understand with regard to your
 11    five-minute estimate, I believe there was a submission from
 12    your lawyer, Mr. Levy, in which you pointed out in your
 13    submission from what I took it that you were confused by
 14    earlier phone records that had been shown to you, is that fair?
 15    A.  Yes, I think it is.
 16    Q.  So is it your testimony that the records earlier caused you
 17    to estimate the second call at five minutes?
 18            MR. HILLEBRECHT:  Objection.  Again, your Honor, I
 19    know you're familiar with it.  I'm not sure that's a fair
 20    statement of his deposition testimony.
 21            THE COURT:  Sustained.
 22    Q.  Let me ask it differently.  At the time I asked you for
 23    your best estimate, I told you that I didn't have a phone
 24    record, correct?
 25            MR. HILLEBRECHT:  Objection.  Again, misstates, your
```

```
       CA1CITH                    Asbury - direct
 1    Honor.  He'd been told that there were phone records.
 2              THE COURT:  If someone wants to point the witness
 3    to --
 4              MR. GOLDSTEIN:  I'm sorry -- not to interrupt you,
 5    your Honor, let me point the witness to the line and page.
 6    Q.  Mr. Asbury, take a look, if you would, at page 53, starting
 7    at line 19 and I'll read it into the record and see if you
 8    agree that I in fact informed you that I didn't have a phone
 9    record when I was asking for your best estimate.  The question
10    was --
11              THE COURT:  You're looking, just so the record is
12    clear --
13              MR. GOLDSTEIN:  Yes, your Honor, page --
14              THE COURT:  It's page 53, line 19, quote:
15              "Question:  All I am trying to get at, if this is all
16    that you told him, and you believe it was a brief conversation
17    to the best of your recollection -- obviously, I don't have the
18    phone records so that's all I'm trying to find out is how long
19    do you believe the call took, the best estimate that you could
20    give me under oath here.
21              "Answer: Five minutes."
22              I put aside my own doubts about the sincerity of the
23    question.  Counsel, at the time you put that question you had
24    been told by your investigator that the conversation lasted
25    much more than five minutes or anything like that, correct?
```

CA1CITH                         Asbury - direct

 1              MR. GOLDSTEIN:  That's correct, your Honor.
 2              THE COURT:  So when undoubtedly batting your eyes you
 3     said, oh, I don't have the phone record but all I'm trying to
 4     figure out is how long this took, that was less than sincere,
 5     true?
 6              MR. GOLDSTEIN:  Your Honor, certainly that was not my
 7     intent to be less than sincere.
 8              THE COURT:  I'm just surrounded with people today with
 9     innocent intent.  It's amazing.  We should form a Boy Scout
10     troop.
11              MR. GOLDSTEIN:  Your Honor, may I respond?  I did in
12     fact ask Mr. Asbury if he recalled if when he called Mr. Keatly
13     the call was dropped and he called back.  At the time we were
14     told Mr. Keatly was a wholesale fabricator and he was a liar.
15     I had his phone log, yes, but I didn't have the phone records,
16     and frankly at the time I wanted to be objective and give him
17     an opportunity to say, look, he told me it was five minutes.  I
18     did not have any reason to doubt Mr. Asbury at the time in
19     terms of his testimony.
20              THE COURT:  All right.  So let me get more to the meat
21     and substance, Mr. Asbury.  Here's what it comes down to.
22     Counsel is legitimately raising the issue that when you said
23     five minutes that you lied, and the reason he's asking the
24     Court to infer that is that according to what he had learned
25     from his investigator you had a detailed conversation on

CA1CITH                    Asbury - direct
1    numerous points lasting many minutes, and while one can't
2    necessarily recall everything about a conversation that
3    happened well before this time, it seems strange, he's asking
4    the Court to infer, that you would even remotely say things
5    like it's just five minutes and we didn't discuss anything
6    meaningful.
7            So do you want to say -- I'm going to of course have
8    questions by defense counsel and I've received a letter from
9    your counsel, but did you want to say anything about that
10   allegation?
11           THE WITNESS:  Yes, your Honor.  In the morning I had
12   been shown some phone records that, and I don't know the exact
13   language that was used to describe them, but they were roughly
14   described as two calls, one on September 19th of five to six
15   minutes and another on 9/22.  They were represented to me as
16   call records of a conversation between Mr. Keatly and myself.
17   At the time I felt, I was asked about the first call I
18   explained that I thought that felt about right.  On the second
19   call I told them that I thought it was slightly longer than
20   that, not how long, slightly longer than what was there in the
21   record.  Later on as we went through this dialogue with
22   Mr. Goldstein or the questioning with Mr. Goldstein I
23   repeatedly refused to give an estimate because I did not, I did
24   not have a feeling or a recollection or anything else.
25   Finally, I think it was after he phrased it in terms of I'd
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

45

CA1CITH                          Asbury - cross
1    this case, although the amended complaint in its text adds
2    Ms. Gooden as a defendant in the caption she is not listed.
3    That needs to be fixed.
4               MR. RUDMAN:  We'll take care of that, your Honor.
5               MR. HILLEBRECHT:  Your Honor, may I approach the
6    witness?
7               THE COURT:  Yes.
8    Q.  Mr. Asbury, I'm going to hand to you what's been marked as
9    Defense Exhibit 1 and ask you to take a look at that document
10   and tell me if you recognize it.
11              MR. GOLDSTEIN:  Your Honor, may I inquire of
12   Mr. Hillebrecht if this was covered in his deposition?  I have
13   not been provided and have not seen this before the hearing and
14   my knowledge is limited to the witness's phone conversations
15   and not long range planning.
16              THE COURT:  That's two different objections.  The
17   first one is, is this something that's been produced in
18   discovery.
19              MR. HILLEBRECHT:  Absolutely, your Honor, it bears a
20   Bates number.
21              THE COURT:  The second question is what does it have
22   to do with this hearing?
23              MR. HILLEBRECHT:  First of all, it was a document that
24   Mr. Asbury was questioned about extensively by plaintiff's
25   counsel and the reason for showing the witness the document is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

CA1CITH                      Asbury - cross
1    to rebut the view that he told anybody in September of 2009
2    that they couldn't make the financial projections.  This
3    document speaks directly to that.
4             THE COURT:  Okay, go ahead.
5    Q.  First, Mr. Asbury, if you could, tell us what that is.
6    A.  This would be the 2009 tactical plan, which is self
7    descriptive, but if I may, after the forecast for an individual
8    year was developed and then approved, we would go before
9    Ms. Gooden and her staff and present why we felt we had a way
10   of tacking in, a plan essentially for executing on that year.
11   Q.  And was this particular document, defense Exhibit 1,
12   created under your direction as president of the civil line of
13   business of IS&GS?
14   A.  Yes, it would have been.
15   Q.  And it was created on or about February 2009?
16   A.  I'd be more comfortable telling you it was done probably in
17   January or February of 2009.
18   Q.  Was it ultimately presented as the type of tactical plan
19   that you just alluded to earlier?
20   A.  Yes, it would have been.
21   Q.  And you recall what the date of that meeting was?
22   A.  I don't recall, but I'm going to be informed by the charts.
23   I think the chart probably tells us it was February 16, 2009.
24   Q.  Very well.  I think just to put a little bit of context on
25   this for the Court, could you describe for us briefly how IS&GS
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

47

CA1CITH                    Asbury - cross
1   was organized at the time, meaning February 2009, and how civil
2   fit into that IS&GS structure?
3   A.  Yes.  We reorganized, Linda reorganized between 2008 and
4   2009 and we had, I want to say ten to eleven different
5   companies that formed ISGS in the 2008 time frame and we were
6   transitioning to a smaller number of companies, six if I recall
7   correctly, with three of them being very large and that would
8   have been intel, civil and defense.  In the case of this
9   plan -- what we would do is take the forecast, go into it in
10  great detail looking at new business, on contract growth,
11  program performance, that sort of thing and we would conduct
12  sort of risk and opportunity analysis against the forecast and
13  to look at the levers we had to pull, the things we had to
14  focus on in order to make the plan achievable.
15  Q.  Referencing the February 16, 2009 tactical plan meeting did
16  the presidents on other lines of Lockheed Martin within IS&GS
17  have to demonstrate that their own plan was achievable?
18  A.  Yes, they would have.
19  Q.  Turn if you would to page 9 of the presentation, Defense 1?
20  There should be a page entitled 2009 commitment.  Do you see
21  that there?
22  A.  Yes.
23  Q.  And I direct your attention particularly to the third
24  column or bar chart on the page, the 365M for million at the
25  top.  Do you see that one?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

```
    CA1CITH                    Asbury - cross
 1  A.  Yes, I do.
 2  Q.  And that's part of the chart referring to EBIT, correct?
 3  A.  Yes.
 4  Q.  Just for the record, could you tell me what EBIT stands
 5  for?
 6  A.  Earnings before income tax.
 7  Q.  And if you look at the lower right hand column of that page
 8  9, there's a target box and it's in green there.  Do you see
 9  that there?  Lower right hand side?
10  A.  Yes.
11  Q.  The targets there, is that a reference to the long range
12  plan or LRP targets?
13  A.  That would be the yearly target for this plan as a first
14  year of the long range plain.
15  Q.  And specifically for civil, correct?
16          MR. GOLDSTEIN:  Your Honor, may I lodge an objection?
17  Defense counsel had an opportunity to cross-examine the witness
18  at his deposition regarding this and did not ask one single
19  question about it to establish at the time.  Apparently what he
20  wants to do now is show that Mr. Asbury couldn't have said that
21  to the investigator.  I'm not sure what we're doing here now if
22  the issue is what was said during the deposition under oath and
23  whether or not Mr. Asbury told the truth under oath.
24          THE COURT:  No.  The ultimate question is whether
25  plaintiff's counsel had an adequate good-faith basis to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

49

CA1CITH                     Asbury - cross

 1   attribute to the various confidential witnesses what's
 2   attributed to them in the complaint.  So as I understand what's
 3   being inquired about here is evidence that makes it, defense
 4   counsel would argue, very unlikely that the witness would have
 5   said to the investigator what the investigator reported that is
 6   reflected in the complaint because of things he had signed off
 7   on in effect at an earlier date.  But having said all that, I'm
 8   going to give you no more than four minutes more to complete
 9   this exhibit.
10           MR. HILLEBRECHT:  I was just going to say, your Honor,
11   I have I think a handful of questions left so I appreciate
12   that.
13   Q.  If you can, sir, you see this 365 million, there's a green
14   portion labeled challenge, $55 million.  Could you very briefly
15   explain to the Court what's meant in Lockheed Martin parlance
16   by a challenge in this context?
17   A.  Yes, I'd be happy to.  The rollup -- if I can, let me give
18   you a little bit of context.  The rollup shown in the cylinders
19   on the left is really what our firm follow on business is.  The
20   on contract growth is represented by the purple disk, meaning
21   we think we can grow contracts of that -- excuse me, we think
22   we can grow existing contracts by that amount for a year and
23   that's part of the makeup of our plan.  The green here in this
24   case represents what we would get from new business add ons and
25   pursuing new business and targets and other initiatives which

```
        CA1CITH                      Asbury - cross
   1    are those elements that aren't in firm and follow on that would
   2    have to be acquired or managed during the year in order to
   3    achieve the plan.
   4    Q.  At this point in time in February of 2009, in your opinion,
   5    based on everything you knew at the time, did civil have a plan
   6    in place to achieve the total of $365 million of EBIT for the
   7    full year 2009?
   8    A.  Yes.  There certainly was a plan in place.
   9    Q.  Why don't you turn to the next page, please, page 10, a
  10    page entitled EBIT challenge $55 million.  This is the last
  11    part of the exhibit I'm going to ask about, your Honor.  Do you
  12    see that there, sir?
  13    A.  Yes, I do.
  14    Q.  Heading to the right hand side two columns, initiative and
  15    impact.  You don't have to go through every line item but
  16    generally speaking could you tell the Court what's set out on
  17    this page, the EBIT challenge page?
  18    A.  Yes.  In this page, if I could step back a second, in the
  19    general description of how we would do forecasting before, we
  20    would look at risks and opportunities.  The initiatives are
  21    representing those things, sort of the actions that we would
  22    take in order to close the gap on the EBIT challenge.  A couple
  23    of those are about rates, we were doing consolidation of the
  24    business.  The less expensive we made the rates, the more
  25    profitable we would be on our fixed price and time and
```

