# Exhibit U

# In The Matter Of:

*CITY OF PONTIAC v*
*LOCKHEED MARTIN*

*June 20, 2012*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File C6KHPONA.txt
**Min-U-Script® with Word Index**

1  only one arguing and he is perfectly capable and perfectly
2  familiar with all the facts.
3          So it is always, of course, a pleasure to have all you
4  fine folks here, but I wonder why we need all these lawyers.
5          MR. WAREHAM: From my perspective I can tell you I
6  know two of them aren't billing their time for this.  I also
7  know Ms. Zimmerman has not the foggiest notion who is billing
8  time to the class.  Not the foggiest notion.  Hasn't looked at
9  an invoice, hasn't asked for one, doesn't know who is billing
10 to the class, doesn't know.  I think the court pretty clearly
11 admonished her at the front end of this case to know that type
12 of stuff.
13         THE COURT: Well, I am glad to know that the other two
14 are not billing their time.  So now I guess the question is, is
15 your law firm in such good shape that it can afford to have two
16 folks sitting here not billing their time.  But that is not a
17 question for this court.
18         MR. WAREHAM: It is funny.  Each time I have been in
19 this particular courtroom in a securities case interesting
20 things have happened.  This is a very educational experience
21 for those here and it has been that way -- I don't know why --
22 each time.  And this case, as I am going to get to in a little
23 bit, is taking another turn, an unpredictable turn.
24         THE COURT: OK.
25         MR. WAREHAM: Now, this monitoring agreement, she has

1  testified that every single time Robbins Geller came to them,
2  the retirement system, and suggested there was fraud, they have
3  authorized the filing of a lawsuit.  Their own papers
4  demonstrate that nine times in the past three years the
5  retirement system of Pontiac has sought to be appointed as lead
6  counsel.  They are one unlucky investor.
7          Now, I went through a little bit atypicality.  I think
8  that the In Re Salomon decision and the discussion and logic in
9  that case given the gestalt is more persuasive than the court's
10 rule stated.  Not a hard-and-fast rule but one that says it is
11 not disqualifying to be subject to unique defenses because of
12 trades in the market.
13         I will go right now, I actually have the quote in my
14 notes from Basic v. Levinson:  Who would knowingly roll the
15 dice in a crooked crap game.  Either the game wasn't crooked
16 and there are such unique defenses --
17         THE COURT: I applaud the Supreme Court for its
18 knowledge of crap games, but what I was suggesting is that
19 while of course if someone thought that a company was involved
20 in a fraud from top to bottom one wouldn't invest in that
21 company.  There are many, many, many situations where an
22 otherwise well run and valuable company is accused -- sometimes
23 rightly, sometimes wrongly -- of engaging in some overstatement
24 or some misaccounting or misapplication, etc., that might state
25 a claim under the securities laws and yet doesn't affect the

1  total value of the company.  It affects one aspect of it.  So
2  an investor may have lost money because of that.  The stock may
3  have run up 10 percent above what it otherwise should be.  It
4  doesn't mean necessarily that the company is not still a good
5  investment.  That is why I am not sure that dictum from Basic
6  is really dispositive of this issue.
7          MR. WAREHAM: I think it is instructive and in the
8  main it is because this is not the controller and some regional
9  manager that are defendants in this case.  This is the chairman
10 and chief executive officer.  This is the chief financial
11 officer.  This is the head of one of the four major businesses
12 in the company.  That is the whole crap game.
13         THE COURT: Yes, but what they are claiming is that
14 they knowingly hyped one part of their business above what it
15 should have represented, and I have no opinion as to whether
16 that is right or wrong, but they are not saying that it was an
17 across-the-board fraud involving the entire company.  It is one
18 aspect that they are focusing on.
19         MR. WAREHAM: My point is if the crap dealer, the guy
20 throwing the dice is in your mind a fraudster, you should be
21 out of that game.  I don't want to belabor that point.  This is
22 very senior people.  This is not divisional stuff.
23         I wanted to close, your Honor, with a brief summary of
24 some critical new facts.
25         Now remember the bare bones complaint was filed on

1  July 20, 2011.  There is no evidence that any of the six
2  confidential witnesses that are in the amended complaint filed
3  in October were ever contacted by anyone on behalf of the
4  plaintiff before the first complaint was filed.  No evidence
5  that any witness -- never mind those six -- was ever contacted
6  by the plaintiff or its representative at any time before the
7  first case was filed.
8          All presently known contacts of the six confidential
9  witnesses involved a single private investigator, a gentleman
10 in California.  He made calls by himself.  He is with that firm
11 that is at the center of the Livonia controversy.  No Robbins
12 Geller lawyer ever met with or spoke to any of the so-called
13 confidential witnesses before the second amended complaint was
14 filed.  And of course, Ms. Zimmerman knew nothing of the
15 confidential witnesses, saw no statements, saw no memoranda,
16 knew no names.
17         Your Honor, no affidavits or statements were obtained
18 before the amended complaint was filed.  None of the four
19 so-called witnesses deposed to date, because we are in the
20 course of generating a record for summary judgment, authorized
21 anyone at L.R. Hodges or Robbins Geller to include information
22 about them in the amended complaint or saw the amended
23 complaint.  All six --
24         THE COURT: What is it that you believe the
25 confidential witnesses are adding to the complaint?  What do

### Page 21

you think is there based on them that wouldn't be there otherwise?

