```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
CITY OF PONTIAC GENERAL EMPLOYEES'    :
RETIREMENT SYSTEM,                    :
                                      :
                 Plaintiff,           :
                                      :     11 Civ. 5026 (JSR)
            -v-                       :
                                      :
LOCKHEED MARTIN CORPORATION, ROBERT   :     MEMORANDUM
STEVENS, BRUCE TANNER and LINDA GOODEN,:
                                      :
                 Defendants.          :
------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

  Although it has roots in English equity jurisprudence, the modern form of federal class actions took shape largely after the 1966 amendment to Rule 23 of the Federal Rules of Civil Procedure and is still evolving in unfamiliar, unpredictable ways. In particular, the recent attempts by Congress and the Supreme Court to curtail what they perceive as vexatious, even extortionate class action filings have spawned innovative but problematic reactions -- as this case illustrates.

  By way of background, on December 14, 2012, the Court, by "bottom-line" Order, denied defendants' limited motion for summary judgment in this previously-certified class action, with opinion to follow. The same day, the parties jointly informed the Court that they had agreed in principle to settle the case. On March 27, 2013, the Court preliminarily approved the settlement, and the Court anticipates it will be giving final approval to the settlement very shortly. Although, in light of the parties' settlement, it is no longer necessary to issue a full opinion setting forth the reasons for the Court's denial of

defendants' summary judgment motion, a few comments may be helpful in light of certain issues presented by that motion that are likely to recur in future cases.

Plaintiff's Amended Complaint alleged that Lockheed Martin Corporation ("Lockheed") and several individual defendants violated sections 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, as well as sections 20(a), and 20(b) of the Act. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; and 15 U.S.C. § 78t(a)-(b). The Amended Complaint principally alleged that individual defendants Robert Stevens (Lockheed's CEO), Bruce Tanner (Lockheed's CFO), and Linda Gooden (Executive Vice President of Lockheed's Information Systems & Global Systems ("IS&GS") division) made statements about the first-quarter 2009 performance of Lockheed's IS&GS division that they knew were materially misleading. See Am. Compl. ¶¶ 34-36. For example, it was alleged that the defendants knew that there were major problems with several IS&GS projects but not only did not disclose that information to investors, id. ¶¶ 40-57, but also, in April 2009, issued positive statements about the IS&GS division's net revenue and operating margins that the defendants knew were materially false and misleading, see Id. ¶¶ 67-83.

Defendants' initial response was to file a motion to dismiss. As a combined result of pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, codified at 15 U.S.C. § 78u-4, and in recent Supreme Court

decisions such as Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), a securities class action cannot survive a motion to dismiss unless it provides considerable factual detail supporting each of the essential elements of a securities fraud claim. In essence, the perhaps-too-easily satisfied "notice pleading" requirements of a quarter century ago have been replaced, so far as securities class actions are concerned, by a "demurrer-like" process that creates considerable hurdles that a plaintiff must overcome before any discovery is permitted. While designed to give district courts a "gatekeeper" responsibility to derail dubious class action lawsuits at the outset, an unintended consequence has been to cause plaintiffs' counsel to undertake surreptitious pre-pleading investigations designed to obtain "dirt" from dissatisfied corporate employees. Thus in this case, as in many others, the Amended Complaint relied heavily, although not exclusively, on information attributed to "confidential witnesses" ("CWs").

For example, the Amended Complaint alleged, with respect to defendant Gooden, that three CWs within Lockheed told her that Lockheed's 2009 financial goals for the IS&GS division could not be achieved; Am. Compl. ¶¶ 35-36; that, according to CWs, she "personally reviewed" contract bids and "deliberately understated" the cost of labor to lowball competitors' bids, id. ¶¶ 38-39; that, according to several CWs, it was made clear to Gooden at a "Red Program Review" meeting that major IS&GS programs were troubled, id. ¶¶ 46-50; and that, in March 2009, Gooden

pressured one of the CWs to represent that IS&GS could claim $2.5 billion in contract backlog (a key metric to project future sales) despite the fact that this figure was overstated, id. ¶ 65. Similarly, the Amended Complaint partially relied upon statements attributed to "CW2" to allege that defendants Stevens and Tanner directly received negative information about the health and performance IS&GS division from Gooden and her finance manager, id. ¶ 36.