51

CA1CITH                    Asbury - cross
1   materials contracts.  Same thing on we had some programs at the
2   time that we needed to try to close out with government
3   activity in order to realize, as you can see pretty large
4   scales of notes, we didn't have a precise number in terms of
5   the EBIT.  And then the tire teams initiatives were sort of
6   independent groups of people going in and looking at the way
7   the organization was running to make sure we were doing it in
8   the most cost effective fashion.
9   Q.  You can put aside the document.
10              THE COURT:  Let me ask one question.  So that chart
11  shows a total if you took all the steps and succeeded you'd
12  have a plus of between 10 million and 68 million, yes?
13              THE WITNESS:  Yes, your Honor.
14              THE COURT:  So what was the basis on which you said
15  55 million?  As a matter of chance it would be 30, what,
16  9 million would be the midpoint?
17              THE WITNESS:  Oh, you mean just in terms of arithmetic
18  average?
19              THE COURT:  Yes.  What was the basis of saying 55?
20              THE WITNESS:  The basis of 55 is even though MTA was a
21  zero to 36 we felt we had a higher than normal probability for
22  a claim that would be at the full extent of that number.  The
23  same thing with TWIC.  We had a government delay that caused us
24  to spend a lot more money over a six-month period that we
25  needed to put in a claim for.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

52

CA1CITH                        Asbury - cross
```
 1              THE COURT:  All right.
 2  BY MR. HILLEBRECHT:
 3  Q.  Just following up on it briefly, Mr. Asbury, you said in an
 4  earlier answer that part of the planning process included doing
 5  risk assessments, applying risks and opportunities.  Is that
 6  part of the process that went into coming up with this tactical
 7  plan?
 8  A.  Yes.  That is correct.
 9  Q.  Now, did you actually present this presentation to
10  Ms. Gooden and her staff and the other presidents at the
11  tactical planning group?
12  A.  Yes, I did.
13  Q.  And during your presentation did you indicate whether
14  civil's 2009 LRP targets were achievable?
15  A.  Yes, I did.
16  Q.  And you indicated that they were?
17  A.  Yes.
18              MR. GOLDSTEIN:  Objection.  Leading, your Honor.
19              MR. HILLEBRECHT:  Bad question, I'm sorry.
20  Q.  Did the presidents of the other IS&GS lines of business
21  similarly present their plan?
22              THE COURT:  This is -- I get the general point and I
23  think we're not making good use of time to go there.
24              MR. HILLEBRECHT:  Very well, your Honor.
25              MR. GOLDSTEIN:  Your Honor, I just want to lodge an
```

53

CA1CITH                    Asbury - cross

 1  objection.  I don't believe this was shown at Mr. Asbury's
 2  deposition.  I could be wrong, but I just want to object on the
 3  record because I don't believe it was.
 4          MR. HILLEBRECHT:  My recollection it was.  I may be
 5  wrong, your Honor.  I know it was shown to another witness as
 6  recently as Friday, so I apologize if I'm wrong.
 7          THE COURT:  And my conclusion, for the record, is it's
 8  completely irrelevant whether it was shown to him at his
 9  deposition or not, but I appreciate filling up our record.
10          MR. HILLEBRECHT:  Your Honor, may I approach the
11  witness again?
12          THE COURT:  Yes.
13          MR. HILLEBRECHT:  For the purpose of time, your Honor,
14  I'm going to hand the witness two exhibits marked Defense 2 and
15  3.
16  Q.  Mr. Asbury, again, take a quick look at both Exhibit 2 and
17  Exhibit 3.  Have you had a chance to look at those?
18  A.  I'm looking at 2 now.  I haven't looked at 3.
19  Q.  Okay.
20  A.  Okay, I've had a chance now.
21  Q.  Okay, good.  First, let me direct your attention to Exhibit
22  2.  It seems to be an e-mail exchange between you and William
23  Parsons, is that correct?
24  A.  Yes, sir.
25  Q.  And the subject line, tactical planning meeting, and the

54

CA1CITH                        Asbury - cross
1   date of February 17, 2009.  Does this e-mail exchange refer to
2   the tactical planning meeting you've just been testifying
3   about?
4   A.  Just based on what's written here and the subject matter,
5   yes, I would think so.
6   Q.  In your response you say in part, "Meeting yesterday went
7   very well."  Do you have a recollection of the tactical
8   planning meeting going very well?
9   A.  I don't have a recollection at all.  I think if it hadn't
10  been going well I would have remembered.
11  Q.  Could you turn to Exhibit 3 now?
12  A.  Okay.
13  Q.  It's an e-mail from you to a large distribution list
14  April 9, 2009, entitled "1Q09 results."  Do you see that there?
15  A.  Yes, sir.
16  Q.  Could you just tell us firstly, in a general way, I don't
17  mean line by line or name by name, the distribution list, who
18  are the folks who were getting this?
19  A.  It would have been the, looks like all of the business unit
20  vice presidents and a lot of members of the civil staff were
21  included on this e-mail.
22  Q.  And I'm not going to look at the whole thing, but it begins
23  with you congratulating each of the folks on it on their
24  contribution of making our 1Q09 plan, right?
25  A.  Yes.

```
        CA1CITH                        Asbury - cross
1     Q.  Did civil in fact make its first quarter 2009 plan?
2     A.  Yes.
3     Q.  Did civil in effect beat its plan for EBIT and cash?
4               THE COURT:  The exhibit speaks for itself.  The
5     Exhibits 1, 2 and 3 are being received not for their truth but
6     for the state of mind of the witness.
7               (Defense Exhibits 1, 2  and 3 received in evidence)
8     Q.  And if I could just show one more, your Honor, it's the
9     last Exhibit 4.  One more, I apologize.  Take a look at that.
10              THE COURT:  Received for the same purpose.
11              (Defense Exhibit 4 received in evidence)
12    Q.  Mr. Asbury, have you had a chance to look at this May 8,
13    2009 e-mail exchange between you and Ms. Gooden?
14    A.  Yes.
15    Q.  Do you have a recollection that on or about May 8, 2009
16    civil was on or --
17              THE COURT:  I've read it.
18              MR. HILLEBRECHT:  Very well, your Honor.
19    Q.  Based on everything you knew at the time, sir, was it your
20    understanding on May 8, 2009 that civil was on or ahead of
21    plans for orders, EBIT and cash for the second quarter?
22              MR. GOLDSTEIN:  Objection.  Leading.
23              THE COURT:  Overruled.
24    A.  Yes.
25    Q.  And as of this point, May 8, 2009, did you still believe
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

56

```
CA1CITH                    Asbury - cross
 1   that the full year 2009 plan was achievable?
 2            MR. GOLDSTEIN:  Same objection.
 3            THE COURT:  Overruled.
 4   A.  Yes.
 5            MR. HILLEBRECHT:  Just one moment, your Honor?
 6            THE COURT:  Yes.
 7            MR. HILLEBRECHT:  Nothing further, Judge.
 8            THE COURT:  Let me find out, are there further
 9   questions from plaintiff?
10            MR. GOLDSTEIN:  No, your Honor.  I would put on the
11   record that we in fact have evidence that we could put in if
12   your Honor would allow, for example that as of February 2009
13   the internal affairs division at Lockheed Martin believed that
14   the internal plan had less than a 45 percent chance of
15   succeeding, but I don't want to burden the record.  If the
16   Court is going to consider substantively, obviously, to
17   supplement the record, we do have a whole lot of evidence to
18   support that allegation.
19            THE COURT:  As I said, I'm only receiving this as to
20   the witness's state of mind so what some other people thought
21   is neither here nor there as to that issue.  It's to the
22   overall lawsuit, I understand.
23            Now, is Mr. Levy here?
24            MR. LEVY:  I am, your Honor.
25            THE COURT:  Are there any questions you want to put to
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

57

CA1CITH                    Asbury - cross
1   your client?
2              MR. LEVY:  No thank you.  You did an extensive job.
3              THE COURT:  All right you may step down.  Call your
4   next witness.
5              MR. GOLDSTEIN:  Your Honor, we call Mr. Morrison.  If
6   he could leave just the complaint and if I could clean up the
7   exhibits just for lack of confusion purposes.
8              MR. LEVY:  Your Honor, if I might, is Mr. Asbury now
9   free to sit in the courtroom?
10             THE COURT:  Yes, but am I misremembering, wasn't he
11  the person whose schedule we accommodated by having this
12  meeting earlier?  Maybe that was a different witness.  Who was
13  that?
14             MR. GOLDSTEIN:  It's Mr. Parsons, your Honor.
15             THE COURT:  Mr. Parsons, I'm sorry.  Yes, that would
16  be fine.
17             MR. GOLDSTEIN:  Your Honor, we have an issue regarding
18  Mr. Asbury and a followup deposition we're seeking to take, so
19  I don't know if that influences the Court's view.  We don't
20  have an objection if he wants to sit in.
21             THE COURT:  Fair enough.  Well, if Mr. Parsons is the
22  person with the time trouble, shouldn't you call Mr. Parsons?
23             MR. GOLDSTEIN:  I'm happy to call him out of turn,
24  your Honor, absolutely.
25             THE COURT:  Let's call Mr. Parsons and have the other
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

58

CA1CITH                        Asbury - cross

1   witness go back in the witness room.  So the next witness is
2   going to be Mr. Parsons.  So the other witness has to go back
3   in the witness room.
4            MR. HILLEBRECHT:  I'm sorry, is someone getting
5   Mr. Parsons?  Okay.
6            MR. GOLDSTEIN:  If I may approach and leave a copy of
7   his deposition on the witness stand.
8            THE COURT:  Yes.
9    WILLIAM PARSONS,
10       called as a witness by the Plaintiff,
11       having been duly sworn, testified as follows:
12            THE DEPUTY CLERK:  State your name spell your last
13   name slowly for the record.
14            THE WITNESS:  William Parsons, P-a-r-s-o-n-s.
15            THE COURT:  Mr. Parsons, how are you presently
16   employed?
17            THE WITNESS:  I'm the president, CEO of RD Amross,
18   which is a joint venture between Rocketdyne and NPO Energomash.
19            THE COURT:  In November 2009 were you a vice president
20   of strategic development of IS&GS?
21            THE WITNESS:  Yes, sir, I was.
22            THE COURT:  Have you read the, or looked at the
23   complaint in this case?
24            THE WITNESS:  I don't know if I've looked at the
25   complaint.  I've read some of the excerpts from some of my --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

59

CA1CITH                         Asbury - cross

1              THE COURT:  Take a look.  There should be a copy
2    there.
3              THE WITNESS:  Is that it?
4              THE COURT:  Yes.  So take a look at page 10, paragraph
5    36 and you are identified as CW3.
6              THE WITNESS:  Yes, sir.
7              THE COURT:  And in the second sentence it says CW2 and
8    CW3, a vice president of strategic development at IS&GS also
9    stated that defendant Gooden was told at the beginning of 2009
10   that the projections for 2009 for IS&GS were overstated.  Do
11   you see that sentence?
12             THE WITNESS:  Yes, sir.
13             THE COURT:  Did you say that?
14             THE WITNESS:  No, sir.  That wouldn't be terms that I
15   would use.  I wouldn't know whether it was overstated or not.
16             THE COURT:  You had a conversation, did you not, with
17   an investigator for the plaintiffs here?
18             THE WITNESS:  Yes, sir, I did.
19             THE COURT:  Did you discuss in any respect the
20   projections for 2009?
21             THE WITNESS:  Yes, sir.  We were told, there was a lot
22   of discussions back then about the financials and so I'm sure
23   that there was some discussions about whether we were going to
24   make our marks or not.
25             THE COURT:  So did you tell the investigator that the