MR. WAREHAM: We would posit that virtually the whole case, from the bare bones case to the amended complaint, the whole change really is these confidential witnesses. Now admittedly one, confidential witness No. 6, says so little that we are unlikely to pursue her in discovery in pursuit of dismissal of the case.

If one of the witnesses says in the amended complaint, as drummed up by L.R. Hodges in California, that Linda Gooden instructed her to change backlog, and this case is ostensibly to some degree about backlog -- while we don't have the benefit of the court's opinion, we think that helped get across the line. That individual, your Honor, in affidavit and now on cross-examination, says the following: I had nothing to do with backlog while at IS and GS. I never had any communication with Ms. Gooden of any kind, not written, not e-mail, not verbal, not telephonic. She says under oath: If I saw Ms. Gooden in the hallways at IS and GS while I was there, I wouldn't have recognized her.

You take confidential witness No. 5, your Honor -- he is identified in the amended complaint as the president of one of the largest divisions of the company. The complaint says he would say: I didn't think in the beginning of '09 we could make our projections. I thought our projections were arbitrary

### Page 22

and I told Linda Gooden, one of the defendants, that we would not make our projections.

He has testified under oath, with independent counsel, that he never talked at any length, at any substance with this private investigator. He has denied flatly ever saying that to the private investigator. More important, he has said that the financials for IS and GS for 2009 were not arbitrary. He just said that he believed that they were makeable numbers, and he said that he never said anything attributed to him in the amended complaint to Ms. Gooden.

This is important stuff, and there are more examples. I don't want to belabor this because we have videotaped deposition, we have written record, and it is coming in next week in the form of a summary judgment motion pursuant to the court's instruction.

So the point really is, who is running this? When we were trying to get the identity of the confidential witnesses, we actually got to the very call, to call the court to ask for permission to file a motion to compel. In that call, the plaintiffs finally gave the names or agreed to give the names. What did they do? Robbins Geller after that, or right before that, contacted, through the private investigation guy in California, all six of these witnesses and offered to pay their legal fees for a sole practitioner, one reference, one guy, a sole practitioner in New York, who happens to be two things.

### Page 23

One, a former partner at the predecessor law firm of Robbins Geller, and, two, a man that has used the private investigator in question in the past.

So we have studied New York ethics rules and it might be possible to do what Robbins Geller has done as long as there is independence. I don't think it is for today to argue the question of whether this person who has been referred to the six people is independent.

Now, three of the six agreed to use that individual, one of whom, this confidential witness No. 2, I have already taken you through her testimony. Even with this lawyer in place, she has steadfastly, in response to unbelievably boisterous, loud, aggressive testimony -- questioning, excuse me, she steadfastly said that she did not say any of those things to the private investigator and, more importantly, she doesn't believe them.

Who is running the lawsuit? It is Robbins Geller who is running the lawsuit. Whose interests are at stake here? Robbins Geller's interests are at stake here.

THE COURT: Who is that lawyer?

MR. WAREHAM: It is Frank Karron, and I am not casting aspersions on Mr. Karron. He is a sole practitioner and he is trying to make a living.

As I said, of the three people that agreed to the suggestion for free counsel, paid for by Robbins Geller, one is

### Page 24

being deposed on Friday, one does not want to be deposed and, as I said, she is confidential witness No. 6. We are probably OK with that. One has already gone forward. The record will come before the court and the video will come before the court reflecting that she stuck to her view of the facts. She stuck to her beliefs.

So I am not suggesting that in and of himself he has done anything improper. Why a law firm would pay for third-party witness counsel itself is perplexing to me. I have been doing this 25 years. I have never seen it. It disturbs me. That will come before the court as well.

THE COURT: I agree it is probably not ripe for today's discussion. I wonder whether those witnesses, those three witnesses don't have potentially mutually antagonistic interests such that one lawyer could not represent all three.

MR. WAREHAM: Well, I think so. And, second, your Honor, do these people know that the man at the core of this, that we believe fabricated information, this private investigator out in California, do these people know that this individual lawyer has used that same investigator in other cases. That presents a whole other avenue for exploration on conflict.

Again, that is not before the court today, but to try to, from the monitoring agreement, to the tactics to block other people, to the inclusion of confidential witness