After defendants moved to dismiss the Amended Complaint on December 7, 2011, all discovery was stayed, pursuant to the PSLRA, until the Court could rule on the motion. See 15 U.S.C. § 78u-4(b)(3)(B). Eventually, however, the Court, by "bottom-line" Order dated February 14, 2012, further elaborated in a Memorandum dated July 13, 2012, denied defendants' motion to dismiss the section 10(b) claim, partly in reliance on the statements attributed to the CWs. See City of Pontiac v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 369-75 (S.D.N.Y. 2012).

Thereafter, however, as part of the ensuing discovery process, plaintiff's counsel disclosed the names of their confidential witnesses to defendants' counsel, pursuant to a protective order. Defendants then took the depositions of the CWs, and, on June 11, 2012, filed the aforesaid motion for summary judgment, arguing that several of the confidential witnesses on which the Amended Complaint relied had "recanted" statements attributed to them in the Amended Complaint and/or had denied making such statements in the first place. Thus, defendants

4

argued, there was no longer any competent evidence supporting the plaintiff's claims.[1]

In response, plaintiff contended that the recanting CWs had changed their stories because of financial and other pressures Lockheed had brought to bear upon them once they had been identified by name, and that the notes of the private investigator who had interviewed the CWs confirmed (with one exception discussed below) that the Amended Complaint faithfully represented what the CWs had stated.

Although plaintiff's response might arguably have been sufficient to deny summary judgment, the parties' competing assertions raised serious questions, going well beyond the legal issues presented by summary judgment, that implicated the integrity of the adversary process itself. Accordingly, the Court, sua sponte, directed the five CWs implicated by defendants' assertions -- namely, Margaret Burns ("CW1"), Pam Hawn ("CW2"), William Parsons ("CW3"), Victor Morrison ("CW4"), and Ken Asbury ("CW5") -- to appear in Court on October 1, 2012, along with plaintiff's investigator Ken Keatly, to give testimony.

With some exceptions, the testimony presented at the October 1 hearing bore witness to the competing pressures this process had placed on the confidential witnesses and the impact such pressures had had on

---

[1] The motion also asserted that this was of a piece with similar "misconduct" practiced by plaintiff's counsel, as allegedly set forth in two recent cases: City of Livonia Emps.' Ret. Sys. v. Boeing Co., 2011 WL 824604 (N.D. Ill. Mar. 7, 2011), aff'd in part and vacated in part, 711 F.3d 754 (7th Cir. 2013); Belmont Holdings Corp. v. SunTrust Banks, Inc., 896 F. Supp. 2d 1210 (N.D. Ga. 2012).

their ability to tell the truth. In a nutshell, it appeared to the Court that some, though not all, of the CWs had been lured by the investigator into stating as "facts" what were often mere surmises, but then, when their indiscretions were revealed, felt pressured into denying outright statements they had actually made.

So, for example, Ken Asbury (CW5), a former president of the IS&GS civil segment, denied under oath that he had ever made most of the statements attributed to him in the Amended Complaint. Indeed, prior to the hearing, he swore that his conversation with plaintiff's investigator, Mr. Keatly, had been a non-substantive conversation lasting just five minutes. See Transcript of Hearing of October 1, 2012 ("Tr.") at 5-7, 12-13, 43-44. But, confronted with telephone records, Ms. Asbury was forced to concede that he had had two conversations with Mr. Keatly, the second of which lasted no less than 50 minutes. Tr. at 14.