                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

60

CA1CITH                      Asbury - cross
1   projections were overstated?
2             THE WITNESS:  No, sir.  It's just not a term I would
3   have used.  I'm not a financial person.  I'm more a manager.
4             THE COURT:  What terms would you recall using?
5             THE WITNESS:  I would have said we were struggling to
6   meet our financial goals.
7             THE COURT:  Why was that?
8             THE WITNESS:  I think a lot of it was because we just
9   reorganized into IS&GS civil, there were a lot of programs that
10  were brand new to the organization and we were just getting to
11  know them and they were having technical or schedule
12  difficulties at that time.
13            THE COURT:  Did you yourself meet with Ms. Gooden
14  about projections?
15            THE WITNESS:  No, sir.  I have sat in meetings with
16  Ms. Gooden only on two occasions or three occasions maybe.
17            THE COURT:  What were those occasions about?
18            THE WITNESS:  Usually it was to go over, the one time
19  that I can recall very vividly it was to go over a proposal
20  that we were submitting and we had to present to Ms. Gooden
21  before that proposal was submitted.  And when I say, I was just
22  a bystander in that meeting.
23            THE COURT:  Take a look at page 11 of the complaint,
24  paragraph 38, the last sentence of that paragraph.  Quote,
25  "According to CW3, defendant Gooden and members of her staff
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

61

CA1CITH                    Asbury - cross

1   personally reviewed each bid submitted by IS&GS and it was
2   their regular practice to revise the bids downward."  Did you
3   tell that to the investigator?
4           THE WITNESS:  I don't believe I would have used the
5   word "regular practice."  I was pretty new to the organization,
6   but the talk was, when I say the talk amongst other people was
7   that usually if you brought a proposal bid to the management
8   group, that it would be moved downwards.
9           THE COURT:  Okay.  So this was, if you will,
10  conversations that you had with your fellow workers in ISGS
11  civil about what higher management would do when bids were
12  presented?
13          THE WITNESS:  Yes, sir.
14          THE COURT:  And when you say that they would revise
15  the bids downward, what do you mean by that?
16          THE WITNESS:  Well, we called it price to win, so you
17  have to find a price that we think would win the contract, and
18  so what in most cases you started out doing was you try to put
19  everything you think of into the proposal, then you start
20  trying to pull things out to get it to a place where it was a
21  price to win.
22          THE COURT:  Did you believe that the downward
23  revisions were justified?
24          THE WITNESS:  I wasn't an expert enough to probably
25  say one way or the other, but we won a lot of contracts.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

62

CA1CITH                          Asbury - cross

1           THE COURT:  Now, you yourself were not present at the
2    meetings where this defendant Gooden or her staff, where this
3    revision downward occurred, were you?
4           THE WITNESS:  I've been in on meetings where the staff
5    is given direction to go scrub the numbers.
6           THE COURT:  Okay.  By Ms. Gooden?
7           THE WITNESS:  Well, Ms. Gooden and her management
8    staff.  She wouldn't be the only one in the meeting.
9           THE COURT:  I understand, but she would be in the
10   meeting?
11          THE WITNESS:  Well, the one or two meetings that I was
12   at, yes, sir.
13          THE COURT:  And tell me, at the one or two meetings
14   you were at, tell me briefly what occurred in this regard.
15          THE WITNESS:  There's presentations made, there's a
16   lot of questions from different staff members about different
17   parts of that presentation.  There's comments about I don't
18   believe that that's an appropriate number or that's -- I think
19   you can get that scrubbed down a little bit, and you need to go
20   back to the drawing board on this particular area.  Things like
21   that.
22          THE COURT:  Okay.  That was accepted?
23          THE WITNESS:  Yes, sir.
24          THE COURT:  Did you say anything about that at the one
25   or two meetings that you recall?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

63

CA1CITH                    Asbury - cross
1               THE WITNESS:  No, sir.
2               THE COURT:  So you were just an observer?
3               THE WITNESS:  Yes, sir.
4               THE COURT:  Let's go to page 13, paragraph 45, the
5    second and third sentence.  Actually the whole paragraph.  The
6    first sentence.  "According to CW3 and CW5, Lockheed Martin
7    held weekly Tuesday telephone conference calls referred to as
8    red program review meetings during which each IS&GS program
9    classified as red was discussed."  Let's stop there.  Did you
10   say anything along those lines to the investigator?
11              THE WITNESS:  Probably so, sir, yes, sir.
12              THE COURT:  Is what is in that sentence accurate to
13   the best of your knowledge?
14              THE WITNESS:  To the best of my knowledge, yes, sir.
15              THE COURT:  The second sentence, "CW3 stated that
16   defendant Gooden and IS&GS program managers regularly
17   participated on these weekly red program calls."  Is that what
18   you told the investigator?
19              THE WITNESS:  Yes, sir.
20              THE COURT:  To the best of your knowledge that's
21   accurate?
22              THE WITNESS:  Yes, sir.
23              THE COURT:  And the third sentence, "According to CW3,
24   it was clear from the calls that major civil segment IS&GS
25   programs were troubled in April and May 2009."  Did you say

CA1CITH                    Asbury - cross

1    that?
2            THE WITNESS:  I can't recall saying exactly that.  I
3    know that we had some programs that were classified red
4    programs.
5            THE COURT:  And that's what you would have meant by
6    troubled?
7            THE WITNESS:  Yes, sir.  I wouldn't use the word
8    "troubled."  Sometimes programs were classified red and we
9    didn't even completely understand why they were red, but they
10   were visible, needed to be presented.
11           THE COURT:  Well, independent of that, were there
12   major civil segment IS&GS programs that in your view were
13   troubled in April and May of 2009?
14           THE WITNESS:  There were a few programs that we were
15   concerned about, yes, sir.
16           THE COURT:  And then the final sentence, "While CW3
17   stated that there were at least five major civil programs in
18   IS&GS in the months leading up to 2009, CW3 was not aware of
19   any IS&GS programs that unexpectedly entered red status in June
20   or July 2009."  Did you say that to the investigator?
21           THE WITNESS:  Yes, sir.  That sounds like something I
22   would have said.
23           THE COURT:  Okay.  Very good.
24           Let's go on.
25           MR. HILLEBRECHT:  Your Honor, I'm sorry to interrupt,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

65

CA1CITH                        Asbury - cross
1   it may have been intentional, but I just want to point out to
2   the Court on the previous page, page 11, Mr. Parsons is also
3   discussed in paragraph 39.
4           THE COURT:  Oh.  Thank you very much.  Yes.  Thank you
5   very much.  I missed that.  Let's go back for a minute to
6   paragraph 39.  The first sentence.  "CW3 stated that many of
7   the problems with IS&GS's financial performance in the second
8   quarter of '09, 2Q09, including margins and earnings, were due
9   to defendant Gooden's practice of submitting lowball bids to
10  win contracts."  Did you say that?
11          THE WITNESS:  That's just not something that would be
12  in my terminology, so I don't believe I've said anything like
13  that.
14          THE COURT:  All right.  And forgetting about whether
15  you said it or not, was it true?
16          THE WITNESS:  Not -- I just don't, again, I don't have
17  the expertise to say that that would be true or not true.
18          THE COURT:  Okay.  In that regard, what were your
19  duties at this time at IS&GS?
20          THE WITNESS:  I basically was brought over because of
21  my background in NASA programs and I was there to help look for
22  space-type related contracts and programs, and I was on the
23  senior staff of IS&GS civil, so I was helping with some
24  organizational kinds of things that we were doing during that
25  time.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

66

CA1CITH                         Asbury - cross

 1          THE COURT:  And just for my information, what's your
 2 educational background?
 3          THE WITNESS:  I have an engineering degree and a
 4 masters in engineering.
 5          THE COURT:  Within engineering did you have a
 6 specialty?
 7          THE WITNESS:  Well, back in the early days it was
 8 aerospace mechanical.
 9          THE COURT:  On page 14 -- oh, yes, I'm sorry, on page
10 13 -- no, I think we covered everything on paragraph 39.  So
11 page 14, paragraph 49, this is like the fourth sentence of
12 paragraph 49.  Quote: "According to CW3 problems with HR Access
13 were the result of poor program management which led to the
14 termination of several program managers."  Did you say that?
15          THE WITNESS:  Probably something along that line.  I
16 don't know if I would have said it was a result of program
17 management.  I just know that a number of program managers had
18 been replaced and they were having problems with HR Access.
19          THE COURT:  And then in paragraph 50, second sentence,
20 quote: "According to CW3 the cyber security program for New
21 York City encountered a lot of problems including cost
22 overruns."  Did you say that?
23          THE WITNESS:  I believe that -- something to that
24 effect.  Maybe not exactly that, sir.
25          THE COURT:  And next sentence: "CW3 learned about
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

CA1CIT1                    Parsons - direct

```
 1               MR. GOLDSTEIN:  Because at the time, your Honor --
 2               THE COURT:  And I would sustain that objection.  Now,
 3      if you are withdrawing the objection, that's a different
 4      question.
 5               MR. GOLDSTEIN:  I am withdrawing the objection, your
 6      Honor.
 7               THE COURT:  So -- all right.  And I take it defense
 8      counsel has no objection.
 9               MR. HILLEBRECHT:  Well, your Honor --
10               THE COURT:  You put the question.  I suppose -- and,
11      I'm sorry, there's a gentleman who is standing, I assume it's
12      not just because he wants exercise.  Do you want to identify
13      yourself for the record?
14               MR. KARAM:  Your Honor my name is Francis Karam.  I'm
15      Mr. Parsons' counsel.  I made an objection on the record and I
16      identified the basis for my objection.  I do not withdraw that
17      objection.
18               THE COURT:  Okay.  So the objection is sustained.
19               MR. GOLDSTEIN:  Very well.
20      BY MR. GOLDSTEIN:
21      Q.  Did you submit an affidavit in this case, sir?
22      A.  I don't know.  I don't know.
23               THE COURT:  I want to make clear, by the way, just for
24      what it's worth, the Court sua sponte is sustaining its
25      objection to the entirety of page 148, line 4, through 25 page
```

```
      CA1CIT1                    Parsons - direct
 1    149, lines 1 and 2.
 2              MR. GOLDSTEIN:  Very well.  The Court covered the
 3    questions I was going to do with Mr. Parsons, so I pass the
 4    witness.
 5              THE COURT:  Very good, counsel.  And, by the way, that
 6    ruling is only with respect to this hearing.  I'm not making
 7    any ruling as to any future use in some trial or whatever,
 8    though I have extreme doubts about its admissibility for any
 9    purpose at any time.  But I'm only ruling so far as this
10    hearing is concerned.
11              MR. HILLEBRECHT:  Just one moment, your Honor.
12    CROSS-EXAMINATION
13    BY MR. HILLEBRECHT:
14    Q.  Good morning, Mr. Parsons, how are you?
15    A.  Good morning.
16    Q.  Could I ask you to take out your deposition transcript
17    which is in front of you?  I direct you to page 58, almost the
18    same portion that counsel, Mr. Goldstein, referred you to.  You
19    were asked questions by his Honor about an excerpt from the
20    complaint to CW3 stating that there were civil segment programs
21    troubled in April and May 2009.  I want to direct your
22    attention on page 58 to line 21, your answer, where it says,
23    "Yeah, I don't, I don't remember saying April and May.  It's
24    very difficult for me to narrow it down to that time frame."
25    Do you see that?
```