Similarly, Pamela Hawn (CW2), testified in Court that she had only had a "short call" with Mr. Keatly in October of 2009 -- "three, four minutes" -- and flatly denied that she had made any of the statements attributed to her in the amended complaint. See Tr. at 125-33. Yet plaintiff's phone records revealed a call between Mr. Keatly and Ms. Hawn lasting 64.8 minutes. Id. at 134. Ms. Hawn accounted for the sixty-minute difference between her recollection and plaintiff's phone records by noting that after she heard the investigator's statement that his call

concerned Lockheed, she "blocked it out" and she "[did not] remember the call." Id. at 136.

In another variation on this theme, Victor H. Morrison, Jr. (CW4) similarly denied ever making the key statements attributed to him in the Amended Complaint. See Tr. at 83. But he also failed to recall telling Lockheed's own counsel, as recorded in that counsel's notes, that if he were called to testify in this action and asked about such substantive matters, he would respond "I don't know" or say nothing. Tr. at 97; see also Order of September 17, 2012, ECF No. 87.

While the Court was not unsympathetic to the difficult position in which these three witnesses found themselves, their disrespect for their obligation to tell the truth hardly redounded to their credit. Fortunately, the other two CWs, William Parsons (CW3) and Margaret Burns (CW1), provided welcome evidence that some witnesses can still place the value of truth above their self-interest. In brief, both Mr. Parsons and Ms. Burns confirmed the substance of the statements attributed to them in the Amended Complaint, while noting that such snippets did not always convey the nuances of what they had told Mr. Keatly.

As for Mr. Keatly himself, his testimony revealed that his interview practices were less rigorous than would have been typical of, say, a federal law enforcement agent; for example, he did not ask any other member of his staff to be with him on his phone calls with the CWs, nor did he ask the CWs if he could tape-record the calls or meet with them in-person, preferring to rely, instead, on his non-stenographic

notes of their telephone conversations made even while the conversations were continuing. Nevertheless, the fact that the two credible CWs testified to the accuracy of what Keatly had reported them as saying would justify a reasonable fact-finder in inferring that his report of his findings to plaintiff's counsel was accurate in all material respects.

Indeed, the only statement attributed to the CWs in the Amended Complaint that the Court found clearly inaccurate was the result, not of any mis-reporting by Mr. Keatly, but of mis-drafting by counsel. Specifically, paragraph 36 of the Amended Complaint alleged that "[a]ccording to CW2 [i.e., Ms. Hawn], Defendants Stevens and Tanner received information about IS&GS directly from Defendant Gooden and Gooden's finance manager, Jeff McLaughlin." Mr. Keatly's notes record, however, that "[i]t did not seem that Hawn actually knew whether Stevens or Tanner knew, but in her opinion they probably did," and that Ms. Hawn could only "surmise" that Stevens and Tanner received their information from Gooden. See Tr. at 207-08. It was improper for the Amended Complaint drafted by plaintiff's counsel to characterize this surmise as actual knowledge, an error made more egregious by the fact that the Court relied, in part, on the statement in paragraph 36 in denying the motion to dismiss as to Stevens and Tanner. See City of Pontiac, 875 F. Supp. 2d at 371. Fortunately, the Court relied on other evidence as well in denying the motion. See id. at 371-73. Additionally, plaintiff's counsel subsequently amended paragraph 36 to correct the error.

As for the summary judgment motion as a whole, it presented several other interesting but familiar issues that, now that the case has settled, need not be elaborated here. The sole purpose of this Memorandum, rather, is to focus attention on the way in which the PSLRA and decisions like Tellabs have led plaintiffs' counsel to rely heavily on private inquiries of confidential witnesses, and the problems this approach tends to generate for both plaintiffs and defendants. It seems highly unlikely that Congress or the Supreme Court, in demanding a fair amount of evidentiary detail in securities class action complaints, intended to turn plaintiffs' counsel into corporate "private eyes" who would entice naïve or disgruntled employees into gossip sessions that might help support a federal lawsuit. Nor did they likely intend to place such employees in the unenviable position of having to account to their employers for such indiscretions, whether or not their statements were accurate. But, as it is, the combined effect of the PSLRA and cases like Tellabs are likely to make such problems endemic.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       July 9, 2013