75

CA1CITH                        Parsons - cross

1    A.  Yes.
2    Q.  In terms of the programs mentioned in your testimony, is it
3    your firm recollection that it was in April or May of 2009 or
4    could it have been June, July?
5              MR. GOLDSTEIN:  Objection.
6    A.  Could have been at a later time.  I don't have a good
7    feeling for the time frame.
8              THE COURT:  The objection is overruled.
9              MR. HILLEBRECHT:  You know, Judge, your Honor covered
10   pretty much everything I was going to cover, so I have no
11   further questions.
12             THE COURT:  Thank you, you may step down.  Now, I have
13   a telephone conference call at noon, so much as I know you
14   would not like to take a break, we will give you a break until
15   about 12:15.
16             (Recess)
17             (Continued next page)
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Ca1kcit2

```
 1              THE COURT:  Please call your next witness.
 2              MR. GOLDSTEIN:  Your Honor, may we raise one brief
 3    matter?  As an accommodation of Mr. Levy, Mr. Asbury's lawyer,
 4    Mr. Levy and I had a pending issue we hoped to raise before the
 5    Court today regarding Mr. Asbury's second deposition.  Mr. Levy
 6    is happy to stay, but I thought, in courtesy to him, perhaps
 7    maybe we can raise it now or set a time tomorrow.
 8              THE COURT:  Go ahead.
 9              MR. GOLDSTEIN:  Your Honor, essentially plaintiffs had
10    on short notice responded to defendants' subpoena of Mr. Asbury
11    with relation to this case and the confidential witness issue,
12    which was taken in June.  At the time they produced about 7,000
13    documents.  Since then, they produced an additional
14    approximately 3500 documents, and Mr. Asbury is the key person
15    because a key allegation of ours is that the civil division was
16    the reason why they missed, and that they knew in fact that the
17    projections were --
18              THE COURT:  How long was the original deposition?
19              MR. GOLDSTEIN:  The original deposition, I believe,
20    your Honor -- and I don't believe it was about six hours -- I'm
21    not certain, I'd have to look at the transcript, but it didn't
22    go all day.  I would certainly limit my questions to documents
23    I received after his first deposition and not retread on issues
24    I had gone over.
25              THE COURT:  How long do you think that would take?
```

CA1KCIT2                      Burns - direct
1            THE COURT:  Let me put it this way:  He didn't make a
2    promise either way?
3            THE WITNESS:  No, he didn't.
4            THE COURT:  OK, very good.
5            Look at paragraph 44.  So there's, I think, the first
6    reference to you -- unless I missed one.  No, I don't think so.
7    It's a fairly plain vanilla kind of thing, but it says, in I
8    guess the third sentence, "According to CW1, the ratings for
9    projects were based on objective criteria.  The project rating
10   status was established by the main Lockheed Martin
11   headquarters, and every IS&GS project was evaluated on a
12   monthly basis."
13           Do you recall telling him that?
14           THE WITNESS:  I did speak about the color readings,
15   and I did tell them that they were objective criteria, that
16   that criteria was established by headquarters.  However, the
17   part about every project being evaluated on a monthly basis is
18   not completely accurate.
19           THE COURT:  OK.  Do you recall what you said in that
20   regard?
21           THE WITNESS:  Yes.  I told him that it was traditional
22   for every project to fill out what at the time we called a
23   six-block, which included color ratings, and that could be done
24   as often as monthly for projects of a certain size but that the
25   formal evaluations were an annual evaluation.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CA1KCIT2                        Burns - direct

1                THE COURT:  And by colorings, you mean red, yellow or
2      green?
3                THE WITNESS:  Yes.
4                THE COURT:  It goes on to state in the final
5      paragraph, if you turn the page, final sentence of that
6      paragraph, "CW1 stated that Defendant Gooden reported the
7      status of IS&GS projects to Lockheed Martin's other senior
8      executives."
9                Did you say that?
10               THE WITNESS:  No, sir.
11               THE COURT:  Is that true, not true, or don't you know?
12               THE WITNESS:  I don't actually know for sure.
13               THE COURT:  Do you have a belief?
14               THE WITNESS:  I am of the belief that Ms. Gooden
15     certainly speaks about programs with other executives at
16     Lockheed Martin.
17               THE COURT:  So what you're saying is you don't know
18     whether she in effect made out a formal report or something of
19     that sort?
20               THE WITNESS:  Correct.
21               THE COURT:  Were you present ever when she reported
22     about any of these projects to other senior executives?
23               THE WITNESS:  No, sir.
24               THE COURT:  So you only know this from forming an
25     impression from other conversations?

116

CA1KCIT2                        Burns - direct

1              THE WITNESS:  Correct.
2              THE COURT:  Let's go on to page 14, paragraph 48, the
3      second sentence.  "CW1 stated that the Sentinel program had
4      problems because it had been priced at a very low rate."  Did
5      you tell that to the investigator?
6              THE WITNESS:  I did not.
7              THE COURT:  Do you recall saying anything about
8      problems with Sentinel?
9              THE WITNESS:  I did tell the investigator that the
10     challenges on Sentinel were due to the technical nature of what
11     we were trying to accomplish and the lack of clarity in the
12     requirements as provided by the FBI.
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

117

CA1FCIT3                      Burns - direct
1                THE COURT:  So that's what you told him?
2                THE WITNESS:  Yes.
3                THE COURT:  Then later on in paragraph 49, sort of
4       middle of the paragraph, quote, "According to CW1, the TSA,
5       Transportation Security Administration, was not satisfied with
6       the work performed by Lockheed Martin," close quote.  Did you
7       say that?
8       A.  So I don't recall precisely, sir.  I may have said
9       something like that.
10               THE COURT:  And what was the basis of your
11      understanding of their dissatisfaction, if you had one?
12               THE WITNESS:  So in 2010, I was part of a program
13      review of that program and so at that point I had exposure to
14      the program's performance and understood what the difficulties
15      were in the program and which things had or had not satisfied
16      the TSA at that point.
17               THE COURT:  Okay.  Counsel.
18      BY MR. GOLDSTEIN:
19      Q.  Just on a couple of the points that the Court raised.
20      Ms. Burns, it was typical, was it not, for programs to be
21      reviewed internally every month, right?
22      A.  Could you define what you mean by internally, sir?
23      Q.  Sure.  Let me see, let me refer you to your deposition and
24      see if that will help with clarification, okay?  Let me refer
25      you to your deposition at page 97, line 19.  Read through line
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

118

CA1FCIT3                    Burns - direct

1    98, 8 through 10.
2              THE COURT:  Which exhibit?
3              MR. GOLDSTEIN:  Your Honor, this is Exhibit 6 to the
4    Rudman declaration, starting again at line 97, 19.  Let me make
5    sure I've given the right cite, please.
6              THE COURT:  Okay.
7    Q.  And I'd ask, Ms. Burns, if you could just read to yourself,
8    if you would, through line 10.  Let me know when you're
9    finished and I'll pose some questions.
10             MR. HILLEBRECHT:  I apologize, counsel, could you tell
11   me --
12             MR. GOLDSTEIN:  Sure, it's 97, 19, to 98, 10.
13             MR. HILLEBRECHT:  Thank you.
14             (Pause)
15   A.  Go ahead.
16   Q.  My question was, independent of the testimony you gave
17   prior, was it typical for programs to be reviewed internally on
18   a monthly basis?
19   A.  Yes.  The program would review itself internally, yes.
20   Q.  With regard to the TSA program, is that something that
21   prior to being placed on that program you had heard from your
22   colleagues that it was a tough program?
23   A.  Yes.
24   Q.  So in 2009 you knew colleagues who were working on that
25   program who described it as a tough program, right?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

CA1FCIT3                      Burns - direct

1    A.  I did not know colleagues on the program at the time but I
2    had heard the program described as tough.
3    Q.  With regard to Sentinel, the Sentinel program was part of
4    your business unit, right?
5    A.  Yes, it was.
6    Q.  You had access to the budget?
7    A.  Yes.
8    Q.  And you believed that Sentinel was one of the more
9    challenging programs, correct?
10   A.  Yes, Sentinel was challenging.
11   Q.  While you didn't know how it was bid, you did know how it
12   was priced, meaning the price that Lockheed was charging the
13   FBI for the work, right?
14   A.  I knew the budget that we had available to perform the
15   program, yes.
16   Q.  And you believe those things were discussed with the
17   investigator, correct?
18   A.  We did not discuss the budget, to my recollection.
19   Q.  Ms. Burns, Mr. Keatly, when he first introduced himself to
20   you, he didn't tell you that he represented Lockheed Martin,
21   did he?
22   A.  No, he did not.
23   Q.  And he didn't tell you that he would keep everything that
24   you said to him as confidential, correct?
25   A.  Correct.

                                                                120
CA1FCIT3                    Burns - direct
1   Q.  Now, Ms. Burns, when you left Lockheed Martin, you signed a
2   separation agreement, correct?
3   A.  Correct.
4   Q.  I could certainly show that to you, but do you have an
5   understanding as to whether under that separation agreement you
6   had to cooperate with Lockheed if asked in litigation?
7   A.  Yes.
8   Q.  And you had an obligation not to disclose confidential
9   information?
10  A.  Yes.
11  Q.  And you also had an obligation not to disparage the
12  company?
13  A.  Yes.
14  Q.  And did you understand that if you breached any of those
15  that they could go after any severance paid as well as any
16  severance due?
17  A.  Yes.
18  Q.  And when you left you received a severance package
19  somewhere between 400 and $500,000?
20  A.  Correct.
21  Q.  Just as I understand it, after, at some point after you
22  spoke to the investigator, did you get a call from defense
23  counsel from Lockheed Martin?
24  A.  Mr. Wareham called, yes.
25  Q.  Did he ask you whether or not you'd been contacted by the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

121

```
CA1FCIT3                    Burns - direct
 1   investigator?
 2   A.  I believe he did.
 3   Q.  And did you discuss with Mr. Wareham or did he tell you
 4   that he wanted to meet with you to discuss --
 5   A.  Yes.
 6   Q.  I'm sorry to cut you off.
 7   A.  Yes.  He said he wanted to meet with me.
 8   Q.  And did you tell him, yeah, I'd be happy to meet with you?
 9   A.  Initially that's what I told him.
10   Q.  And what happened after that?  You hung up the phone and
11   decided you wanted to get Mr. Niedermayer to represent you?
12   A.  That is correct.
13   Q.  In your first conversation with Mr. Wareham, was the
14   severance agreement discussed?
15           MR. WAREHAM:  Objection.
16   A.  I don't recall the severance agreement was discussed in
17   that first conversation with Mr. Wareham.
18   Q.  Are you aware at any time that your lawyer discussed with
19   Mr. Wareham whether or not you should be compensated for your
20   expenses because you were abiding by your decision to
21   cooperate?
22   A.  Could you repeat?
23   Q.  Sure.  Do you know whether or not at any time your lawyer
24   ever reached out to Mr. Wareham and asked that you be
25   compensated for your expenses because you were abiding by your
```

127

CA1FCIT3                    Burns - direct
1              THE WITNESS:  No, I did not.
2              THE COURT:  Then it says, quote:  "CW2 maintained a
3    report of the performance of his/her area of IS&GS compared
4    with the projections that showed that the goals were not being
5    achieved and could not be achieved."  Do you see that?
6              THE WITNESS:  Yes, I see it.
7              THE COURT:  Did you say that?
8              THE WITNESS:  No, I did not.
9              THE COURT:  Did you maintain reports --
10             THE WITNESS:  No, I --
11             THE COURT:  I'm sorry, go ahead.
12             THE WITNESS:  No.
13             THE COURT:  A little later down in the next paragraph,
14   paragraph 36, it says in the second sentence, quote:  "CW2 and
15   CW3, a vice president of strategic development in IS&GS also
16   stated that defendant Gooden was told at the beginning of 2009
17   that the projections for 2009 for IS&GS were overstated."
18             Did you say that?
19             THE WITNESS:  No.
20             THE COURT:  Was that true?
21             THE WITNESS:  I don't know.
22             THE COURT:  Okay.  Continuing.  Quote:  "According to
23   CW2 while Lockheed Martin knew that the goals for IS&GS
24   couldn't be achieved, shareholders did not know this
25   information.  According to CW2, defendant Stevens and Tanner
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

Case 1:11-cv-05026-JSR   Document 92-19   Filed 10/15/12   Page 45 of 84

CA1FCIT3                    Burns - direct

```
 1   received information about IS&GS directly from defendant Gooden
 2   and defendant Gooden's finance manager, Jeff McLaughlin.
 3   According to CW --"  Well, the next one is CW3.
 4           Did you say any of those things that are in those two
 5   sentences?
 6           THE WITNESS:  No, I did not.
 7           THE COURT:  Do you know anything from personal
 8   knowledge as to how defendant Stevens and Tanner received
 9   information about IS&GS?
10           THE WITNESS:  No, I do not.
11           THE COURT:  All right.  Turn to page 11, the paragraph
12   38, second sentence.  Quote:  "According to CW2 Lockheed Martin
13   deliberately underbid on programs and knew it could not perform
14   the work of many programs without large cost overruns."  Do you
15   see that?
16           THE WITNESS:  Yes, I see it.
17           THE COURT:  Did you say that?
18           THE WITNESS:  No, I did not.
19           THE COURT:  Do you have any information as to whether
20   there was any deliberate underbidding?
21           THE WITNESS:  No, I do not.
22           THE COURT:  Did you discuss bidding at all with the
23   investigator?
24           THE WITNESS:  I don't believe I did.
25           THE COURT:  Turn next to page 12, paragraphs 43, last
```

CA1FCIT3                      Burns - direct

1   few lines of that paragraph.  Quote:  "According to CW2, due to
2   cost cutting in 2008, IS&GS primarily had low paid personnel
3   assigned to programs which negatively impacted execution,
4   performance and customer satisfaction."
5          Did you say that to the investigator?
6          THE WITNESS:  No, I did not.
7          THE COURT:  Did you say anything about the level of
8   pay of personnel?
9          THE WITNESS:  No.
10         THE COURT:  Turn to page 14, paragraph 48.  "According
11   to CW2 the Sentinel program was placed into red status by early
12   2009 and problems with the Sentinel program were caused in part
13   by the inexperience of IS&GS personnel assigned to the
14   program."  Do you see that?
15         THE WITNESS:  Yes, I see it.
16         THE COURT:  Did you say that to the investigator?
17         THE WITNESS:  No, I did not.
18         THE COURT:  Let me pause for a moment.  In the three
19   or four moments that you spoke with the investigator, what if
20   anything do you recall discussing?
21         THE WITNESS:  I started out by telling him I couldn't
22   discuss any financial information and after that, I just
23   remember the investigator did all the talking.  I didn't do any
24   talking.
25         THE COURT:  All right.  He was trying to get you to

144
Ca1kcit4                        Hawn - direct
 1              MR. GOLDSTEIN:  Well, your Honor, I would ask I would
 2     have an opportunity to point that out to you.  I apologize, and
 3     I'm not --
 4              THE COURT:  Very good.  Move on.
 5              MR. GOLDSTEIN:  But I will do so after the
 6     questioning, if you would give me the opportunity.
 7     BY MR. GOLDSTEIN:
 8     Q.  Ms. Hawn, there is reference in your declaration or in your
 9     affidavit to one question on paragraph 19 of your affidavit, to
10     which you provided a substantive response regarding cooking the
11     books.  Are you with me in that paragraph?
12     A.  Yes.
13     Q.  And did you recall today answering one question, providing
14     a substantive response regarding cooking the books?
15     A.  From who?
16     Q.  A question that was posed to you by Mr. Keatly, the
17     investigator, that you're discussing here in paragraph 19 of
18     your affidavit?
19              THE COURT:  He's saying, as you sit here today, do you
20     have a recollection of what Mr. Keatly asked you in that
21     regard, if anything?
22              THE WITNESS:  A little bit.
23     Q.  Tell me what you remember.
24     A.  He asked if anyone had ever asked me if I changed numbers.
25              THE COURT:  And what did you say?
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
     Ca1kcit4                    Hawn - direct
 1              THE WITNESS:  And I said yes, but that I did not.
 2              THE COURT:  So someone had asked you that before but
 3    you had told that person you had not changed the numbers, yes?
 4              THE WITNESS:  Right.
 5              THE COURT:  Who is that person who had asked you that?
 6              THE WITNESS:  The business manager above me.
 7              THE COURT:  Named who?
 8              THE WITNESS:  The name of him?
 9              THE COURT:  Yes.
10              THE WITNESS:  Steve ***Berglin.
11              THE COURT:  Do you know why he asked that?
12              THE WITNESS:  No, I don't.
13              THE COURT:  Now, tell me a little bit more about what
14    your duties were during the period around 2009.
15              THE WITNESS:  2009?  I didn't have much in the way of
16    responsibilities.
17              THE COURT:  Well, did you work 9:00 to 5:00?
18              THE WITNESS:  I worked 9:00 to 5:00, and I was just
19    doing special assignments, whatever my director wanted me to
20    do.
21              THE COURT:  Prior to that 2008, when was the last time
22    before 2009 you had, if you will, a regular assignment?
23              THE WITNESS:  The end of 2007 and the first few
24    months, three months maybe, of 2008.
25              THE COURT:  And what was that?
```

146

Ca1kcit4                          Hawn - direct
1            THE WITNESS:  I was business manager on the IATI
2    program.
3            THE COURT:  To be business manager on a program means
4    what?
5            THE WITNESS:  You were responsible for the finance and
6    scheduling of the program.
7            THE COURT:  So you were, if you will, on the money end
8    of things?
9            THE WITNESS:  Yes, the scheduling.
10           THE COURT:  And the scheduling.  OK, very good.
11           Go ahead, Counsel.
12   BY MR. GOLDSTEIN:
13   Q.  Ms. Hawn, did you ever discuss whether anyone asked you to
14   change the numbers, with counsel for defendants in this case?
15   A.  Yes.
16   Q.  And what did you tell them?
17   A.  I started to tell them that I had been asked -- they asked
18   me if anyone ever asked me to change the numbers, and I said
19   yes.
20   Q.  And what happened?
21   A.  They were specifically looking for the years 2008 and 2009.
22   Q.  What, if anything, did they say to you after, specifically
23   if you recall, after you told them that that you had been asked
24   to change the numbers?
25   A.  I just told you, they were looking for 2008 and 2009, and I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

147

Ca1kcit4                         Hawn - direct
1    said no one asked me to change any numbers during that time
2    period.
3             THE COURT:  Someone asked you to change numbers at an
4    earlier time?
5             THE WITNESS:  Yes.
6             THE COURT:  When?
7             THE WITNESS:  2004-'5 time frame.
8             THE COURT:  OK.  Go ahead, Counsel.
9             Did you do so?
10            THE WITNESS:  No.
11            THE COURT:  Was this person a superior of yours?
12            THE WITNESS:  Yes.
13            THE COURT:  Who?
14            THE WITNESS:  Steve Berglin.
15            THE COURT:  Oh, that's the conversation you referred
16    to?
17            THE WITNESS:  Right.
18            THE COURT:  OK.
19   BY MR. GOLDSTEIN:
20   Q.  Ms. Hawn, let me refer, if you would, to your severance
21   agreement.  It was previously marked in your deposition as Hawn
22   Exhibit 3.
23   Q.  You worked at Lockheed for over 30 years, correct?
24   A.  Correct.
25   Q.  You can put it down.

148
Ca1kcit4                    Hawn - direct
 1            When you left, did you receive approximately $78,000,
 2   as reflected in the first page of the agreement?
 3   A.  Yes.
 4   Q.  And this agreement, did you want to consult with a lawyer
 5   prior to signing it?
 6   A.  I did not consult with a lawyer.
 7   Q.  My question is a little different.  Did you want to?
 8   A.  Yes.
 9   Q.  Were you able to?
10   A.  No.
11   Q.  Explain why you were not able to, please.
12   A.  I received the agreement on -- I don't remember which day
13   it was, but I had to get the agreement back within five days,
14   and I could not get with my attorneys during that time period.
15            THE COURT:  Did you ask for an extension of time?
16            THE WITNESS:  I told my boss that my lawyers could not
17   see me until it was like the seventh day, and my boss said we
18   have to have this signed.
19            THE COURT:  And who was your boss?
20            THE WITNESS:  Dave Valore.
21            THE COURT:  Dave?
22            THE WITNESS:  Valore, V-a-l-o-r-e.
23   Q.  Ms. Hawn, other than the things we discussed today, do you
24   remember speaking with Mr. Keatly about -- let me just start
25   over.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

149

Ca1kcit4                    Hawn - direct
1              Other than what you have discussed today, and what you
2       believe to have been a three- to four-minute conversation with
3       Mr. Keatly, is there anything else that you remember
4       specifically about that conversation?
5       A.  No.
6              MR. GOLDSTEIN:  That's all I have, your Honor.
7              THE COURT:  All right.  Defense counsel?
8       CROSS-EXAMINATION
9       BY MR. HILLBRECHT:
10      Q.  Ms. Hawn, good afternoon.  Do you still have the amended
11      complaint, the first thing his Honor started asking you about,
12      in front of you?
13      A.  Is that -- yes.
14      Q.  You do?  Great.
15             Could you flip to page 7.  Particularly in paragraph
16      24, the paragraph, I don't think a judge asked you about that.
17             THE COURT:  Thank you for catching it.
18      A.  OK.
19      Q.  Look at paragraph 24, which reads -- it's the very last
20      sentence starting at the bottom of page 4 -- "CW2 had regular
21      interactions with Defendant Gooden and other business area
22      managers."
23             During 2008 or 2009, did you in fact have regular
24      interactions with Linda Gooden?
25      A.  No.

ca1kcit4                    Hawn - cross

1   Q.  Did you have any interactions at all with Linda Gooden in
2   2008 and 2009?
3   A.  No.
4   Q.  Would you have known Linda Gooden if you saw her walking
5   down the hall?
6   A.  No.
7   Q.  Did Ms. Gooden in some other fashion instruct you to change
8   backlog numbers?
9   A.  No.
10          MR. HILLBRECHT:  Thanks very much.  That's it, Judge.
11          THE COURT:  Anything else?
12          MR. GOLDSTEIN:  No, your Honor.
13          THE COURT:  OK.  Thank you very much.  You may step
14  down.
15          (Witness excused)
16          THE COURT:  Other than Mr. Keatly, do we have anyone
17  else?
18          MR. GOLDSTEIN:  That's it, your Honor.
19          THE COURT:  So I'm going to give you a ten-minute
20  break while I take another very short matter that I have to
21  take now, and then we will resume with his testimony in ten
22  minutes.
23          MR. GOLDSTEIN:  Very well.
24          THE COURT:  You can leave your stuff at the tables but
25  you'll need to vacate the tables.

ca1kcit4
```
 1                MR. KARAM:  Your Honor, may Ms. Hawn be excused?
 2                THE COURT:  Yes.
 3                (Recess)
 4                THE COURT:  Please call your next witness.
 5                MR. GOLDSTEIN:  The plaintiffs call Mr. Ken Keatly.
 6     KEN KEATLY,
 7           called as a witness by the Plaintiff,
 8           having been duly sworn, testified as follows:
 9                THE DEPUTY CLERK:  State your name and spell it slowly
10     for the record.
11                THE WITNESS:  Ken Keatly, K-e-n K-e-a-t-l-y.
12                THE COURT:  Counsel.
13                MR. GOLDSTEIN:  Very well, your Honor.
14     DIRECT EXAMINATION
15     BY MR. GOLDSTEIN:
16     Q.  Mr. Keatly, were you honorably discharged from the
17     U.S. Army?
18     A.  That's correct, yes.
19     Q.  Have you served as an investigator for a period of time?
20     A.  Yes, I have.
21     Q.  How long?
22     A.  Almost 13 years.
23     Q.  And have you conducted numerous investigations?
24     A.  That's correct.
25     Q.  I want to talk about the contact with certain witnesses in
```

```
        ca1kcit4                    Keatly - direct
 1   this case.
 2              Did you contact certain confidential witnesses in this
 3   case, particularly Mr. Asbury, Ms. Hawn, Mr. Morrison,
 4   Ms. Burns, and Mr. Parsons?
 5   A.  I did.
 6   Q.  And when you spoke to those people, did you speak to them
 7   alone on the telephone or with another person?
 8   A.  I spoke with them alone on the phone.
 9              THE COURT:  Why?
10              THE WITNESS:  Your Honor, it's the practice of our
11   firm, L.R. Hodges & Associates, to conduct these telephone
12   interviews individually, for one primary consideration, being
13   the logistical difficulty of having two investigators always
14   available when a witness is available, which is, often we're
15   often contacting them by way of a cold call where we don't know
16   if they will or will not be available.  And also the
17   consideration is the cost factor that that entails for our firm
18   to pass that cost as a billable item to our client is something
19   we may not be able to pass along.
20              THE COURT:  If I remember correctly, you take notes of
21   your conversations?
22              THE WITNESS:  Correct.
23              THE COURT:  You take them by hand or you type them as
24   you're listening, or how?
25              THE WITNESS:  I take them by hand while I'm listening,
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
         ca1kcit4                    Keatly - direct
 1   your Honor.
 2              THE COURT:  Are you trained as a stenographer?
 3              THE WITNESS:  I am not, your Honor.
 4              THE COURT:  So, it may be that occasionally you make a
 5   mistake?
 6              THE WITNESS:  Anything is possible, your Honor, yes.
 7              THE COURT:  Well, in your experience, have you ever
 8   looked at your notes and said, oh, no, I got that wrong?
 9              THE WITNESS:  I'm trying to think of an example that
10   would answer your question precisely, your Honor, and I can't
11   think of an example that would -- there may be an occasion
12   where I couldn't read my handwriting or recollect exactly what
13   the witness said.
14              THE COURT:  My point is, that by not having someone
15   else on the phone, don't you increase the possibility that
16   mistakes will be made?
17              THE WITNESS:  I don't -- I can't say if the
18   possibility of mistakes being increased would arise by only
19   having one investigator on the phone.
20              THE COURT:  Because you have a pin perfect memory?
21              THE WITNESS:  Not because I have a pin perfect memory
22   but also because I have been in situations, I think, your
23   Honor, where there have been either other investigators or
24   attorneys present during an interview where I have also seen
25   where there might be a difference in recollection or a
```

ca1kcit4                     Keatly - direct
1    evidence in this hearing.  If for any reason -- and I have no
2    reason to believe this is at all a problem, but if for any
3    reason either counsel feels the need to get directly from the
4    phone company the relevant records, I will be happy to sign a
5    court subpoena and make it a court subpoena that is returnable
6    on very short notice, enforceable by contempt of court, so we
7    don't have to wait around.  I know phone companies typically
8    receive many requests and they give priority to the squeaky
9    wheel, so I'm prepared to squeak.
10                Anyway, go ahead.
11   BY MR. GOLDSTEIN:
12   Q.  Let me show you --
13                MR. GOLDSTEIN:  If I may approach, your Honor.
14   Q.  -- what was marked as Exhibit 1 to your deposition,
15   Mr. Keatly.  Do you recognize -- actually, I gave you the wrong
16   thing.
17                MR. GOLDSTEIN:  My apologies.  Sorry, your Honor.
18   Q.  Let me ask you, did in fact you provide a phone log in this
19   case?
20   A.  I'm sorry, again, I didn't hear your question.
21   Q.  I believe I did give you the right exhibit.  Do you
22   recognize this document?
23   A.  I do.
24   Q.  What is it?
25   A.  It's a redacted copy of my phone log.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

ca1kcit4                    Keatly - direct

1   Q.  And is this something that you do in everybody single case?
2   A.  It's my practice to do it in every case.
3   Q.  And, for example, with respect to -- let's look at a couple
4   of the witnesses.  Let's turn to the page, the second page,
5   there's an entry for Mr. Asbury.  Explain to me what those two
6   entries of the page ending 484 reflect and how those were
7   entered.
8           MR. GOLDSTEIN:  And if we can pull them up on the
9   screen for ease, highlighting the ones for Mr. Asbury at the
10  bottom of the page.
11  A.  The first entry, where the time is six minutes, that's
12  where I had attempted to call him at the time we had arranged,
13  following an earlier preliminary discussion a couple of days
14  prior.  He had not been available, and I left a message with
15  his receptionist, that I was trying to reach him for our
16  scheduled discussion.
17  Q.  What does the second entry show, the one that has 50
18  minutes, two calls?  What does that reflect?
19  A.  The second entry is reflecting that for a total of 50
20  minutes there were two calls.  The two calls reflect that one
21  of the calls was a dropped and then at that time -- but the
22  substance was that I had conducted the scheduled interview.
23  Q.  Did Mr. Asbury call you or did you call him, with respect
24  to those two calls that are entered in the second line?
25  A.  He had called me following the message that I had left for

162

```
           ca1kcit4                    Keatly - direct
 1    him with his receptionist.
 2    Q.  The call dropped and then he called you back?
 3    A.  That's correct.
 4    Q.  With regard to Mr. Asbury, did you discuss substantive
 5    information about his experience at Lockheed Martin with him
 6    during the initial 15-minute callback and then the following 36
 7    minutes?
 8    A.  That's correct.
 9    Q.  And do you believe that what you discussed with
10    Mr. Asbury -- did you try, to the best of your ability, to
11    document what he said to you, in your notes?
12    A.  I did.
13    Q.  And before we get to your notes, your memoranda are
14    prepared sometime after your notes, correct?
15    A.  That's correct.
16    Q.  So, looking at your notes, do you believe that's the
17    closest-in-time document that would reflect any conversations
18    you had with Mr. Asbury?
19    A.  The notes would be the closest in time, yes.
20    Q.  And those were taken after or during the two calls that
21    comprised 50 minutes with Mr. Asbury?
22    A.  They were taken during the two calls.
23    Q.  And if I could, let me hand you your notes.  But let me is
24    ask you before we get there:  Do you recall giving a deposition
25    in this matter?
```

CA1FCIT5                    Keatly - direct
1  higher pay grade of worker and replaced them with a lower pay
2  grade of worker.
3  Q.  Did she provide you with an example of what the pay rates
4  might be?
5              THE COURT:  Hang on.  I have an important conversation
6  with the attorney Leonard Deitz.
7              (Pause)
8              THE COURT:  Okay.
9  Q.  Did she provide you actually an example of what the labor
10 rates might be?
11 A.  Yes.
12 Q.  What did she say?
13 A.  I think she said that the highest labor rates that were
14 eliminated were about $60 an hour and the lower rate may be $22
15 an hour.
16 Q.  Did you have labor rates in mind and provide them to her
17 and say we've heard $60 or 22 and confirm that, or was that
18 independent information that she gave you that you would be
19 hearing for the first time?
20 A.  It was the latter.  It was independent information that I
21 was hearing for the first time.
22 Q.  And you believe that that conversation as well as the labor
23 rate example that we just discussed is also in your notes,
24 correct?
25 A.  I do.

CA1FCIT5                    Keatly - direct
1                MR. GOLDSTEIN:  Your Honor, I think just for purposes
2     of time I just would point the Court again to Exhibit 37 where
3     there's numerous examples.  I don't want to quibble.
4                THE COURT:  I'm getting the general idea, so I think
5     we can move along.
6                MR. GOLDSTEIN:  And I just want to point out, there's
7     numerous examples with respect to each witness, your Honor,
8     that's elucidated for you there.  If I could just have one
9     moment to conclude and then I'll be finished here.
10               THE COURT:  Yes.
11               (Pause)
12               MR. GOLDSTEIN:  Thank you, Mr. Keatly.  That's all I
13    have.  Thank you.
14               THE COURT:  Cross-examination.
15               MR. HILLEBRECHT:  May I,your Honor?
16               THE COURT:  Please.
17    CROSS-EXAMINATION
18    BY MR. HILLEBRECHT:
19    Q.  Mr. Keatly, good afternoon.  In answer to some questions
20    from Mr. Goldstein, both in connection with Mr. Asbury's
21    interview and Ms. Hawn's interview, you used very similar
22    phrases about the ability to meet, quote, "the forecast for the
23    year."  Do you recall using that phrase?
24    A.  I believe I probably used that phrase.
25    Q.  Do you understand what that phrase means?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

188

CA1FCIT5                    Keatly - direct
1    A.  In a general sense I think so, yes.
2    Q.  Can you articulate for us what it meant to you when you
3    were conducting these interviews and writing these notes?
4    A.  I can't tell you I remember exactly what I thought at the
5    time.  I can tell you what I think it means now to the best of
6    my ability.
7    Q.  Sure.
8    A.  I think that a forecast for the year would be the
9    projections that are being established for the division's
10   performance for the fiscal year upcoming.
11   Q.  And in your mind does that mean the internal targets set as
12   an internal metric within Lockheed Martin?
13   A.  As opposed to?
14   Q.  As opposed to projections that were made public to the
15   vesting public.
16   A.  I understand the distinction.  I understood it to mean
17   these were the internal projections of the company, but would
18   have had some carryover potentially in some way to what was
19   being publicly projected.
20   Q.  When you say it would have some carryover potentially, what
21   do you mean by that?
22   A.  That it's potential of the internal projections as I would
23   understand about internal projections -- I'm just drawing from
24   my own thoughts on this topic -- might have included stretch
25   goals that might have deviated from the public projections, but

CA1FCIT5                    Keatly - direct
1    I don't know.
2    Q.  And by deviated, do you mean the internal goals would be
3    higher than the external forecasts?
4    A.  I don't know, but I couldn't rule it out.  That's possible.
5    I don't know if there was a -- I don't know.
6    Q.  Did you ever have a conversation as part of your interview
7    with Mr. Asbury about these issues to try to clarify, make sure
8    you guys were still talking about the same terms, same issues?
9    A.  I don't remember exactly.
10   Q.  Do you recall trying to do that in connection with Ms. Hawn
11   or any of the other witnesses?
12   A.  The issues may have come up, but I don't remember if they
13   did or didn't.
14   Q.  I think it's clear now for each of these interviews of each
15   of the six confidential witnesses, let me make sure I got it
16   straight, you conducted the interview by yourself over the
17   telephone, correct?
18   A.  That's correct.
19   Q.  As I understand it after you conducted the interviews you
20   turn your notes into a memorandum, right?
21   A.  That's correct.
22   Q.  Which you then send to Robbins Geller, correct?
23   A.  That's correct.
24   Q.  After typing your memos but before sending them to Robbins
25   Geller, did you make any effort to confirm the accuracy of your

190

CA1FCIT5                    Keatly - direct
1   memoranda with the witnesses you had interviewed?
2   A.  I did not.
3   Q.  Before the amended complaint was filed, did you make any
4   effort to confirm with the cooperating witnesses that the
5   allegations attributed to them in the amended complaint were
6   true and accurate?
7   A.  I didn't know what the allegations in the amended complaint
8   were prior to its filing.
9   Q.  So I take it the answer is no.
10  A.  No.
11  Q.  And to your knowledge did anybody else at Robbins Geller,
12  or working on Robbins Geller's behalf make any effort
13  whatsoever to confirm the accuracy of each of the allegations
14  attributed to each of those confidential witnesses before
15  filing the amended complaint?
16  A.  I don't know.
17  Q.  You've seen the amended complaint.
18          THE COURT:  Did Robbins Geller ever run by you what
19  they were going to be putting in the complaint as attributed to
20  a given confidential witness?
21          THE WITNESS:  Your Honor, I don't remember if we did
22  speak about that by phone, myself and the attorneys.  It's
23  possible we may have, but I don't remember.
24          THE COURT:  All right.
25  Q.  At this point, you've seen the amended complaint, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

191
CA1FCIT5                        Keatly - direct
1   A.  I have.
2   Q.  And you in fact have seen the portions of the amended
3   complaint in which the allegations of each confidential witness
4   is set forth.
5   A.  I have.
6   Q.  You would agree with me, would you not, it would only take
7   a handful of minutes to read to each of the confidential
8   witnesses each of their statements in the amended complaint?
9              MR. GOLDSTEIN:  Objection.
10             THE COURT:  Sustained.
11  Q.  Let me ask it a different way.  I think you articulated how
12  one of the rationales at L.R. Hodges for having you conduct
13  these interviews by yourself, no witness or other participant,
14  was cost, correct?
15  A.  I think it's that in the broader term, in the broader
16  consideration is that cost is a factor, but it's also our
17  practice, the vast majority of interviews are conducted
18  individually, not just on this case but in other cases.
19  Q.  Did I misunderstand your testimony?  I thought you said one
20  of the reasons was cost.
21  A.  Well, I think I was trying to make a distinction and you're
22  correct that it would be cost in this and every other case why
23  that's our practice of interviewing individually for the most
24  part.
25  Q.  Can you spell out first a little bit the logistical
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

192

CA1FCIT5                    Keatly - direct

1  difficulties, I think was the phrase you used, in having two
2  investigators on an interview?
3  A.  Oh, I'd be happy to.  The starting point for an
4  investigation is to have to reach out to these individuals and
5  establish contact with them.  These are not individuals who are
6  expecting to receive a call from an investigator on this
7  matter.  Their availability to receive such a call is
8  completely unpredictable, and there could be in the course of a
9  given investigation a given evening of an investigation where
10 we may be attempting a dozen or two dozen potential witnesses
11 in succession.  One person may say, hey, I'll talk to you but
12 you're going to have to call me on Saturday morning or I'll be
13 available at this time.  We've got other cases going on as
14 well, too, which require an equal amount of their own time and
15 energy from the staff that we have available to us.  So that's
16 one illustration that I hope explains why it's very difficult
17 to always insure, that it would be very difficult to insure
18 always having two individuals when someone is ready to pick up
19 the phone and speak with us.
20 Q.  Well, in the instance you just alluded to where a witness
21 says or potential witness says I can't talk to you now call me
22 Saturday, why can't you get together with one of your
23 colleagues and patch things together and make a conference
24 call?
25 A.  I think that gets back to the cost factor too and it's been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

193

CA1FCIT5                     Keatly - direct

1  a practice of our firm that the interviews are conducted
2  individually.
3  Q.  What is your billing rate?
4  A.  My billing rate is 225 an hour.
5  Q.  In the relative scheme of things is that high or low for
6  the investigator at L.R. Hodges?
7  A.  It's the top billing rate.
8  Q.  So it would have been possible to have an investigator at
9  least for the portion where you sought to confirm allegations
10  which we saw in your phone record were pretty short, at a quite
11  modest cost, right?
12           MR. GOLDSTEIN:  Object to the form.
13           THE COURT:  I'll sustain.  I get the point.  Before
14  becoming an investigator, what was your employment?
15           THE WITNESS:  I was working for a scientific
16  consultancy in San Diego.
17           THE COURT:  How many people are employed in your
18  company?
19           THE WITNESS:  At the moment we probably have about a
20  dozen personnel, your Honor.
21           THE COURT:  Do any of them have prior law enforcement
22  background?
23           THE WITNESS:  At the moment we do not have anybody
24  with prior law enforcement backgrounds, but we have had
25  individuals with prior law enforcement backgrounds.

CA1FCIT5                        Keatly - direct
```
 1              THE COURT:  Go ahead, counsel.
 2   Q.  And to clarify, I'm not sure if we elicited that here
 3   today, you yourself have no law enforcement background of any
 4   kind?
 5   A.  That's right.
 6   Q.  Other than training at L.R. Hodges, you have no training in
 7   investigative techniques or other techniques, is that correct?
 8   A.  That's correct.
 9   Q.  As part of your standard interview technique one thing you
10   would do, in fact, is to provide substantive information or
11   allegations to the witnesses and seek to have them confirm it,
12   right?
13   A.  I may ask them or tell them that we are looking into a
14   particular issue that we have been hearing about and if they
15   have, if they have information about that or if that would be a
16   topic that would be worth spending time discussing based on
17   their knowledge of it.
18   Q.  It's more so than just telling them you've been hearing
19   about certain topics.  You provide them detailed allegations
20   about specific individuals who are being targeted to be
21   defendants and seek to have them confirm the information you're
22   providing to them, isn't that right?
23              MR. GOLDSTEIN:  Objection.
24              THE COURT:  No, I'll allow it.  You may answer it.
25   A.  And I'm potentially not understanding your question
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CA1FCIT5                    Keatly - direct
1   correctly, but if you're asking if I'm asking them about the
2   individually named defendants or individuals who may be
3   potentially named as defendants, I would be asking them about
4   the defendants if I'm able to in the context of the interview.
5   Q.  And you don't simply ask them in an open ended fashion like
6   what do you know about Ms. Gooden, right?  You give them
7   targeted questions that include within the question specific
8   allegations of wrongdoing?
9              MR. GOLDSTEIN:  Objection, your Honor.
10             THE COURT:  Ground?
11             MR. GOLDSTEIN:  It's compound, as well as, he can't
12  answer yes to two questions.  If he can break it down, I'd
13  appreciate it.
14             THE COURT:  All right.  Break it down.
15  Q.  In posing questions to the witnesses, isn't it a fact that
16  you include for the first time in the conversation specific
17  allegations about specific individuals in a specific time
18  frame.
19  A.  I'm trying to understand your question.  I want to answer
20  it accurately.  I think it would be helpful for me if you could
21  rephrase it because I wasn't sure when you said "for the first
22  time."
23  Q.  Okay.  I take your point.  What I'm suggesting is you ask
24  the question which injects into the conversation with the
25  witness for the first time a specific allegation against an
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

201

CA1FCIT5                        Keatly - direct

```
 1    was trying to learn from her what did she mean by the term
 2    "cooking the books."
 3               THE COURT:  Yes, all right.
 4               THE WITNESS:  And that's what's reflected.
 5               THE COURT:  I understand that, but now you put this
 6    question to her, and her response, if any, would have been
 7    right below, right?
 8               THE WITNESS:  Yes, your Honor.
 9               THE COURT:  And the response, read me what it says
10    below.
11               THE WITNESS:  "Knew in beginning" --
12               THE COURT:  No, that's not it.  I'm speaking after you
13    put the statement that is Asbury dash.
14               THE WITNESS:  That's what I was about to read, your
15    Honor.
16               THE COURT:  That's not what I want you to read.
17    That's the question you're putting.  You're saying to her, I
18    think the only, you can tell me if I'm wrong and you wrote
19    this, but I think the reasonable inference is that you put
20    Asbury dash to show in your notes that this is where you were
21    saying to her, without revealing that it was Asbury, that could
22    she confirm that you had heard that Linda Gooden was told by
23    people in February etc.  That's all that is circled against the
24    number 20.  And then her response would be, if any, what's
25    below, but the next thing that follows below is HG question
```

202

CA1FCIT5                        Keatly - direct
1    mark.  What does that mean?
2                THE WITNESS:  May I respond, your Honor?
3                THE COURT:  Yes.
4                THE WITNESS:  I have to respectfully disagree with the
5    inference that you've taken.  The question to me, my notation
6    is Asbury period.
7                THE COURT:  There's no period after Asbury.
8                THE WITNESS:  Well, or the dash.
9                THE COURT:  Dash.  What did you mean by the dash?
10               THE WITNESS:  Well, your Honor, I can't necessarily
11   reconstruct why I put a dash there.
12               THE COURT:  Well, I think the common sense of it is
13   that it means that he is the source of what follows the dash.
14   Unless I learned the wrong lessons in punctuation that would be
15   the normal reading.
16               THE WITNESS:  Your Honor, may I speak?
17               THE COURT:  Yes.
18               THE WITNESS:  Again, I have to tell you that the
19   statement, the word Asbury, whether it's followed by a dash or
20   a period or a notation --
21               THE COURT:  It's not followed by a period, it's
22   followed by a dash.
23               THE WITNESS:  Followed by a dash, is my notation to me
24   that I had indeed asked her about what I had learned from
25   Asbury.  The words that follow are Hawn's words, they're not
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

CA1FCIT5                    Keatly - direct
1  words that I wrote that Asbury told me that then I am saying
2  that she, that she purported to say.  Those were her words,
3  your Honor.
4            THE COURT:  All right.  So -- looking at it that way,
5  Linda told, read me your notes in that box.  Linda told by
6  people initially what?
7            THE WITNESS:  Internally.
8            THE COURT:  Internally what?
9            THE WITNESS:  We knew it but shareholders didn't.
10           THE COURT:  All right.  Go ahead.
11 BY MR. HILLEBRECHT:
12 Q.  But you would agree, Mr. Keatly, that the first person in
13 your conversation with Ms. Hawn who injected the concept of
14 Ms. Gooden being told in February 2009 that the IS&GS division
15 heads that they couldn't make the total for year 2009 was you,
16 right?
17 A.  It may have been.  I don't remember exactly how it went,
18 but it may have been.
19 Q.  Let me focus on Ms. Hawn for a minute.  Do you recall
20 Ms. Hawn gave her title as a business area manager, right?
21 A.  Yes, sir.
22 Q.  Did you make any effort after your interview with Ms. Hawn
23 to figure out where she fits in the Lockheed Martin hierarchy?
24 A.  I don't remember if I did or didn't.
25 Q.  As you sit here now do you have any idea what a business

CA1FCIT5                          Keatly - direct
1   area manager is?
2   A.  I don't.
3   Q.  Do you have any idea that there are literally thousands and
4   thousands of programs at Lockheed Martin?
5   A.  I do have an awareness there are quite a few programs.
6   Q.  Are you equally aware there are literally thousands of
7   business area managers at Lockheed Martin?
8   A.  I am not.
9   Q.  You claim Ms. Hawn told you that she was pressured to
10  change her backlog figure to $2.5 billion of backlog.  Do you
11  remember that?
12  A.  That's what she told me.
13  Q.  Did you take any steps to determine if that figure was a
14  completely plausible figure or completely preposterous figure?
15  A.  The way the conversation had been proceeding I didn't feel
16  I was in a position to ask her as many detailed questions
17  regarding her basis for her assertions.  However, I had no
18  reason in the context of that interview to believe that she was
19  someone lacking in credibility.
20  Q.  That's not exactly what I asked you.  My question was the
21  following.  Did you make any effort to figure out in the
22  context of Lockheed Martin what a supposed backlog figure
23  $2.5 billion would mean?
24  A.  And I'm sorry I'm not sure I do understand -- could you
25  repeat it, please?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

205

CA1FCIT5                    Keatly - direct

1   Q.  Sure.  Ms. Hawn is one of thousands of people at her level
2   in Lockheed Martin, and what I'm asking you is whether you made
3   any effort to figure out whether one person, one business area
4   manager out of the thousands of business area managers could
5   plausibly have $2.5 billion in backlog when she is one of
6   thousands of people who have that position?
7   A.  I didn't know there were thousands of business area
8   managers within Lockheed.
9   Q.  Did you make any effort to determine the inherent
10  plausibility or implausibility of that $2.5 billion figure?
11              MR. GOLDSTEIN:  Judge, objection.
12              THE COURT:  I would phrase that objection as asked and
13  answered.  Mr. Hillebrecht, I'm going to give you whatever
14  amount of time you need, but I need to know how much more you
15  have.
16              MR. HILLEBRECHT:  I think I need a few minutes, your
17  Honor.
18              THE COURT:  Do you want to define few?
19              MR. HILLEBRECHT:  Five.  How is that?
20              MR. GOLDSTEIN:  Your Honor, may I request two minutes
21  of redirect?
22              THE COURT:  Yes, of course.  Go ahead.
23  Q.  Now, in terms of the interview technique of providing to
24  the interviewee substantive information that has not previously
25  been discussed with that individual, am I correct that you did

```
CA1FCIT5                    Keatly - direct
```
1   that on more than one occasion, the occasion we've talked about
2   a minute ago and other occasions as well?
3   A.  I shared information that I had learned in the course of
4   the investigation with other witnesses in the course of
5   interviewing them, yes.
6   Q.  And to the extent, for example, you discussed with some of
7   the witnesses specific programs, isn't it the case that that
8   was largely because you injected those programs into the
9   interview?
10  A.  Not necessarily.
11          MR. GOLDSTEIN:  Objection, your Honor.  Vague,
12  multiple witnesses, there's no reference to specific testimony
13  or parts of the memoranda.
14          THE COURT:  Well, I get the point and we can discuss
15  that more by reference to specific memoranda and elsewhere when
16  we finish with this witness.
17          MR. HILLEBRECHT:  Okay, your Honor.  Less is more.
18          THE COURT:  All right.
19  Q.  Turn back, if you could, to the Hawn memo which I think is
20  still in front of you.  Actually, do you have a copy of the
21  complaint in front of you, sir?  Do you have it there, sir?  If
22  you could turn to paragraph 36, sir, which is on page 10.  And
23  about three quarters of the way or a little more than halfway
24  down the page is a sentence, "According to CW2."  Do you recall
25  that that was Ms. Hawn?

CA1FCIT5                    Keatly - direct
```
 1   A.  Yes.
 2   Q.  "According to CW2, defendant Stevens and Tanner received
 3   information about IS&GS directly from defendant Gooden and
 4   Gooden's finance manager, Jeff McLaughlin."  Do you see that
 5   there?
 6   A.  I do.
 7   Q.  Do you recall, sir, that in fact Ms. Hawn never told you
 8   anything of the sort in your interview?
 9   A.  She didn't -- we discussed it and she did not know, she did
10   not know the answer to that.
11   Q.  Do you remember as you sit there now what you and she
12   actually discussed about this topic and what she said to you?
13   A.  I have some recollection.
14   Q.  Do you want me to show you the memo or do you want to --
15   let's do this.  Turn to page 4 of your memo, sir.  The first
16   full paragraph there.  It says, "We asked."  Just so the Court
17   is aware, when you say "we" in your memorandum that means you?
18   A.  Yes.
19   Q.  "We asked if those at Lockheed headquarters i.e. Bob
20   Stevens and Bruce Tanner were aware that the IS&GS goals in
21   2009 were unattainable.  It did not seem that Hawn actually
22   knew whether Stevens or Tanner knew, but in her opinion they
23   probably did."  Do you see that there?
24   A.  I do.
25   Q.  Later on it says she surmised.  Do you see at the bottom of
```

CA1FCIT5                    Keatly - direct
1   that paragraph?  Is "surmised" your word or her word?  How did
2   that come into your memo?
3   A.  That's my word.
4   Q.  In fact, sir, none of the witnesses you interviewed told
5   you that Bob Stevens was aware in the first quarter of 2009
6   that the 2009 plan was unachievable, right?
7   A.  I don't remember if they did or didn't.
8            THE COURT:  So let me ask plaintiff's counsel.  Do you
9   agree that the allegation there in paragraph 36 beginning
10  "According to CW2 defendants Stevens and Tanner," etc. is
11  inaccurate?
12           MR. RUDMAN:  Your Honor, I'll speak to that because I
13  spoke to that at the last hearing.  I agree that it doesn't say
14  directly, that it says "surmised."  The allegation could have
15  been written differently.  I mean, that's what I said the last
16  time I spoke about it.
17           THE COURT:  I'm sorry, I do recall that now, and I
18  will reconfirm that I'm troubled by that allegation.
19           MR. RUDMAN:  I understand that, your Honor.  Well, the
20  facts also happen to be true, but putting that fact aside --
21           THE COURT:  You know because you're a personal witness
22  to them, so you can't be counsel in this case because you're
23  going to testify?
24           MR. RUDMAN:  No.
25           THE COURT:  Then how do you know it's true?  There's
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

209

CA1FCIT5                    Keatly - direct
1   no way you know it's true.  You have information that leads you
2   to believe it's true at best.
3              MR. RUDMAN:  Yes, your Honor.
4              THE COURT:  All right.
5              MR. HILLEBRECHT:  Just to close the loop on that, your
6   Honor.  I broke up that last question into two parts, one for
7   Bob Stevens that we just addressed but also for Bruce Tanner.
8   Q.  It's true, is it not, that not a single one of the
9   witnesses that you interviewed told you that they had knowledge
10  that Bruce Tanner knew in the first quarter of 2009 that the
11  full year plan was unachievable, right?
12  A.  I don't remember if they did or didn't at this point.
13  Q.  Well, as we just saw now, you tried to get Ms. Hawn to
14  confirm that allegation as to Mr. Stevens and Mr. Tanner and
15  she didn't do so, right?
16  A.  She believed that they did, but she could not confirm it
17  definitively.
18             MR. HILLEBRECHT:  Nothing further, your Honor.
19             THE COURT:  All right.  Mr. Goldstein.
20             MR. GOLDSTEIN:  Thank you, your Honor.
21  REDIRECT EXAMINATION
22  BY MR. GOLDSTEIN:
23  Q.  Mr. Keatly, there was a discussion about whether or not you
24  used information from other witnesses to try to get information
25  from a witness like Ms. Hawn, and in fact, did you try and hide
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
        CA1FCIT5                    Keatly - redirect
 1   the fact that you may have had information prior and then asked
 2   a witness to confirm it?
 3   A.  No.
 4   Q.  Did you in fact put that in your memoranda?
 5   A.  Yes.
 6   Q.  And why?
 7   A.  To accurately convey the substance and tenor of the
 8   interview as best I could.
 9   Q.  And with respect to Ms. Hawn, you didn't tell her
10   Mr. Asbury, the president of the division, said this?
11   According to your memo you said you did it without disclosing
12   the source, is that right?
13   A.  That's correct.
14   Q.  With regard to Ms. Hawn, did you have an understanding as
15   to how long she worked at the company for?
16   A.  I did.
17   Q.  How long?
18   A.  Without referring to my notes, I believe it was fairly -- a
19   number of years, but I don't remember the exact number.
20   Q.  Does the term --
21              THE COURT:  Does the word "forever" ring a bell?
22   Q.  Did you have an understanding as to whether or not she
23   worked there for over 30 years?
24   A.  We're talking about Ms. Hawn?
25   Q.  Yes.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```

211

CA1FCIT5                    Keatly - redirect

1   A.  I think so, yes.
2   Q.  And that can be fairly characterized as forever, right?
3   A.  I think so.
4   Q.  And had you also prior to interviewing her been told
5   anything about Ms. Hawn by any other witness?
6   A.  I have.
7   Q.  And who was that?
8   A.  That was the witness Karen Nimmons.
9   Q.  And what did she say about Ms. Hawn, and refer to your memo
10  if it helps refresh your recollection if you need.
11  A.  I had asked Ms. Nimmons if she could refer me to anybody
12  who might be worthwhile reaching out to and I believe that
13  Ms. Nimmons had recommended that I speak with Peggy Burns and
14  also with Pamela Hawn who I think Nimmons said would be
15  knowledgeable regarding intelligence division programs.
16  Q.  And in conclusion, Mr. Keatly, anything in your notes or
17  any memoranda did you make up yourself?
18  A.  I did not.
19  Q.  Were everything that's in your memoranda you believe and in
20  your notes you believe were given or provided to you by
21  witnesses?
22  A.  I do.
23  Q.  And is it your testimony under oath that you did your
24  absolute best to try to record them as accurately as possible?
25  A.  That is my testimony.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

212
CA1FCIT5                        Keatly - redirect

1              MR. GOLDSTEIN:  Thank you.  That's all I have.
2              THE COURT:  Thank you very much.  You may step down.
3    Thank you.  All right.  Let's discuss where we go from here,
4    bearing in mind that for a family obligation reasons I've got
5    to leave in five minutes.  I think it would be very helpful to
6    the Court to have written submissions from counsel as to how
7    they think the Court should evaluate the testimony here.
8    You'll need, of course, to first get the transcript, which I
9    know you will jointly and severally order on an expedited
10   basis.
11             I have some very tentative initial impressions that
12   are easily subject to change, but I thought I would share them
13   just because we shall know where the Court is starting from.
14   As I've already indicated, I found Ms. Burns to be a credible
15   witness.  I found Mr. Morrison to be a non-credible witness.
16   When I say non-credible, I'm not necessarily drawing the
17   inference that any given witness lied.  It could be that the
18   Court concluded that they were not careful witnesses or have
19   been shown to have poor recollections or whatever.  But if you
20   want me to believe Mr. Morrison, you have a tough row to hoe.
21             I think Mr. Parsons' testimony was largely uncontested
22   if I'm not mistaken.  Though, notwithstanding the hard time I
23   gave him, I thought on the whole that Mr. Keatly's testimony
24   was credible and there may be other issues there such as the
25   ones that I flagged about what now appears to be in many cases

213

CA1FCIT5                    Keatly - redirect

1  double-triple hearsay or better can really support an
2  allegation in the complaint even for pleading purposes.
3          I have serious questions about the credibility of
4  Mr. Asbury and Ms. Hawn.  To take the most obvious point just
5  as an example, it is very difficult for the Court to believe
6  that even with the passage of time those witnesses could have
7  honestly stated that they had very short conversations when in
8  fact they had conversations of 50 and 60 some minutes
9  respectively with Mr. Keatly.  And it seems to me tentatively,
10 this is very tentative and a more plausible possibility that
11 they said all sorts of nasty things about the company to
12 Mr. Keatly for a variety of reasons and then chose to try to
13 cover it up when they were embarrassed by its coming out.  That
14 cuts in many directions, some of which I think are ultimately
15 not questions for this Court but for the jury.  For example,
16 one could I think quite reasonably infer that Miss Hawn lied at
17 length to Mr. Keatly and then lied again to the company, to
18 defense counsel and lied here again on the stand.  She would
19 have motives for all those things.  And ditto Mr. Asbury.  But
20 I don't want to suggest that's the conclusion I'm reaching.
21 Just throwing this out as things you will want to address.
22         I don't think -- we've seen in the last, what, 30, 40
23 years this shift from a plaintiff having to allege very little
24 and a plaintiff having to allege a vast amount, and each of
25 those extremes carries its dangers, which I think this whole

214

CA1FCIT5                    Keatly - redirect
1   hearing is has in some ways pinpointed the difficulties
2   plaintiffs have in getting information that they know they're
3   going to have to get to meet the very high standard that the
4   Supreme Court has now imposed on plaintiffs in these cases, and
5   it is telling to me, at least, though irrelevant and more
6   narrow decisions that I have to make that Mr. Keatly's firm has
7   no one presently with a law enforcement background because the
8   way a lot of these interviews were conducted would not have
9   been the way a law enforcement officer would have conducted
10  them.  But I don't think there's an obligation on plaintiff's
11  counsel as part of the pleading to ascertain whether a
12  confidential witness is telling them the truth, unless it is so
13  inherently implausible that they don't have a good-faith basis
14  for putting it in the complaint, but I do think in evaluating
15  that pleading for purposes of a motion to dismiss or otherwise,
16  the Court does have to look as to whether the information that
17  plaintiff in good faith relied on was, as it turns out,
18  double-triple hearsay or worse.  So those are just some idle
19  thoughts to keep you busy.
20          Now, let's talk about schedule.  I think it would be
21  useful to have simultaneous submissions and simultaneous
22  responses.  So in view of the importance of this and the
23  interests of the issues raised, I would give you both 25 pages
24  for your initial papers and 15 pages for your response and I
25  would suggest -- Ms. Reporter, if expedited transcripts are
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

215

CA1FCIT5                    Keatly - redirect
1    ordered, how soon will the parties have the transcript?
2              THE REPORTER:  Two hours.
3              THE COURT:  Two hours.  All right.  So I'm tempted to
4    say okay, so you'll get me your papers later tonight.  So why
5    don't we say two weeks and say two weeks for opening papers.
6    This would be, today is October 1, so that would be
7    October 15th, and two weeks for response, that's October 29th
8    and I will issue whatever rulings seem to me appropriate under
9    the circumstances.
10             All right?  Anything else we need to raise today?  I
11   know there are some discovery disputes, I know.  I apologize
12   profusely, but it's a choice between having you mad at me or my
13   wife mad at me, but why don't you call tomorrow and we'll deal
14   with those discovery disputes over the phone.
15             MR. KAUFMAN:  Yes, your Honor, we will.
16             (Adjourned)
17
18
19
20
21
22
23
24
25